**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FTS INTERNATIONAL, INC., *et al.*,[1] | ) | Case No. 20-34622 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SUPPLEMENT FOR THE JOINT
PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
OF FTS INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this plan supplement (this "Plan Supplement"), in support of the *Joint Prepackaged Chapter 11 Plan of Reorganization of FTS International, Inc. and its Debtor Affiliates* [Docket No. 16] (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan"),[2] which was filed with the United States Bankruptcy Court for the Southern District of Texas (the "Court") on September 22, 2020.

**PLEASE TAKE FURTHER NOTICE THAT** the Plan Supplement includes current drafts of the following documents (certain of which continue to be negotiated between the Debtors and the Consenting Creditors, and will be Filed in substantially final form prior to the Effective Date), as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A** | New Organizational Documents |
| **Exhibit B** | Registration Rights Agreement |
| **Exhibit C** | Members of the New Board |
| **Exhibit D** | Schedule of Retained Causes of Action |
| **Exhibit E** | Schedule of Rejected Executory Contracts and Unexpired Leases |
| **Exhibit F** | New Revolving Exit Facility Indicative Term Sheet |
| **Exhibit G** | Warrants |
| **Exhibit H** | Management Incentive Plan Documents |

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors and the Consenting Creditors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan and/or the Restructuring Support Agreement, to alter, amend, modify, or supplement the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:   FTS International, Inc. (0081); FTS International Manufacturing, LLC (9132); and FTS International Services, LLC (7729).  The location of Debtor FTS International, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 777 Main Street, Suite 2900, Fort Worth, Texas 76102.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan and/or the Restructuring Support Agreement, and the filing of the forms of the documents set forth in this Plan Supplement shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of of any such party under the Restructuring Support Agreement, the Plan, the Bankruptcy Code, or otherwise; *provided* that, if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors will seek approval of the Disclosure Statement and confirmation of the Plan at a hearing scheduled for **October 30, 2020, at 2:00 p.m., prevailing Central Time** before the Honorable David R. Jones at the United States Bankruptcy Court, Courtroom 400, 515 Rusk Street, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the adequacy of the Disclosure Statement or the confirmation of the Plan is on **October 21, 2020, at 4:00 p.m., prevailing Central Time** (the "Objection Deadline").  Any objection to the Disclosure Statement or the Plan **must**: (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state the name and address of the objecting party and the amount and nature of the claim or interest beneficially owned by such entity; (d) state the legal or factual basis for such objections and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed with the Court with proof of service thereof so as to be *actually received* on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents **free of charge**, contact the Debtors' Claims and Noticing Agent, Epiq Corporate Restructuring, LLC by:  (a) visiting the Debtors' restructuring website https://dm.epiq11.com/FTSI; (b) calling (888) 490-0882 (toll-free in the United States and Canada) or (503) 597-5602 (outside the United States); or (c) by email at FTSInternational@epiqglobal.com, including "FTS International" in the subject line of the email. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee by visiting the Court's website on PACER at https://ecf.txsb.uscourts.gov.

Houston, Texas
October 19, 2020

/s/ *Brian Schartz*

| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **WINSTON & STRAWN LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Katherine A. Preston (TX Bar No. 2968884) |
| Brian Schartz, P.C. (TX Bar No. 24099361) | 800 Capitol Street, Suite 2400 |
| 609 Main Street | Houston, Texas 77002 |

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:   (713) 836-3600
Facsimile:   (713) 836-3601
Email:        brian.schartz@kirkland.com

- and -

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier (admitted *pro hac vice*)
Alexander Nicas (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:        joshua.sussberg@kirkland.com
             emily.geier@kirkland.com
             alexander.nicas@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**WINSTON & STRAWN LLP**
Katherine A. Preston (TX Bar No. 2968884)
800 Capitol Street, Suite 2400
Houston, Texas 77002
Telephone:   (713) 651-2600
Facsimile:   (713) 651-2700
Email:        kpreston@winston.com

- and -

Daniel J. McGuire (admitted *pro hac vice*)
35 W Wacker Drive
Chicago, IL 60601
Telephone:   (312) 558-5600
Facsimile:   (312) 558-5700
Email:        dmcguire@winston.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on October 19, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Brian Schartz
Brian Schartz, P.C.

## <u>Exhibit A</u>

### New Organizational Documents

This **<u>Exhibit A</u>** includes the following new organizational documents for the Reorganized Debtors:

- **<u>Exhibit A(i)</u>**: Amended and Restated Certificate of Incorporation of FTS International, Inc.

- **<u>Exhibit A(ii)</u>**: Amended and Restated Bylaws of FTS International, Inc.

- **<u>Exhibit A(iii)</u>**: Rights Agreement

**Exhibit A(i)**

**Amended and Restated Certificate of Incorporation of FTS International, Inc.**

*DRAFT*

**AMENDED & RESTATED**
**CERTIFICATE OF INCORPORATION**

**OF**

**FTS INTERNATIONAL, INC.**

**ARTICLE 1**
**NAME**

The name of the corporation is FTS International, Inc. (the "**Corporation**").

**ARTICLE 2**
**REGISTERED OFFICE AND AGENT**

The address of the Corporation's registered office in the State of Delaware is 1675 South State Street, Suite B, City of Dover, County of Kent, 19901.  The name of its registered agent at such address is Capitol Services, Inc.

**ARTICLE 3**
**PURPOSE AND POWERS**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**").

**ARTICLE 4**
**CAPITAL STOCK**

**(A)**    Authorized Shares

(1)    **Classes of Stock**.  The total number of shares of stock that the Corporation shall have authority to issue is [•], consisting of [•] shares of Common Stock, par value $0.01 per share[, consisting of Class A Common Stock

and Class B Common Stock][1] (the "**Common Stock**"), and [•] shares of Preferred Stock, par value $0.01 per share (the "**Preferred Stock**").

(2)      **Preferred Stock**.  The Board of Directors is hereby empowered, without any action or vote by the Corporation's stockholders (except as may otherwise be provided by the terms of any class or series of Preferred Stock then outstanding), to authorize by resolution or resolutions from time to time the issuance of one or more classes or series of Preferred Stock and to fix the designations, powers, preferences and relative, participating, optional or other rights, if any, and the qualifications, limitations or restrictions thereof, if any, with respect to each such class or series of Preferred Stock and the number of shares constituting each such class or series, and to increase or decrease the number of shares of any such class or series to the extent permitted by Delaware Law.

**(B)**      Voting Rights

Each holder of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held of record by such holder on all matters on which stockholders generally are entitled to vote; *provided*, *however*, that, except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any certificate of designations relating to any class or series of Preferred Stock) that relates solely to the terms of one or more outstanding classes or series of Preferred Stock if the holders of such affected class or series are entitled, either separately or together with the holders of one or more other such classes or series, to vote thereon pursuant to this Certificate of Incorporation (including any certificate of designations relating to any class or series of Preferred Stock) or pursuant to Delaware Law.

**ARTICLE 5**
**BYLAWS**

The Board of Directors shall have the power to adopt, amend or repeal the bylaws of the Corporation (the "**Bylaws**").

**ARTICLE 6**
**BOARD OF DIRECTORS**

**(A)**      **Power of the Board of Directors**.  The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors.

---

[1] **Note to Draft**: Inclusion of Class B common stock, which would be identical to Class A common stock except that it is not listed, to be determined.

2

**(B)      Number of Directors**.  The number of directors which shall constitute the Board of Directors shall, as of the date this Certificate of Incorporation becomes effective, be five and, thereafter, shall be fixed exclusively by one or more resolutions adopted from time to time solely by the affirmative vote of a majority of the Board of Directors.  The members of the initial Board of Directors shall be as set forth in and elected pursuant to the Plan of Reorganization, which, as amended, was confirmed by the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on [●], 2020.  A majority of the Board of Directors shall constitute a quorum for the transaction of business at any meeting of the Board of Directors and, except as otherwise expressly required by law or by this Certificate of Incorporation, the act of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.

**(C)**      Election of Directors.

(1)      Each director shall serve for a term ending on the date of the annual meeting of stockholders next following the annual meeting at which such director was elected.  Notwithstanding the foregoing, each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.

(2)      There shall be no cumulative voting in the election of directors.  Election of directors need not be by written ballot unless the Bylaws so provide.

**(D)      Vacancies**.  Vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors may be filled solely by a majority of the directors then in office (although less than a quorum) or by the sole remaining director, and each director so elected shall hold office until his or her successor is elected and qualified.

**(E)      Removal**.  Any director may be removed, with or without cause, by the holders of a majority of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class.

### ARTICLE 7
### MEETINGS OF STOCKHOLDERS

**(A)      Annual Meetings**.  An annual meeting of stockholders for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting shall be held at such place, on such date, and at such time as the Board of Directors shall determine.

3

**(B)     Special Meetings**.  Special meetings of the stockholders may be called as set forth in Section 2.03 of the Bylaws.

**(C)     Action by Written Consent**.  Subject to the rights of the holders of any class or series of Preferred Stock then outstanding, as may be set forth in the resolution or resolutions adopted by the Board of Directors pursuant to **Article** 4(A) hereto for such class or series of Preferred Stock, any action required or permitted to be taken at any annual or special meeting of stockholders may be taken upon the vote of stockholders at an annual or special meeting duly noticed and called in accordance with Delaware Law, as amended from time to time, and this *Article* 7 or by written consent of stockholders without a meeting.

**ARTICLE 8**

**INDEMNIFICATION**

**(A)     Limited Liability**.  A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by Delaware Law.

**(B)**     Right to Indemnification.

(1)     Each person (and the heirs, executors or administrators of such person) who was or is a party or is threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware Law. The right to indemnification conferred in this **Article** 8 shall also include the right to be paid by the Corporation the expenses incurred in connection with any such proceeding in advance of its final disposition to the fullest extent authorized by Delaware Law.  The right to indemnification conferred in this **Article** 8 shall be a contract right.

(2)     The Corporation may, by action of its Board of Directors, provide indemnification to such of the employees and agents of the Corporation to such extent and to such effect as the Board of Directors shall determine to be appropriate and authorized by Delaware Law.

**(C)     Insurance**.  The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such person's

4

status as such, whether or not the Corporation would have the power to indemnify such person against such liability under Delaware Law.

**(D)**     **Nonexclusivity of Rights**.  The rights and authority conferred in this **Article** 8 shall not be exclusive of any other right that any person may otherwise have or hereafter acquire.

**(E)**     **Preservation of Rights**.  Neither the amendment nor repeal of this **Article** 8, nor the adoption of any provision of this Certificate of Incorporation or the Bylaws, nor, to the fullest extent permitted by Delaware Law, any modification of law, shall adversely affect any right or protection of any person granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

## ARTICLE 9
## RELATED PARTY TRANSACTIONS

**(A)**     **Section 203 of Delaware Law**.  The Corporation shall not be governed by or subject to the provisions of Section 203 of Delaware Law as now in effect or hereafter amended, or any successor statute thereto.

**(B)**     Related Party Transactions.

(1)     In addition to any affirmative vote required by law or otherwise, and except as expressly provided in this Article 9, the approval or authorization of any Related Party Transaction between the Corporation or any Subsidiary, on the one hand, and any Related Person, on the other hand, shall require (a) if the Related Party Transaction is an agreement or transaction described in clauses (i), (ii) or (iii) of the definition of "Related Party Transaction" and the consideration to be paid in such Related Party Transaction is all cash, the affirmative vote of the holders of not less than a majority of all outstanding Voting Securities, excluding Voting Securities Beneficially Owned by a Related Person, voting together as a single class or (b) if (x) the Related Party Transaction is an agreement or transaction described in clauses (i), (ii) or (iii) of the definition of "Related Party Transaction" and any part of the consideration to be paid in such Related Party Transaction is other than cash or (y) the Related Party Transaction is an agreement or transaction described in clauses (iv), (v) , (vi) or (vii) of the definition of "Related Party Transaction", the affirmative vote of the holders of not less than $66^2/_3\%$ of all outstanding Voting Securities, excluding Voting Securities Beneficially Owned by a Related Person, voting together as a single class.  Such affirmative vote shall be required notwithstanding the fact that no vote may be required, or that a lesser percentage may be specified, by law, in this Certificate of Incorporation or in any agreement with any national securities exchange or otherwise.

(2)     For purposes hereof:

(a)     The terms "**Affiliate**" and "**Associate**" shall have the same meaning as in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").  In this case, the term "**registrant**" in Rule 12b-2(1) shall mean the Corporation and in Rule 12b-2(3) shall mean the Related Person.

(b)     The term "**Beneficial Owner**" shall mean any Person which beneficially owns (within the meaning of Rule 13d-3 of the General Rules and Regulations under the Exchange Act) any Voting Securities or who has the right to acquire any such beneficial ownership (whether or not such right is exercisable immediately, with the passage of time or subject to any condition), including any right to acquire pursuant to any agreement, contract, arrangement or understanding or otherwise.  A Person shall be deemed the Beneficial Owner of all Voting Securities of which any Affiliate or Associate of such Person is the Beneficial Owner.

(c)     The term "**Person**" shall mean any individual, corporation, partnership or other entity, including any group having as a purpose the acquisition, holding, voting or disposition of Voting Securities and each Person which is a member of such group and any Affiliate or Associate of any such member.

(d)     The term "**Related Party Transaction**" shall mean any of the following agreements or transactions between the Corporation or a Subsidiary, on the one hand, and any Related Person, on the other hand:  (i) any merger or consolidation of the Corporation or a Subsidiary with a Related Person, (ii) any sale, lease, exchange, transfer or other disposition of 10% or more of the consolidated assets of the Corporation and its Subsidiaries to a Related Person, (iii) the issuance of any securities of the Corporation or a Subsidiary to a Related Person, (iv) the adoption of any plan or proposal for the liquidation or dissolution of the Corporation proposed by or on behalf of any Related Person, (v) any reclassification of securities or recapitalization of the Corporation or merger or consolidation of the Corporation with one or more Subsidiaries that would have the effect directly or indirectly of increasing the voting power or equity interest of a Related Person in the Corporation or a Subsidiary, (vi) the purchase, lease, exchange or other acquisition or receipt of any assets or securities of a Related Person by the Corporation or a Subsidiary or (vii) any loan, advance, guaranty, pledge or other financial assistance by the Corporation or a Subsidiary to or for the

6

benefit, directly or indirectly (except proportionately as a stockholder), of a Related Person.

(e) The term "**Related Person**" shall mean (i) any Person which, together with its Affiliates and Associates, is the Beneficial Owner of an aggregate of 20% or more of the outstanding shares of Common Stock or of all outstanding Voting Securities, (ii) any officer, director or employee of a Related Person, (iii) any Person which, together with its Affiliates and Associates, shall become, in a transaction or series of transactions not involving a public offering within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**") the Beneficial Owner of Voting Securities of which a Related Person was the Beneficial Owner at any time during the two years prior to the time such Person, Affiliate or Associate became such Beneficial Owner and (iv) any Affiliate or Associate of any such Person; *provided*, *however*, that the term "**Related Person**" shall not include any trustee or fiduciary when acting in such capacity with respect to any employee benefit plan of the Corporation or any Subsidiary all the capital stock of or equity interest in which is owned by the Corporation, by one or more such Subsidiaries or by the Corporation and one or more such Subsidiaries.

(f) The term "**Subsidiary**" shall mean any Person a majority of the securities or other ownership interests having ordinary voting power of which, or a majority of the equity interest in which, is owned by the Corporation, one or more Subsidiaries or the Corporation and one or more Subsidiaries.

(g) The term "**Voting Securities**" shall mean all outstanding shares of Common Stock and all other outstanding securities of the Corporation, if any which are then entitled to vote generally in the election of directors.

(3) A majority of the Board of Directors shall have the power and duty to determine for the purposes of this Article 9, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article 9, including, without limitation, (a) whether a person is a Related Person, (b) the number of shares of Voting Securities Beneficially Owned by any Person, (c) whether a Person is an Affiliate or Associate of another and (d) such other matters with respect to which a determination is required under this Article 9. The good faith determination of a majority of the Board of Directors on such matters shall be conclusive and binding for all purposes of this Article 9.

7

## ARTICLE 10
## NONVOTING EQUITY SECURITIES

The Corporation shall not issue nonvoting equity securities; provided, however the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.  The prohibition on the issuance of nonvoting equity securities is included in this Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code.

## ARTICLE 11
## CORPORATE OPPORTUNITIES

In anticipation that the Corporation and certain of its directors may engage in, and are permitted to have, investments or other business relationships, ventures, agreements or arrangements with entities engaged in, the same or similar activities or lines of business , and in recognition of (1) the benefits to be derived by the Corporation through the continued service of such directors and (2) the difficulties attendant to any director, who desires and endeavors fully to satisfy such director's fiduciary duties, in determining the full scope of such duties in any particular situation, the provisions of this Article 11 are set forth to regulate, define and guide the conduct of certain affairs of the Corporation as they may involve such directors and the powers, rights, duties and liabilities of the Corporation and its officers, directors and stockholders in connection therewith.

The Corporation's directors shall not have a duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation, and no officer or director of the Corporation shall be liable to the Corporation or its stockholders for breach of any fiduciary duty by reason of any such activities.  If the Corporation's directors acquire knowledge of a potential transaction or matter that may be a corporate opportunity for the Corporation, such directors shall have no duty to communicate or offer such corporate opportunity to the Corporation and shall not be liable to the Corporation or its stockholders for breach of any fiduciary duty by reason of the fact that such corporate opportunity is not communicated or offered to the Corporation.

Any person or entity purchasing or otherwise acquiring any interest in any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Article 11.

None of the alteration, amendment, change and repeal of any provision of this Article 11 nor the adoption of any provision of this Certificate of Incorporation inconsistent with any provision of this Article 11 shall eliminate or

8

reduce the effect of this Article 11 in respect of any matter occurring, or any cause of action, suit or claim that, but for this Article 11, would accrue or arise, prior to such alteration, amendment, repeal or adoption.

## ARTICLE 12
## EXCLUSIVE FORUM

**(A)**     Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if and only if the Court of Chancery does not have subject matter jurisdiction, another state court sitting in the State of Delaware or, if and only if neither the Court of Chancery nor any state court sitting in the State of Delaware has subject matter jurisdiction, then the federal district court for the District of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, creditors or other constituents, or a claim of aiding and abetting any such breach of fiduciary duty, (iii) any action asserting a claim arising pursuant to any provision of Delaware Law or this Certificate of Incorporation or the Bylaws (in each case, as they may be amended from time to time), (iv) any action to interpret, apply, enforce or determine the validity of this Certificate of Incorporation or the Bylaws, (v) any action asserting a claim governed by the internal affairs doctrine, or (vi) any action asserting an "internal corporate claim" as that term is defined in Section 115 of Delaware Law. The choice of forum provision set forth in this Section A of this Article 12 does not apply to any actions arising under the Securities Act or the Exchange Act.

**(B)**     Unless the Corporation consents in writing to the selection of an alternative forum, the federal district court for the District of Delaware shall be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act against the Corporation or any director or officer of the Corporation.

**(C)**     Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this **Article** 12.

## ARTICLE 13
## AMENDMENTS

The Corporation reserves the right to amend this Certificate of Incorporation in any manner permitted by Delaware Law and all rights and powers conferred upon stockholders, directors and officers herein are granted subject to this reservation.  Notwithstanding the foregoing, the provisions set forth

in Article 9 and this Article 13 may not be repealed or amended in any respect, and no other provision may be adopted, amended or repealed which would have the effect of modifying or permitting the circumvention of the provisions set forth in Article 9 and this Article 13, unless such action is approved by the affirmative vote of the holders of not less than $66\frac{2}{3}\%$ of the total voting power of all outstanding securities of the Corporation generally entitled to vote in the election of directors, voting together as a single class.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Incorporation this _____ day of _____, 20__.

_____
[Name]

<u>**Exhibit A(ii)**</u>

**Amended and Restated Bylaws of FTS International, Inc.**

*DRAFT*

**AMENDED & RESTATED BYLAWS**

**OF**

**FTS INTERNATIONAL, INC.**

\* \* \* \* \*

ARTICLE 1
OFFICES

Section 1.01. *Registered Office.* The address of the registered office of FTS International, Inc. (the "**Corporation**") in the State of Delaware is 1675 South State Street, Suite B, City of Dover, County of Kent, 19901. The name of its registered agent at such address is Capitol Services, Inc.

Section 1.02. *Other Offices.* The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 1.03. *Books.* The books of the Corporation may be kept within or without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

ARTICLE 2
MEETINGS OF STOCKHOLDERS

Section 2.01. *Time and Place of Meetings.* All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman of the Board of Directors in the absence of a designation by the Board of Directors).

Section 2.02. *Annual Meetings.* An annual meeting of stockholders shall be held for the election of directors and to transact such other business as may properly be brought before the meeting.

Section 2.03. *Special Meetings.* (a) Special meetings of stockholders may be called by the Board of Directors or the chairman of the Board of Directors, the President or the Secretary of the Corporation and may not be called by any other person.

(b)     A special meeting of stockholders shall be called by the Secretary of the Corporation pursuant to this Section 2.03(b) at the written request or requests (each, a "**Special Meeting Request**" and, collectively, the "**Special Meeting Requests**") of holders of record of at least 25% of the voting power of the outstanding capital stock of the Corporation entitled to vote on the matter or matters to be brought before the proposed special meeting (the "**Requisite Percentage**"). A Special Meeting Request to the Secretary shall be signed and dated by each stockholder of record (or a duly authorized agent of such stockholder) requesting the special meeting (each, a "**Requesting Stockholder**"), shall comply with this Section 2.03, and shall include (i) a statement of the specific purpose or purposes of the special meeting, (ii) the information required by Section 2.09(a)(iii), (iii) an acknowledgement by the Requesting Stockholders and the beneficial owners, if any, on whose behalf the Special Meeting Request(s) are being made that a disposition of shares of the Corporation's capital stock owned of record or beneficially as of the date on which the Special Meeting Request in respect of such shares is delivered to the Secretary that is made at any time prior to the special meeting shall constitute a revocation of such Special Meeting Request with respect to such disposed shares and (iv) documentary evidence that the Requesting Stockholders own the Requisite Percentage as of the date of such written request to the Secretary; provided, however, that if the Requesting Stockholders are not the beneficial owners of the shares representing the Requisite Percentage, then to be valid, the Special Meeting Request(s) must also include documentary evidence (or, if not simultaneously provided with the Special Meeting Request(s), such documentary evidence must be delivered to the Secretary within 10 business days after the date on which the Special Meeting Request(s) are delivered to the Secretary) that the beneficial owners on whose behalf the Special Meeting Request(s) are made beneficially own the Requisite Percentage as of the date on which such Special Meeting Request(s) are delivered to the Secretary. In addition, the Requesting Stockholders and the beneficial owners, if any, on whose behalf the Special Meeting Request(s) are being made shall promptly provide any other information reasonably requested by the Corporation. The information required under clauses (C)(2), (3) and (4) of Section 2.09(a)(iii) shall be supplemented by each Requesting Stockholder and any beneficial owner on whose behalf the Special Meeting Request(s) are made not later than 10 days after the record date for the special meeting to disclose such information as of the record date.

(c)     A special meeting requested by stockholders pursuant to Section 2.03(b) shall be held on such date and at such time as may be fixed by the Board of Directors in accordance with these Bylaws; provided, however, that the date of any such special meeting shall not be more than 90 days after a Special Meeting

2

Request that satisfies the requirements of this Section 2.03 is received by the Secretary.

(d)      Notwithstanding the foregoing provisions of this Section 2.03, a special meeting requested by stockholders pursuant to Section 2.03(b) shall not be held if (i) the Special Meeting Request does not comply with this Section 2.03, (ii) the Special Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law, (iii) the Special Meeting Request is received by the Corporation during the period commencing 90 days prior to the first anniversary of the date of the immediately preceding annual meeting and ending on the date of the next annual meeting, (iv) an annual or special meeting of stockholders that included an identical or substantially similar item of business ("**Similar Business**") was held not more than 120 days before the Special Meeting Request was received by the Secretary, (v) the Board of Directors has called or calls for an annual or special meeting of stockholders to be held within 90 days after the Special Meeting Request is received by the Secretary and the business to be conducted at such meeting includes the Similar Business or (vi) the Special Meeting Request was made in a manner that involved a violation of Regulation 14A under the Exchange Act or other applicable law.  For purposes of this Section 2.03(d), the nomination, election or removal of directors shall be deemed to be Similar Business with respect to all items of business involving the nomination, election or removal of directors, changing the size of the Board of Directors and filling of vacancies and/or newly created directorships resulting from any increase in the authorized number of directors.  The Board of Directors shall determine in good faith whether the requirements set forth in this Section 2.03(d) have been satisfied.

(e)      In determining whether a special meeting of stockholders pursuant to Section 2.03(b) has been requested by the record holders of shares representing in the aggregate at least the Requisite Percentage, multiple Special Meeting Requests delivered to the Secretary will be considered together only if (i) each Special Meeting Request identifies substantially the same purpose or purposes of the special meeting and substantially the same matters proposed to be acted on at the special meeting (in each case as determined in good faith by the Board of Directors) and (ii) such Special Meeting Requests have been dated and delivered to the Secretary within 60 days of the earliest dated Special Meeting Request.  A Requesting Stockholder may revoke a Special Meeting Request at any time by written revocation delivered to the Secretary and if, following such revocation, there are outstanding un-revoked requests from Requesting Stockholders holding less than the Requisite Percentage, the Board of Directors may, in its discretion, cancel the special meeting.  If none of the Requesting Stockholders appears or sends a duly authorized agent to present the business to be presented for consideration that was specified in the Special Meeting Request, the Corporation need not present such business for a vote at such special meeting.

(f)      Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the

3

Corporation's notice of meeting pursuant to Section 2.04.  Nothing contained herein shall prohibit the Board of Directors from submitting matters to the stockholders at any special meeting requested by stockholders.

Section 2.04.  *Notice of Meetings and Adjourned Meetings; Waivers of Notice.*  (a)  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("**Delaware Law**"), such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting.  The Board of Directors or the chairman of the meeting may adjourn the meeting to another time or place (whether or not a quorum is present), and notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, are announced at the meeting at which such adjournment is made.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)     A written waiver of any such notice signed by the person entitled thereto, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.05.  *Quorum.*  Unless otherwise provided under the Certificate of Incorporation or these Bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the total voting power of all outstanding securities of the Corporation generally entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the chairman of the meeting or a majority in voting interest of the stockholders present in person or represented by proxy may adjourn the meeting, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be

present or represented any business may be transacted that might have been transacted at the meeting as originally notified.

Section 2.06. *Voting.* (a) Unless otherwise provided in the Certificate of Incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights. Except as otherwise required by law, the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of the holders of a majority of the votes cast at the meeting on the subject matter shall be the act of the stockholders. Abstentions and broker non-votes shall not be counted as votes cast. Subject to the rights of the holders of any class or series of preferred stock to elect additional directors under specific circumstances, as may be set forth in the certificate of designations for such class or series of preferred stock, a nominee for director shall be elected to the Board of Directors if the nominee receives a majority of the votes cast with respect to that nominee's election at any meeting for the election of directors at which a quorum is present; *provided, however*, that if as of the tenth (10th) day preceding the date the Corporation first mails its notice of meeting for such meeting to the stockholders of the Corporation, the number of nominees for director exceeds the number of directors to be elected (a "contested election"), the directors shall be elected by the vote of a plurality of the shares represented in person or by proxy at any such meeting and entitled to vote on the election of directors. If an incumbent director nominee fails to receive a majority of the votes cast in an election that is not a contested election, the director shall immediately tender his or her resignation to the Board of Directors. The nominating and governance committee of the Board of Directors, or such other committee designated by the Board of Directors, shall make a recommendation to the Board of Directors as to whether to accept or reject the resignation of such incumbent director, or whether other action should be taken. If the Board of Directors accepts a director's resignation pursuant to this Section 2.06(a), or if a nominee for director is not elected and the nominee is not an incumbent director, the remaining members of the Board of Directors may fill the resulting vacancy pursuant to Section 3.12 or may decrease the size of the Board of Directors pursuant to Section 3.02.

(b)     Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, appointed by an instrument in writing, subscribed by such stockholder or by his attorney thereunto authorized, or by proxy sent by cable, telegram or by any means of electronic communication permitted by law, which results in a writing from such stockholder or by his attorney, and delivered to the secretary of the meeting. No proxy shall be voted after three (3) years from its date, unless said proxy provides for a longer period.

Section 2.07. *Organization.* At each meeting of stockholders, the Chairman of the Board of Directors, if one shall have been elected, or in the Chairman's absence or if one shall not have been elected, the director designated by the vote of the majority of the directors present at such meeting, shall act as chairman of the meeting. The Secretary (or in the Secretary's absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 2.08. *Order of Business.* The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

Section 2.09. *Nomination of Directors and Proposal of Other Business.*

(a)      *Annual Meetings of Stockholders.* (i) Nominations of persons for election to the Board of Directors or the proposal of other business to be transacted by the stockholders at an annual meeting of stockholders may be made only (A) pursuant to the Corporation's notice of meeting (or any supplement thereto), (B) by or at the direction of the Board of Directors or any committee thereof or (C) as may be provided in the certificate of designations for any class or series of preferred stock or (D) by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in paragraph (ii) of this Section 2.09(a) and at the time of the annual meeting, who shall be entitled to vote at the meeting and who complies with the procedures set forth in this Section 2.09(a), and, except as otherwise required by law, any failure to comply with these procedures shall result in the nullification of such nomination or proposal.

(ii)      For nominations or other business to be properly brought before an annual meeting of stockholders by a stockholder pursuant to clause (D) of paragraph (i) of this Section 2.09(a), the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation and any such proposed business (other than the nominations of persons for election to the Board of Directors) must constitute a proper matter for stockholder action. To be timely, a stockholder's notice shall be delivered to, or mailed and received by, the Secretary of the Corporation at the principal executive offices of the Corporation not less than 120 days nor more than 150 days prior to the first anniversary of the preceding year's annual meeting of stockholders (which anniversary date, for purposes of the Corporation's first annual meeting of stockholders to be held after [[●], 2020][1], shall be deemed to be [●], 2021 (the "First Annual Meeting"); *provided, however*, that in the event that the date of the annual meeting is advanced more than 30 days prior to such anniversary date (other than in connection with the First Annual Meeting) or delayed more than 70 days after such anniversary date (other than in connection

---

[1]      NTD: Insert date of emergence.

with the First Annual Meeting) then to be timely such notice must be received by the Corporation no earlier than 120 days prior to such annual meeting and no later than the later of 70 days prior to the date of the meeting or the 10th day following the day on which public announcement of the date of the meeting was first made by the Corporation.  In no event shall the adjournment or postponement of any meeting, or any announcement thereof, commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

(iii)      A stockholder's notice to the Secretary shall set forth (A) as to each person whom the stockholder proposes to nominate for election or reelection as a director:  (1) all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934 (as amended (together with the rules and regulations promulgated thereunder), the "**Exchange Act**")) including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected; and (2) a reasonably detailed description of any compensatory, payment or other financial agreement, arrangement or understanding that such person has with any other person or entity other than the Corporation including the amount of any payment or payments received or receivable thereunder, in each case in connection with candidacy or service as a director of the Corporation (a "**Third-Party Compensation Arrangement**"), (B) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws, the text of the proposed amendment), the reasons for conducting such business and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made and (C) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the proposal is made:

(1)      the name and address of such stockholder (as they appear on the Corporation's books) and any such beneficial owner;

(2)      for each class or series, the number of shares of capital stock of the Corporation that are held of record or are beneficially owned by such stockholder and by any such beneficial owner;

(3)      a description of any agreement, arrangement or understanding between or among such stockholder and any such beneficial owner, any of their respective affiliates or associates, and any other person or persons (including their names) in connection with the proposal of such nomination or other business;

(4)      a description of any agreement, arrangement or understanding (including, regardless of the form of settlement, any derivative, long or short positions, profit interests, forwards, futures, swaps, options, warrants, convertible securities, stock appreciation or similar rights, hedging transactions and borrowed or loaned shares) that has been entered into by or on behalf of, or any other agreement, arrangement or understanding that has been made, the effect or intent of which is to create or mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of, such stockholder or any such beneficial owner or any such nominee with respect to the Corporation's securities;

(5)      a representation that the stockholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to bring such nomination or other business before the meeting;

(6)      a representation as to whether such stockholder or any such beneficial owner intends or is part of a group that intends to (i) deliver a proxy statement and/or form of proxy to holders of at least the percentage of the voting power of the Corporation's outstanding capital stock required to approve or adopt the proposal or to elect each such nominee and/or (ii) otherwise to solicit proxies from stockholders in support of such proposal or nomination;

(7)      any other information relating to such stockholder, beneficial owner, if any, or director nominee or proposed business that would be required to be disclosed in a proxy statement or other filing required to be made in connection with the solicitation of proxies in support of such nominee or proposal pursuant to Section 14 of the Exchange Act; and

(8)      such other information relating to any proposed item of business as the Corporation may reasonably require to determine whether such proposed item of business is a proper matter for stockholder action.

(b)      *Special Meetings of Stockholders*.  Nominations of persons for election to the Board of Directors of the Corporation at a special meeting of stockholders may be made by stockholders only (i) in accordance with Section 2.03 or (ii) if the election of directors is included as business to be brought before a special meeting in the Corporation's notice of meeting, then only by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 2.09(b) at the time of the special meeting, who shall be entitled to vote at the meeting and who complies with the

8

procedures set forth in this Section 2.09(b).  The proposal by stockholders of other business to be conducted at a special meeting of stockholders may be made only in accordance with Section 2.03.  For nominations to be properly brought by a stockholder before a special meeting of stockholders pursuant to this Section 2.09(b), the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation.  To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation (A) not earlier than 150 days prior to the date of the special meeting nor (B) later than the later of 120 days prior to the date of the special meeting or the 10th day following the day on which public announcement of the date of the special meeting was first made.  A stockholder's notice to the Secretary shall comply with the notice requirements of Section 2.09(a)(iii).

(c)     *General*.  (i) To be eligible to be a nominee for election as a director, the proposed nominee must provide to the Secretary of the Corporation in accordance with the applicable time periods prescribed for delivery of notice under Section 2.09(a)(ii) or Section 2.09(b): (1) a completed D&O questionnaire (in the form provided by the secretary of the Corporation at the request of the nominating stockholder) containing information regarding the nominee's background and qualifications and such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as a director of the Corporation or to serve as an independent director of the Corporation, (2) a written representation that, unless previously disclosed to the Corporation, the nominee is not and will not become a party to any voting agreement, arrangement or understanding with any person or entity as to how such nominee, if elected as a director, will vote on any issue or that could interfere with such person's ability to comply, if elected as a director, with his/her fiduciary duties under applicable law, (3) a written representation and agreement that, unless previously disclosed to the Corporation pursuant to Section 2.09(a)(iii)(A)(2), the nominee is not and will not become a party to any Third-Party Compensation Arrangement and (4) a written representation that, if elected as a director, such nominee would be in compliance and will continue to comply with the Corporation's corporate governance guidelines as disclosed on the Corporation's website, as amended from time to time.  At the request of the Board of Directors, any person nominated by the Board of Directors for election as a director shall furnish to the Secretary of the Corporation the information that is required to be set forth in a stockholder's notice of nomination that pertains to the nominee.

(ii)     No person shall be eligible to be nominated by a stockholder to serve as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section 2.09.  No business proposed by a stockholder shall be conducted at a stockholder meeting except in accordance with the procedures set forth in Section 2.03 and this Section 2.09.

9

(iii)     The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the procedures prescribed by these Bylaws or that business was not properly brought before the meeting, and if he/she should so determine, he/she shall so declare to the meeting and the defective nomination shall be disregarded or such business shall not be transacted, as the case may be.  Notwithstanding the foregoing provisions of this Section 2.09, unless otherwise required by law, if the stockholder (or a qualified representative of the stockholder) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or other proposed business, such nomination shall be disregarded or such proposed business shall not be transacted, as the case may be, notwithstanding that proxies in respect of such vote may have been received by the Corporation and counted for purposes of determining a quorum.  For purposes of this Section 2.09, to be considered a qualified representative of the stockholder, a person must be a duly authorized officer, manager or partner of such stockholder or must be authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders.

(iv)     Without limiting the foregoing provisions of this Section 2.09, a stockholder shall also comply with all applicable requirements of the Exchange Act with respect to the matters set forth in this Section 2.09; *provided*, *however*, that any references in these Bylaws to the Exchange Act are not intended to and shall not limit any requirements applicable to nominations or proposals as to any other business to be considered pursuant to this Section 2.09, and compliance with paragraphs (a)(i)(C) and (b) of this Section 2.09 shall be the exclusive means for a stockholder to make nominations or submit other business (other than as provided in Section 2.09(c)(v)).

(v)     Notwithstanding anything to the contrary, the notice requirements set forth herein with respect to the proposal of any business pursuant to this Section 2.09 shall be deemed satisfied by a stockholder if such stockholder has submitted a proposal to the Corporation in compliance with Rule 14a-8 under the Exchange Act, and such stockholder's proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for the meeting of stockholders.

ARTICLE 3
DIRECTORS

Section 3.01.  *General Powers.*  Except as otherwise provided in Delaware Law or the Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 3.02.  *Number, Election and Term Of Office.*  The number of directors shall be determined from time to time solely by resolution adopted by the affirmative vote of a majority of the Board.  The directors shall be elected at the Corporation's annual meeting of the stockholders, except as provided in Section 3.12 herein, and each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.  Directors need not be stockholders.

Section 3.03.  *Quorum and Manner of Acting.*  Unless the Certificate of Incorporation or these Bylaws require a greater number, a majority of the Board of Directors shall constitute a quorum for the transaction of business at any meeting of the Board of Directors and, except as otherwise expressly required by law or by the Certificate of Incorporation, the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.  When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting.  If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat shall adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.04.  *Time and Place of Meetings.*  The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman of the Board of Directors in the absence of a determination by the Board of Directors).

Section 3.05.  *Annual Meeting.*  The Board of Directors shall meet for the purpose of organization, the election of officers and the transaction of other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held.  Notice of such meeting need not be given.  In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 3.07 herein or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 3.06. *Regular Meetings.*  After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 3.07. *Special Meetings.*  Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors or the President and shall be called by the Chairman of the Board of Directors, President or the Secretary, on the written request of three directors.  Notice of special meetings of the Board of Directors shall be given to each director at least 48 hours before the date of the meeting in such manner as is determined by the Board of Directors.

Section 3.08. *Committees.*  The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters:  (a) approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Law to be submitted to the stockholders for approval or (b) adopting, amending or repealing any Bylaw of the Corporation.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.09. *Action by Consent.*  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions, are filed with the minutes of proceedings of the Board of Directors or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10. *Telephonic Meetings.*  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a

12

meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.11.  *Resignation.*  Any director may resign from the Board of Directors at any time by giving notice to the Board of Directors or to the Secretary of the Corporation.  Except as provided in Section 2.06, any such notice must be in writing or by electronic transmission to the Board of Directors or to the Secretary of the Corporation.  The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 3.12.  *Vacancies.*  Unless otherwise provided in the Certificate of Incorporation, vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors shall, except as otherwise required by law, be filled solely by a majority of the directors then in office (although less than a quorum) or by the sole remaining director, and each director so elected shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.  If there are no directors in office, then an election of directors may be held in accordance with Delaware Law.  Unless otherwise provided in the Certificate of Incorporation, when one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of the other vacancies.

Section 3.13.  *Removal.*  Any director may be removed, with or without cause, by the holders of a majority of the shares of capital stock of the Corporation then entitled to vote generally in the election of directors, voting together as a single class.

Section 3.14.  *Compensation.*  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

Section 3.15. *Preferred Stock Directors.*  Notwithstanding anything else contained herein, whenever the holders of one or more classes or series of preferred stock shall have the right, voting separately as a class or series, to elect directors, the election, term of office, filling of vacancies, removal and other features of such directorships shall be governed by the terms of the resolutions applicable thereto adopted by the Board of Directors pursuant to the Certificate of

13

Incorporation, and such directors so elected shall not be subject to the provisions of Sections 3.02, 3.12 and 3.13 of this Article 3 unless otherwise provided therein.

ARTICLE 4
OFFICERS

Section 4.01. *Principal Officers.*  The principal officers of the Corporation shall be a Chief Executive Officer, a Chief Financial Officer, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose.  The Corporation may also have such other principal officers, including one or more Vice Presidents or Controllers, as the Board of Directors may in its discretion appoint.  One person may hold the offices and perform the duties of any two or more of said offices.

Section 4.02. *Appointment, Term of Office and Remuneration.*  The principal officers of the Corporation shall be appointed by the Board of Directors in the manner determined by the Board of Directors.  Each such officer shall hold office until his or her successor is appointed, or until his or her earlier death, resignation or removal.  The remuneration of all officers of the Corporation shall be fixed by the Board of Directors.  Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 4.03. *Subordinate Officers.*  In addition to the principal officers enumerated in Section 4.01 herein, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.04. *Removal.*  Except as otherwise permitted with respect to subordinate officers, any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 4.05. *Resignations.*  Any officer may resign at any time by giving notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer).  Any such notice must be in writing.  The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 4.06. *Powers and Duties.*  The officers of the Corporation shall have such powers and perform such duties incident to each of their respective

14

offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

## ARTICLE 5
CAPITAL STOCK

Section 5.01. *Uncertificated Shares; Stock Certificates.*  Except as otherwise provided in a resolution approved by the Board of Directors, all shares of capital stock of the Corporation issued after the date hereof shall be uncertificated.  In the event the Board of Directors elects to provide in a resolution that certificates shall be issued to represent some or all shares of any or all classes or series of capital stock of the Corporation, every holder of such shares shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, representing the number of shares held by such holder registered in certificate form.  Each such certificate shall be signed in a manner that complies with Section 158 of Delaware Law.

Section 5.02. *Transfer Of Shares.*  Shares of the stock of the Corporation may be transferred on the record of stockholders of the Corporation by the holder thereof or by such holder's duly authorized attorney upon surrender of a certificate therefor properly endorsed or upon receipt of proper transfer instructions from the registered holder of uncertificated shares or by such holder's duly authorized attorney and upon compliance with appropriate procedures for transferring shares in uncertificated form, unless waived by the Corporation.

Section 5.03. *Authority for Additional Rules Regarding Transfer.*  The Board of Directors shall have the power and authority to make all such rules and regulations as they may deem expedient concerning the issue, transfer and registration of certificated or uncertificated shares of the stock of the Corporation, as well as for the issuance of new certificates in lieu of those which may be lost or destroyed, and may require of any stockholder requesting replacement of lost or destroyed certificates, bond in such amount and in such form as they may deem expedient to indemnify the Corporation, and/or the transfer agents, and/or the registrars of its stock against any claims arising in connection therewith.

## ARTICLE 6
GENERAL PROVISIONS

Section 6.01. *Fixing the Record Date.*  (a) In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for

15

determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided* that the Board of Directors may in its discretion or as required by law fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall fix the same date or an earlier date as the record date for stockholders entitled to notice of such adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  Any stockholder seeking to have the stockholders authorize or take corporate action by written consent shall, by written notice to the secretary, request the Board of Directors to fix a record date.  The Board of Directors shall promptly, but in all events within 10 days after the date on which such a request is received, adopt a resolution fixing the record date.  If no record date has been fixed by the Board of Directors within 10 days of the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or any officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board of Directors and prior

16

action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 6.02. *Dividends.*  Subject to limitations contained in Delaware Law and the Certificate of Incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid either in cash, in property or in shares of the capital stock of the Corporation.

Section 6.03. *Year.*  The fiscal year of the Corporation shall commence on January 1 and end on December 31 of each year.

Section 6.04. *Voting of Stock Owned by the Corporation.*  The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6.05. *Nonvoting Equity Securities*.  The Corporation shall not issue nonvoting equity securities; provided, however the foregoing restriction shall (i) have no further force and effect beyond that required under Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.  The prohibition on the issuance of nonvoting equity securities is included in these Bylaws in compliance with Section 1123(a)(6) of the Bankruptcy Code.

Section 6.06. *Amendments.*  These Bylaws or any of them, may be altered, amended or repealed, or new Bylaws may be made, by the stockholders entitled to vote thereon at any annual or special meeting thereof or by the Board of Directors.  Unless a higher percentage is required by the Certificate of Incorporation as to any matter that is the subject of these Bylaws, all such amendments must be approved by the affirmative vote of the holders of a majority of the total voting power of all outstanding securities of the Corporation, generally entitled to vote in the election of directors, voting together as a single class, or by a majority of the Board of Directors.

17

**Exhibit A(iii)**

**Rights Agreement**

*DRAFT*

# RIGHTS AGREEMENT

dated as of

[•], 2020

between

## FTS INTERNATIONAL, INC.

and

## [•][1]

as Rights Agent

---

[1] **Note to Draft**: To insert the transfer agent of the Company.

## TABLE OF CONTENTS

PAGE

Section 1. *Definitions* ................................................................................................1
Section 2. *Other Definitional and Interpretative Provisions* ................................9
Section 3. *Issuance of Rights and Right Certificates* ..........................................10
Section 4. *Form of Right Certificates* .................................................................12
Section 5. *Registration; Transfer and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates* .........................13
Section 6. *Exercise of Rights* ..............................................................................14
Section 7. *Cancellation and Destruction of Right Certificates* ..........................16
Section 8. *Reservation and Availability of Capital Stock* ...................................17
Section 9. *Adjustment of Purchase Price, Number and Kind of Shares or Number of Rights* .............................................................................18
Section 10. *Certificate of Adjusted Purchase Price or Number of Shares* ........23
Section 11. *Consolidation, Merger or Sale or Transfer of Assets or Earning Power* .........................................................................................23
Section 12. *Fractional Rights and Fractional Shares* .........................................27
Section 13. *Rights of Action* ................................................................................28
Section 14. *Agreement of Right Holders* .............................................................29
Section 15. *Right Certificate Holder Not Deemed a Stockholder* .......................29
Section 16. *Appointment of Rights Agent* ............................................................30
Section 17. *Merger or Consolidation or Change of Name of Rights Agent* .........30
Section 18. *Duties of the Rights Agent* ................................................................31
Section 19. *Change of Rights Agent* ....................................................................33
Section 20. *Redemption* .......................................................................................34
Section 21. *Exchange* ...........................................................................................36
Section 22. *Notice of Proposed Actions* ..............................................................38
Section 23. *Renewal* .............................................................................................39
Section 24. *Notices* ..............................................................................................40
Section 25. *Supplements and Amendments* ..........................................................41
Section 26. *Successors* .........................................................................................41
Section 27. *Determinations and Actions by the Board, etc* .................................41
Section 28. *Benefits of This Rights Agreement* ...................................................41
Section 29. *Severability* .......................................................................................42
Section 30. *Governing Law* ..................................................................................42
Section 31. *Counterparts; Effectiveness* ..............................................................42
Section 32. *Force Majeure* ..................................................................................42

Exhibit A  Form of Certificate of Designations of Series A Participating Cumulative Preferred Stock
Exhibit B  Summary Description of the Stockholder Rights Agreement
Exhibit C  Form of Right Certificate

## RIGHTS AGREEMENT

RIGHTS AGREEMENT dated as of [•], 2020 (this "**Rights Agreement**"), between FTS International, Inc., a Delaware corporation (the "**Company**"), and [•], as Rights Agent (the "**Rights Agent**").

### W I T N E S S E T H

WHEREAS, on [•], 2020, the Board of Directors of the Company adopted resolutions that created a series of preferred stock designated as "Series A Participating Cumulative Preferred Stock" and authorized and declared a dividend of one preferred stock purchase right (a "**Right**") for each share of Common Stock (as defined below) outstanding at the close of business (as defined below) on [•], 2020[2] (the "**Record Date**") and further authorized the issuance, upon the terms and subject to the conditions herein, of one Right (subject to adjustment) in respect of each share of Common Stock issued after the Record Date but before the earlier of the Distribution Date (as defined below) and the Expiration Date (as defined below), each Right representing the right to purchase, upon the terms and subject to the conditions herein, one one-thousandth (subject to adjustment) of a share of Preferred Stock (as defined below);

NOW, THEREFORE, in consideration of the premises and the mutual agreements, provisions and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1.   *Definitions.*  (a)  The following terms, as used herein, have the following meanings:

"**Acquiring Person**" means any Person who or which, together with all Affiliates and Associates of such Person, is the Beneficial Owner of the Specified Percentage of shares of outstanding Common Stock; *provided* that "Acquiring Person" shall not include:

(i)       an Exempt Person;

(ii)      any Person that the Board determines became the Beneficial Owner of the Specified Percentage of shares of outstanding Common Stock inadvertently (including, without limitation, because such Person was unaware that it Beneficially Owned the Specified Percentage of shares of outstanding Common Stock, or such Person was aware of the extent of its Beneficial Ownership of Common Stock but had no actual knowledge of the consequences of obtaining such Beneficial Ownership under this Rights Agreement) and without any plan or intention to change, influence or obtain control of the Company unless and until such Person shall have failed to divest itself, as soon as practicable (as determined by the Board of Directors of the Company), of

---

[2] Note to Draft: To be at least 10 days following the date of this Rights Agreement.

Beneficial Ownership of a sufficient number of shares of Common Stock so that such Person would Beneficially Own less than the Specified Percentage of shares of outstanding Common Stock; *provided* that any such determination or judgment by the Board shall be made in its sole discretion and shall be final and binding;

(iii)　any Person that, as the result of an acquisition of shares of Common Stock by the Company that, by reducing the number of shares of Common Stock outstanding, increases the proportionate number of shares of Common Stock Beneficially Owned by such Person to the Specified Percentage of shares of Common Stock then outstanding; *provided*, *however*, that if such Person shall thereafter become the Beneficial Owner of any additional shares of Common Stock (other than pursuant to a dividend or distribution paid or made by the Company on the outstanding Common Stock or pursuant to a split or subdivision of outstanding Common Stock), then such Person shall be deemed to be an "Acquiring Person" unless upon becoming the Beneficial Owner of such additional shares of Common Stock such Person does not Beneficially Own the Specified Percentage of the shares of Common Stock then outstanding;

(iv)　any Person that, as of the date hereof or prior to the first public announcement of the adoption of this Rights Agreement, is or becomes the Beneficial Owner of the Specified Percentage of shares of Common Stock outstanding, unless and until such time as such Person shall, after the first public announcement of the adoption of this Rights Agreement, become the Beneficial Owner of any additional shares of Common Stock (other than pursuant to a dividend or distribution paid or made by the Company on the outstanding Common Stock or pursuant to a split or subdivision of the outstanding Common Stock), unless, upon becoming the Beneficial Owner of such additional shares of Common Stock, such Person is not then the Beneficial Owner of the Specified Percentage of shares of Common Stock then outstanding; or

(v)　any Person that shall become an "Acquiring Person" solely as a result of any unilateral grant of any security by the Company or through the exercise of any options, warrants, rights or similar interests (including restricted stock) granted by the Company to its directors, officers and employees; provided that if such Person shall thereafter become the Beneficial Owner of any additional shares of Common Stock (other than pursuant to a dividend or distribution paid or made by the Company on the outstanding Common Stock or pursuant to a split or subdivision of the outstanding Common Stock), then such Person shall be deemed to be an "Acquiring Person" unless upon becoming the Beneficial Owner of such additional shares of Common Stock such Person does not Beneficially Own the Specified Percentage of the shares of Common Stock then outstanding.

Notwithstanding the foregoing, if a bona-fide securities dealer, swaps dealer or security-based swaps dealer who would otherwise be an "Acquiring Person" has become so solely as a result of its actions in the ordinary course of its business that the Board determines were taken without the intent or effect of evading or assisting any other Person to evade the purposes and intent of this

2

Rights Agreement, or otherwise seeking to obtain or change control or influence the management and policies of the Company, then, and unless and until the Board shall otherwise determine, such Person shall not be an "Acquiring Person".

"**Affiliate**" has the meaning ascribed to such term in Rule 12b-2 under the Exchange Act as in effect on the date hereof.

"**Associate**" has the meaning ascribed to such term in Rule 12b-2 of the Exchange Act as in effect on the date hereof.

A Person shall be deemed the "**Beneficial Owner**" of, and shall be deemed to have "**Beneficial Ownership**" of and to "**Beneficially Own**", any securities:

(i)    that such Person or any of its Affiliates or Associates, directly or indirectly, beneficially owns (as determined pursuant to Rule 13d-3 under the Exchange Act as in effect on the date hereof);

(ii)    that such Person or any of its Affiliates or Associates, directly or indirectly, has

(A)    the right or obligation to acquire (whether such right is exercisable or such obligation is required to be performed immediately or only upon the occurrence of certain events or the passage of time or both) pursuant to any agreement, arrangement or understanding (whether or not in writing) or upon the exercise of conversion rights, exchange rights, other rights (other than the Rights), warrants or options, or otherwise, including any securities represented by "when issued" trading thereof; *provided* that a Person shall not be deemed the "Beneficial Owner" of or to "Beneficially Own", (1) securities tendered pursuant to a tender or exchange offer made by or on behalf of such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange, (2) securities issuable upon the exercise of Rights at any time prior to a Section 9(a)(ii) Event, (3) securities issuable upon the exercise of Rights from and after a Section 9(a)(ii) Event if such Rights were acquired by such Person or any of such Person's Affiliates or Associates prior to the Distribution Date or pursuant to Sections 3(c), 4(c) or Section 9(a) hereof in connection with any adjustment made with respect to the Rights or (4) securities which such Person or any of such Person's Affiliates or Associates may acquire, does or do acquire or may be deemed to have the right to acquire, pursuant to any merger or other acquisition agreement between the Company and such Person (or one or more of such Person's Affiliates or Associates) if such agreement has been approved by the Board of Directors of the Company prior to a Section 9(a)(ii) Event; or

(B)    the right to vote (whether such right is exercisable immediately or only upon the occurrence of certain events or the passage

3

of time or both) pursuant to any agreement, arrangement or understanding (whether or not in writing); *provided* that a Person shall not be deemed the "Beneficial Owner" of or to "Beneficially Own" any security under this clause (B) as a result of an agreement, arrangement or other understanding that (1) arises solely from a revocable proxy or consent given in response to a public proxy or consent solicitation made pursuant to, and in accordance with, the applicable rules and regulations under the Exchange Act and (2) is not also then reportable by such Person on Schedule 13D under the Exchange Act (or any comparable or successor report); or

(iii)    that are beneficially owned, directly or indirectly, by any other Person (or any Affiliate or Associate thereof) and with respect to which such Person or any of its Affiliates or Associates has any agreement, arrangement or other understanding (whether or not in writing) for the purpose of acquiring, holding, voting (except pursuant to a revocable proxy or consent as described in the proviso in clause (ii)(B) immediately above) or disposing of any such securities; or

(iv)    which are beneficially owned, directly or indirectly, by a Counterparty (or any of such Counterparty's Affiliates or Associates) under any Derivatives Contract (without regard to any short or similar position under the same or any other Derivatives Contract) to which such Person or any such Person's Affiliates or Associates is a Receiving Party (as such terms are defined in the immediately following paragraph); *provided, however*, that the number of shares of Common Stock that a Person is deemed to Beneficially Own pursuant to this clause (iv) in connection with a particular Derivatives Contract shall not exceed the number of Notional Common Shares with respect to such Derivatives Contract; *provided, further*, that the number of securities beneficially owned by each Counterparty (including its Affiliates and Associates) under a Derivatives Contract shall for purposes of this clause (iv) be deemed to include all securities that are beneficially owned, directly or indirectly, by any other Counterparty (or any of such other Counterparty's Affiliates or Associates) under any Derivatives Contract to which such first Counterparty (or any of such first Counterparty's Affiliates or Associates) is a Receiving Party, with this proviso being applied to successive Counterparties as appropriate.

A "**Derivatives Contract**" is a contract between two parties (the "**Receiving Party**" and the "**Counterparty**") that is designed to produce economic benefits and risks to the Receiving Party that correspond substantially to the ownership by the Receiving Party of a number of shares of Common Stock specified or referenced in such contract (the number corresponding to such economic benefits and risks, the "**Notional Common Shares**"), regardless of whether obligations under such contract are required or permitted to be settled through the delivery of cash, Common Stock or other property, without regard to any short position under the same or any other Derivatives Contract. For the avoidance of doubt, interests in broad-based index options, broad-based index

4

futures and broad-based publicly traded market baskets of stocks shall not be deemed to be Derivatives Contracts.

Notwithstanding the foregoing, nothing contained in this definition shall cause a Person to be deemed the "Beneficial Owner" of, or to "beneficially own" or to have "Beneficial Ownership" of, any securities (A) if the Person is ordinarily engaged in business as an underwriter of securities and has acquired such securities in a bona fide firm commitment underwriting pursuant to an underwriting agreement with the Company, (B) if such Person is a "clearing agency" (as defined in Section 3(a)(23) of the Exchange Act) and has acquired such securities solely as result of such status or (C) in the case of Beneficial Ownership pursuant to clause (iv) of such definition, if the Person (or an Affiliate or Associate of such Person) is a Counterparty to a Derivatives Contract referred to in such clause (iv) that has been entered into with the Company.

Further, notwithstanding anything in this definition of Beneficial Ownership to the contrary, the phrase "then outstanding" when used with reference to a Person's Beneficial Ownership of securities of the Company, shall mean the number of such securities then issued and outstanding together with the number of such securities not then actually issued and outstanding which such Person would be deemed to Beneficially Own hereunder.

"**Board**" means the Board of Directors of the Company.

"**Book Entry**" shall mean an uncertificated book-entry in the account system of the transfer agent for the Company's stock.

"**Business Day**" means any day other than a Saturday, Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

"**close of business**" on any given date means 5:00 p.m., New York City time, on such date; *provided* that if such date is not a Business Day "close of business" means 5:00 p.m., New York City time, on the next succeeding Business Day.

"**Common Stock**" means the Common Stock, par value $0.01 per share, of the Company, except that, (i) when used with reference to any Person which shall be organized in corporate form (other than the Company), "Common Stock" means the equity securities or other equity interest of such Person having the greatest aggregate voting power in the election of directors of all classes of capital stock or equity securities of such corporation or power to control or direct the management of such Person and (ii) when used with reference to any Person which shall not be organized in corporate form, shall mean units of beneficial interest in the profits or losses of such Person or other equity security of such Person having the greatest aggregate voting power in the election of the directors, trustees, managers or other Persons performing governance functions of all classes of equity securities of such Person.

"**Definitive Acquisition Agreement**" shall mean any definitive written agreement entered into by the Company that is conditioned on the approval by the holders of not less

5

than a majority of the outstanding Common Stock at a meeting of the stockholders of the Company with respect to (i) a merger, consolidation, recapitalization, reorganization, share exchange, business combination or similar transaction involving the Company or (ii) the acquisition in any manner, directly or indirectly, of more than 50% of the consolidated total assets (including, without limitation, equity securities of its subsidiaries) of the Company and its Subsidiaries.

"**Distribution Date**" means the earlier of (i) the close of business on the tenth Business Day after, but not including, the Stock Acquisition Date and (ii) the close of business on the tenth Business Day (or such later day as may be designated prior to the occurrence of a Section 9(a)(ii) Event by the Board) after, but not including, the date of the commencement of a tender or exchange offer by any Person if, upon consummation thereof, such Person would be an Acquiring Person; *provided*, *however*, that if either of such dates occurs after the date of this Rights Agreement and on or prior to the Record Date, then the Distribution Date shall be the Record Date.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, unless otherwise expressly specified.

"**Exempt Person**" means the Company or any Subsidiary of the Company (in each case including, without limitation, in any fiduciary capacity), any employee benefit plan of the Company or of any Subsidiary of the Company or any entity or trustee holding Common Stock for or pursuant to the terms of any such plan or for the purpose of funding any such plan or other benefits for employees of the Company or of any Subsidiary of the Company.

"**Expiration Date**" means the earliest of (i) the Final Expiration Date, (ii) the time at which all Rights are redeemed as provided in Section 20 or exchanged as provided in Section 21 and (iii) the closing of any merger or other acquisition transaction involving the Company pursuant to an agreement of the type described in clause (ii)(A)(4) of the definition of "Beneficial Ownership" in Section 1 and Section 11(g) at which time the Rights are terminated.

"**Final Expiration Date**" means the close of business on the date that is 364 days after the date hereof.

"**Multiplier Number**" shall have the meaning set forth in the Form of Certificate of Designations of Series A Participating Cumulative Preferred Stock in Exhibit A.

"**Person**" means an individual, firm, entity or organization.

"**Preferred Stock**" means the Series A Participating Cumulative Preferred Stock, par value $0.01 per share, of the Company, having the terms set forth in the Form of Certificate of Designations of Series A Participating Cumulative Preferred Stock attached hereto as Exhibit A.

"**Purchase Price**" means the price (subject to adjustment as provided herein) at which a holder of a Right may purchase one one-thousandth of a share of Preferred Stock

(subject to adjustment as provided herein) upon exercise of a Right, which price shall initially be $[•].

"**Qualifying Offer**" means an offer determined by the Board in good faith to be: (i) an offer that has commenced within the meaning of Rule 14d-2(a) under the Exchange Act; (ii) a fully financed all-cash tender offer or an exchange offer offering shares of Common Stock of the offeror, or a combination thereof, in each such case for any and all of the outstanding shares of Common Stock of the Company at the same per-share consideration; (iii) (A) an offer that is conditioned on a minimum of at least 85% of the shares of Common Stock of the Company outstanding on a fully-diluted basis being tendered and not withdrawn as of the offer's expiration date, which condition shall not be waivable or (B) an offer (1) that is conditioned on a minimum of at least a majority of (I) the shares of Common Stock of the Company outstanding on a fully diluted basis, and (II) the outstanding shares of Common Stock of the Company not held by the offeror (or such offeror's Affiliates and Associates) being tendered and not withdrawn as of the offer's expiration date, which condition shall not be waivable, and (2) pursuant to which the Company has received an irrevocable, legally binding written commitment of the offeror to consummate, as promptly as practicable upon successful completion of the offer, a second step transaction whereby all Common Stock not tendered into the offer shall be acquired at the same consideration per share of Common Stock actually paid pursuant to the offer, subject to stockholders' statutory dissenters' rights, if any (the "**Minimum Tender Condition**"); (iv) an offer that is subject only to the Minimum Tender Condition and other customary terms and conditions, which conditions shall not include any financing, funding or similar conditions or any requirements with respect to the offeror or its representatives being permitted any due diligence with respect to the books, records, management, accountants or other outside advisers of the Company; (v) an offer pursuant to which the Company has received an irrevocable written commitment by the offeror that the offer, if it is otherwise to expire prior thereto, will be extended for at least fifteen (15) Business Days after any increase in the consideration offered or after any bona fide alternative offer is commenced; (vi) an offer pursuant to which the Company has received an irrevocable, legally binding written commitment of the offeror that the offer will remain open until at least the latest of (A) the date the Board redeems the outstanding Rights or exempts such offer from the terms of this Rights Agreement; (B) if no Meeting Demand has been received from the holders of a Requisite Percentage with respect to such offer, ten (10) Business Days after the end of the Board Evaluation Period; and (C) if a Qualifying Offer Meeting is duly requested in accordance with Section 20(c), ten (10) Business Days after the date of such Qualifying Offer Meeting or, if no Qualifying Offer Meeting is held within the Meeting Period, ten (10) Business Days following the last day of such Meeting Period; (vii) an offer pursuant to which the Company has received an irrevocable, legally binding written commitment of the offeror that no amendments shall be made to the offer to reduce the consideration being offered or to otherwise change the terms of the offer in a way that is adverse to a tendering stockholder (other than extensions of the offer consistent with the terms thereof); and (viii) if the offer includes Common Stock of the offeror, (A) the offeror is a publicly owned United States corporation and its Common Stock is freely tradable and is listed or admitted to trading on a national securities exchange; (B) no stockholder approval of the offeror is required to issue such Common Stock, or, if required, such approval has

7

already been obtained; (C) no Person (including such Person's Affiliates and Associates) Beneficially Owns more than 20% of the voting shares of the offeror at the time of commencement of the offer or at any time during the term of the offer; (D) no other class of voting shares of the offeror is outstanding; and (E) the offeror meets the registrant eligibility requirements for use of Form S-3 for registering securities under the Securities Act, including, without limitation, the filing of all required Exchange Act reports in a timely manner during the twelve calendar months prior to the date of commencement of such offer.

For the purposes of the definition of Qualifying Offer, "fully financed" shall mean that the offeror has sufficient funds for the offer and related expenses which shall be evidenced by (x) firm, unqualified, written commitments from responsible financial institutions having the necessary financial capacity, accepted by the offeror, to provide funds for such offer subject only to customary terms and conditions; (y) cash or cash equivalents then available to the offeror, set apart and maintained solely for the purpose of funding the offer with an irrevocable, legally binding written commitment being provided by the offeror to the Board to maintain such availability until the offer is consummated or withdrawn; or (z) a combination of the foregoing; which evidence has been provided to the Company prior to, or upon, commencement of the offer. If an offer becomes a Qualifying Offer in accordance with this definition, but subsequently ceases to be a Qualifying Offer as a result of the failure at a later date to continue to satisfy any of the requirements of this definition, such offer shall cease to be a Qualifying Offer and the provisions of Section 20(c) shall no longer be applicable to such offer.

"**Record Date**" shall have the meaning set forth in the preamble.

"**Securities Act**" means the Securities Act of 1933, as amended, unless otherwise expressly specified.

"**Specified Percentage**" means 20% or more.

"**Stock Acquisition Date**" means the date of the first public announcement (including the filing of a report on Schedule 13D or Schedule 13G under the Exchange Act (or any comparable or successor report)) by the Company or an Acquiring Person indicating that an Acquiring Person has become such, or such earlier date as a majority of the Board of Directors of the Company shall become aware of the existence of an Acquiring Person.

"**Subsidiary**" of any Person means any other Person of which securities or other ownership interests having ordinary voting power, in the absence of contingencies, to elect a majority of the board of directors or other Persons performing similar functions are at the time directly or indirectly beneficially owned by such first Person.

"**Trading Day**" means a day on which the principal national securities exchange or over-the-counter market on which the shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are

not listed or admitted to trading on any national securities exchange or over-the-counter market, a Business Day.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Adjustment Shares | 9(a)(ii) |
| Authorized Officer | 18 |
| Board Evaluation Period | 20(c) |
| Company | Preamble |
| current market price | 9(b) |
| Demanding Stockholders | 20(c) |
| Derivatives Contract | 1 |
| Exchange Ratio | 21 |
| Exemption Date | 20(c) |
| Meeting Demand | 20(c) |
| Meeting Period | 20(c) |
| Notional Common Shares | 1 |
| NYSE American | 9(b)(ii) |
| Principal Party | 11 |
| Qualifying Offer Approval | 20(c)(ii) |
| Qualifying Offer Meeting | 20(c) |
| Qualifying Offer Resolution | 20(c) |
| Record Date | Recitals |
| Redemption Price | 20 |
| Renewal Meeting | 23(a) |
| Renewal Meeting Date | 23(c) |
| Renewal Meeting Demand | 23(a) |
| Renewal Meeting Period | 23(b) |
| Renewal Percentage | 23(a) |
| Renewal Resolution | 23(a) |
| Renewal Shareholders | 23(a) |
| Requisite Percentage | 20(c) |
| Right | Recitals |
| Rights Agent | Preamble |
| Rights Agreement | Preamble |
| Right Certificate | 3(c) |
| Section 9(a)(ii) Event | 9(a)(ii) |
| Section 11 Event | 11 |
| Substitution Period | 9(a) |
| Trust Agreement | 21 |

Section 2.     *Other Definitional and Interpretative Provisions.*  The words "hereof", "herein" and "hereunder" and words of like import used in this Rights Agreement shall refer to this Rights Agreement as a whole and not to any particular provision of this Rights Agreement.  The captions herein and descriptive headings of the

9

several sections of this Rights Agreement are included for convenience of reference only and shall be ignored in the construction or interpretation of any of the provisions of this Rights Agreement.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Rights Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Rights Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Rights Agreement.  Any singular term in this Rights Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Rights Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Person include the successors and permitted assigns of that Person.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.

Section 3.    *Issuance of Rights and Right Certificates.*  (a) As soon as practicable after the Record Date, the Company will send a summary of the Rights substantially in the form of Exhibit B hereto, by first-class mail, postage prepaid, to each record holder of the Common Stock as of the close of business on the Record Date at the address of such holder shown on the records of the Company or the transfer agent or registrar of the Common Stock.  Any certificates for the Common Stock issued (including, without limitation, certificates issued upon original issuance, issued from the Company's treasury or upon transfer or exchange of Common Stock) after the Record Date but prior to the earlier of the Distribution Date and the Expiration Date shall have printed or written on or otherwise affixed to them a legend in substantially the following form:

> This certificate also evidences and entitles the holder thereof to certain Rights as set forth in a Rights Agreement between FTS International, Inc. (the "**Company**") and [•] (and any successor rights agent thereto) as Rights Agent, dated as of [•], 2020, and as supplemented, amended or restated from time to time (the "**Rights Agreement**"), the terms of which are hereby incorporated herein by reference and a copy of which is on file at the principal executive offices of the Company.  The Company will mail to the holder of this certificate a copy of the Rights Agreement without charge promptly after receipt of a written request therefor.  Under certain circumstances, as set forth in the Rights Agreement, such Rights may be evidenced by separate certificates instead of by this certificate and may be redeemed or exchanged or may expire.  **As set forth in the Rights Agreement, Rights issued to or Beneficially Owned by, any Person who is, was or becomes an Acquiring Person or an Affiliate or Associate thereof (as such capitalized terms are defined in the Rights Agreement), whether currently held by or on behalf of such Person or by any subsequent holder, shall be null and void.**

10

With respect to any shares of Common Stock held in Book Entry form, such legend (except that any references to "this certificate" contained therein shall be replaced by the phrase "this statement") shall be included in any written notice or statement or confirmation sent to the record holder of such shares in accordance with applicable law, to the extent such notices, statements or confirmations are otherwise sent to such holders. In the event that the Company purchases or otherwise acquires any shares of Common Stock after the Record Date but prior to the Distribution Date, any Rights associated with such shares of Common Stock shall be deemed canceled and retired so that the Company shall not be entitled to exercise any Rights associated with the shares of Common Stock that are no longer outstanding.  Notwithstanding any provision of this Rights Agreement, neither the omission of a legend, nor the failure to provide notice thereof, shall affect the enforceability of any part of this Rights Agreement or the rights of any holder of the Rights.

(b)     Until the Distribution Date, (i) the Rights shall be evidenced by the certificates for Common Stock registered in the names of the holders of Common Stock (or by the Book Entry account that evidences record ownership for Common Stock) and not by separate Right certificates, and the record holders of such certificates (or registered holders of such Book Entry accounts) for Common Stock shall be the record holders of the Rights represented thereby and (ii) each Right shall only be transferable simultaneously and together with the transfer of a share of Common Stock (subject to adjustment as hereinafter provided).  Until the Distribution Date (or, if earlier, the Final Expiration Date), the surrender for transfer of any certificate for Common Stock (or the effectuation of a Book Entry transfer of shares of Common Stock) shall constitute the surrender for transfer of the Right or Rights associated with the Common Stock evidenced thereby, whether or not accompanied by a copy of the summary of the Rights.

(c)     As soon as practicable after the Distribution Date, the Company will prepare and execute, the Rights Agent will countersign (either manually or by facsimile signature), and the Company will send or cause to be sent (and the Rights Agent will, if requested by the Company in writing and provided with a stockholder list and all necessary or relevant information and documents, at the Company's expense, send) by first class mail, postage prepaid, to each record holder of the Common Stock as of the close of business on the Distribution Date (other than any Acquiring Person or any Affiliate or Associate thereof) as shown by the records of the Company or the transfer agent or registrar for Common Stock, at the address of such holder shown on such records, a certificate substantially in the form of Exhibit C hereof (a "**Right Certificate**"), evidencing one Right (subject to adjustment as provided herein) for each share of Common Stock so held.  As of and after the Distribution Date, the Rights shall be evidenced solely by Right Certificates and may be transferred by the transfer of the Right Certificate as permitted hereby, separately and apart from any transfer of one or more shares of Common Stock.  The Company shall, as promptly as practicable, notify the Rights Agent in writing upon occurrence of the Distribution Date, and if such notification is given orally the Company shall confirm the same in writing on or prior to the Business Day next following.  Until such notice is received by the Rights Agent, the Rights Agent may presume conclusively for all purposes that the Distribution Date has not occurred.  Notwithstanding any other provision hereof, the Company and the Rights

11

Agent may amend this Rights Agreement to provide for uncertificated Rights in addition to or in place of Right Certificates evidencing Rights to the extent permitted by applicable law.  If an adjustment in the number of Rights per share of Common Stock has been made pursuant to Section 9, the Company shall, at the time of distribution of the Right Certificates, make the necessary and appropriate rounding adjustments in accordance with Section 12(a) so that Right Certificates representing only whole numbers of Rights are distributed and cash is paid in lieu of any fractional Rights.

(d)     Rights shall be issued in respect of, and associated with each, share of Common Stock outstanding as of the Record Date and each additional share of Common Stock that shall become outstanding after the Record Date but prior to the earlier of the Distribution Date and the Expiration Date.  In addition, in connection with the issuance or sale of shares of Common Stock following the Distribution Date and prior to the Expiration Date, the Company (i) shall, with respect to shares of Common Stock so issued or sold (A) pursuant to the exercise of stock options or under any employee plan or arrangement or (B) upon the exercise, conversion or exchange of other securities issued by the Company prior to the Distribution Date, and (ii) may, in any other case, if deemed appropriate by the Board, issue Right Certificates representing the appropriate number of Rights in connection with such issuance or sale; *provided* that no such Right Certificate shall be issued (i) if, and to the extent that, the Company is advised by counsel that such issuance would create a significant risk of material adverse tax consequences to the Company or the Person to whom such Right Certificate would be issued, (ii) if, and to the extent that, appropriate adjustment shall otherwise have been made in lieu of the issuance thereof or (iii) to an Acquiring Person or an Affiliate or Associate of an Acquiring Person.

Section 4.     *Form of Right Certificates.*  (a) The Right Certificates (and the forms of election to purchase shares of Preferred Stock and of assignment to be printed on the reverse thereof) shall be substantially in the form of Exhibit C hereto and may have such marks of identification or designation and such legends, summaries or endorsements printed thereon as the Company may deem appropriate (but which shall not affect the rights, duties, liabilities, protections or responsibilities of the Rights Agent) and as are not inconsistent with the provisions of this Rights Agreement, or as may be required to comply with any applicable law, rule or regulation or with any rule or regulation of any stock exchange on which the Rights may from time to time be listed, or to conform to customary usage.  Subject to the other provisions of the Agreement (including Section 9), the Right Certificates shall entitle the holder thereof to purchase such number of one one-thousandths of a share of Preferred Stock as shall be set forth therein at the Purchase Price for each share of one one-thousandth of a share of Preferred Stock, but the number and identity of such shares and the Purchase Price shall be and remain subject to adjustment as provided herein.

(b)     The Right Certificates shall be executed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, its Chief Financial Officer, its President, its Treasurer or any Vice President, either manually or by facsimile signature.  The Right Certificates shall be either manually or by facsimile signature countersigned by the Rights Agent and shall not be valid for any purpose unless so countersigned.  In case

12

any officer of the Company whose manual or facsimile signature is affixed to any of the Right Certificates ceases to be such officer of the Company before countersignature by the Rights Agent and issuance and delivery by the Company, such Right Certificates may, nevertheless, be countersigned by the Rights Agent and issued and delivered with the same force and effect as though the Person who signed such Right Certificates had not ceased to be such officer of the Company.  Any Right Certificate may be signed on behalf of the Company by any Person who, at the actual date of the execution of such Right Certificate, shall be a proper officer of the Company to sign such Right Certificate, although at the date of the execution of this Rights Agreement any such Person was not such an officer.

(c)     Notwithstanding any of the provisions of this Rights Agreement or of the Rights to the contrary, the Company may, at its option, issue new Right Certificates evidencing Rights in such form as may be approved by its Board to reflect any adjustment or change in the Purchase Price and the number or kind or class of shares of stock, or other securities or property issuable upon exercise of the Rights made in accordance with the provisions of this Rights Agreement.

Section 5.     *Registration; Transfer and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates.*  (a) Following the Distribution Date and receipt by the Rights Agent of such notice to that effect and all other relevant information referred to in Section 3, the Rights Agent shall keep or cause to be kept, at its offices designated for such purpose, books for registration and transfer of the Right Certificates.  Such books shall show with respect to each Right Certificate the name and address of the registered holder thereof, the number of Rights indicated on the certificate, the certificate number of each Right Certificate and the date of each of the Right Certificates.  The Right Certificates are transferable only on the registry books of the Rights Agent.

(b)     Subject to the provision of this Rights Agreement, at any time after the Distribution Date and prior to the Expiration Date, any Right Certificate or Right Certificates (other than Right Certificates representing Rights that became null and void pursuant to Section 6(e) hereof, or that have been exchanged pursuant to Section 21 hereof) may, upon the terms and subject to the conditions set forth in this Rights Agreement, be transferred, split up, combined or exchanged for another Right Certificate or Right Certificates entitling the registered holder to purchase a like number of shares of Preferred Stock (or other securities, cash or other assets) as the Right Certificate or Right Certificates surrendered then entitled such holder to purchase.  Any registered holder desiring to transfer, split up, combine or exchange any Right Certificate or Right Certificates shall make such request in writing delivered to the Rights Agent and shall surrender such Right Certificate or Right Certificates (with the form of assignment and certificate contained therein properly completed and duly executed) to the Rights Agent at the office of the Rights Agent designated for such purpose.  Neither the Rights Agent nor the Company shall be obligated to take any action whatsoever with respect to the transfer of any such surrendered Right Certificate or Right Certificates until the registered holder of the Rights has complied with the requirements of Section 6(f) and shall have paid a sum sufficient to cover any transfer tax or other governmental charge that may be

13

imposed in connection with any transfer, split up, combination or exchange of any Right Certificate or Right Certificates.  Upon satisfaction of the foregoing requirements, the Rights Agent shall, subject to Sections 6(e), 6(f), 8(d), 12 and 21, countersign and deliver to the Person entitled thereto a Right Certificate or Right Certificates as so requested.  The Rights Agent shall promptly forward any such sums collected by it to the Company or to such Persons as the Company shall specify by written notice.  The Rights Agent shall have no duty or obligation under any Section of this Rights Agreement that requires the payment of taxes or charges unless and until it is satisfied that all such taxes and/or charges have been paid.

(c)     Subject to the provisions of this Rights Agreement, at any time after the Distribution Date and prior to the Expiration Date, upon receipt by the Company and the Rights Agent of evidence reasonably satisfactory to them of the loss, theft, destruction or mutilation of a Right Certificate, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to them, and, at the Company's request, reimbursement to the Company and the Rights Agent of all reasonable expenses incidental thereto, and upon surrender to the Rights Agent and cancellation of the Right Certificate if mutilated, the Company will issue and deliver a new Right Certificate of like tenor to the Rights Agent for countersignature and delivery to the registered owner in lieu of the Right Certificate so lost, stolen, destroyed or mutilated.

Section 6.     *Exercise of Rights.*  (a) The registered holder of any Right Certificate may exercise the Rights evidenced thereby (except as otherwise provided herein, including Sections 6(e), 6(f), and 9(a)) in whole or in part at any time after the Distribution Date and prior to the Expiration Date upon surrender of the Right Certificate, with the form of election to purchase and the certificate on the reverse side thereof properly completed and duly executed, to the Rights Agent at the office of the Rights Agent designated for such purpose, together with payment (in lawful money of the United States of America by cash or certified check or bank draft or money order payable in immediately available or next day funds to the order of the Company) of the aggregate Purchase Price for the total number of one one-thousandths of a share of Preferred Stock (or other securities, cash or other assets, as the case may be) as to which such surrendered Rights are then exercisable and an amount equal to any applicable transfer tax or other governmental charge.

(b)     Upon satisfaction of the requirements of Section 6(a) and subject to Section 18(k), the Rights Agent shall thereupon promptly (i) either (A) requisition from any transfer agent of the Preferred Stock (or make available, if the Rights Agent is the transfer agent therefor) certificates (or make a Book Entry) for the total number of one one-thousandths of a share of Preferred Stock to be purchased and the Company hereby irrevocably authorizes its transfer agent to comply with all such requests) or (B) if the Company shall have elected to deposit the shares of Preferred Stock issuable upon exercise of the Rights with a depositary agent, requisition from the depositary agent depositary receipts representing interests in such number of one one-thousandths of a share of Preferred Stock to be purchased (in which case certificates for the shares of one one-thousandths of a share of Preferred Stock represented by such receipts shall be deposited by the transfer agent with the depositary agent and the Company hereby directs

14

each such depositary agent to comply with such request), (ii) when necessary to comply with this Rights Agreement or otherwise when appropriate, as determined by the Company with notice to the Rights Agent, requisition from the Company the amount of cash, if any, to be paid in lieu of issuance of fractional shares in accordance with Section 12, (iii) after receipt of such certificates or depositary receipts (or confirmations or written notices that a Book Entry has been made) cause the same to be delivered to or upon the order of the registered holder of such Right Certificate (with such certificates or receipts registered in such name or names as may be designated by such holder), and (iv) when necessary to comply with this Rights Agreement (or otherwise when appropriate as determined by the Company with notice to the Rights Agent), after receipt thereof, deliver such cash referred to in (ii) above to or upon the order of the registered holder of such Rights Certificate.  If the Company is obligated to deliver Common Stock or other securities, pay cash and/or distribute other property pursuant to this Rights Agreement, the Company will make all arrangements necessary so that such securities, cash and or/other property are available for delivery by the Rights Agent, if and when necessary to comply with this Rights Agreement.

(c)     Each Person (other than the Company) in whose name any certificate (or Book Entry) for a number of one one-thousandths of a share of Preferred Stock (or Common Stock and/or other securities, as the case may be) is issued upon the exercise of Rights shall for all purposes be deemed to have become the holder of record of such one one-thousandths of a share of Preferred Stock (or Common Stock and/or other securities, as the case may be) represented thereby on, and such certificate or Book Entry shall be dated, the date upon which the Right Certificate evidencing such Rights was duly surrendered and payment of the Purchase Price (and any transfer taxes or other governmental charges) was made; *provided* that if the date of such surrender and payment is a date upon which the transfer books of the Company relating to the one one-thousandths of a share of Preferred Stock (or Common Stock and/or other securities, as the case may be) are closed, such Person shall be deemed to have become the record holder of such shares on, and such certificate or Book Entry shall be dated, the next succeeding Business Day on which the applicable transfer books of the Company are open.  Prior to the exercise of the Rights evidenced thereby, the holder of a Right Certificate shall not be entitled to any rights of a stockholder of the Company with respect to shares for which the Rights shall be exercisable, including the right to vote, to receive dividends or other distributions or to exercise any preemptive rights, and shall not be entitled to receive any notice of any proceedings of the Company except as provided herein.

(d)     In case the registered holder of any Right Certificate shall exercise less than all the Rights evidenced thereby, a new Right Certificate evidencing the number of Rights remaining unexercised shall be issued by the Rights Agent and delivered to, or upon the order of, the registered holder of such Right Certificate, registered in such name or names as may be designated by such holder, subject to the provisions of Section 12.

(e)     Notwithstanding anything in this Rights Agreement to the contrary, from and after the first occurrence of a Section 9(a)(ii) Event, any Rights Beneficially Owned by (i) an Acquiring Person or an Associate or Affiliate of an Acquiring Person, (ii) a

transferee of an Acquiring Person (or of any such Associate or Affiliate of an Acquiring Person) who becomes a transferee after a Section 9(a)(ii) Event (a "**Post-Transferee**"), (iii) a transferee of an Acquiring Person (or of any such Associate or Affiliate of an Acquiring Person) who becomes a transferee prior to or concurrently with a Section 9(a)(ii) Event and receives such Rights pursuant to either (x) a transfer (whether or not for consideration) from the Acquiring Person (or any such Associate or Affiliate) to holders of equity interests in such Acquiring Person (or in any such Associate or Affiliate) or to any Person with whom the Acquiring Person (or any such Associate or Affiliate) has any continuing agreement, arrangement or understanding regarding the transferred Rights or (y) a transfer which the Board determines is part of a plan, arrangement or understanding which has as a primary purpose or effect the avoidance of this Section 6(e) (a "**Pre-Transferee**"), or (iv) any subsequent transferee receiving transferred Rights from a Post-Transferee or Pre-Transferee, either directly or through one or more intermediate transferees, shall in each of the cases (i) to (iv) above become null and void without any further action, and no holder of such Rights shall have any rights whatsoever with respect to such Rights, whether under this Rights Agreement or otherwise.  Neither the Company nor the Rights Agent shall have any liability to any holder of Right Certificates or other Person as a result of its failure to make any determinations with respect to an Acquiring Person or its Affiliates and Associates or any transferee of any of them hereunder.  The Company shall give the Rights Agent written notice of the identity of any Acquiring Person, Associate of an Acquiring Person or Affiliate of an Acquiring Person known to it, or the nominee of the foregoing, and the Rights Agent may rely on such notice in carrying out its duties under this Rights Agreement and shall be deemed not to have any knowledge of the identity of such Acquiring Person, Associate or Affiliate or the nominee of the foregoing unless and until it has received notice.

(f)     Notwithstanding anything in this Rights Agreement to the contrary, neither the Rights Agent nor the Company shall be obligated to undertake any action with respect to any purported transfer, split up, combination or exchange pursuant to Section 5 or exercise pursuant to this Section 6 unless the registered holder of the applicable Rights (i) shall have properly completed and duly signed the certificate (including the certification regarding the identity of the Beneficial Owner) contained in the form of assignment or election to purchase, as the case may be, set forth on the reverse side of the Right Certificate surrendered for such transfer or exercise, as the case may be and (ii) shall have provided such additional evidence of the identity of the Beneficial Owner (or former Beneficial Owner) of the Rights evidenced thereby or Affiliates or Associates thereof as the Company or Rights Agent shall reasonably request.

Section 7.    *Cancellation and Destruction of Right Certificates.*  All Right Certificates surrendered for exercise, transfer or exchange shall, if surrendered to the Company or to any of its agents, be delivered to the Rights Agent in canceled form, or, if surrendered to the Rights Agent, shall be canceled by it, and no Right Certificates shall be issued in lieu thereof except as expressly permitted by this Rights Agreement.  The Company shall deliver to the Rights Agent for cancellation and retirement, and the Rights Agent shall cancel and retire, any other Right Certificate purchased or acquired by the Company otherwise than upon the exercise thereof.  The Rights Agent shall deliver all

16

canceled Right Certificates to the Company, or shall, at the written request of the Company, destroy or cause to be destroyed such canceled Right Certificates, and in such case shall deliver a certificate of destruction thereof to the Company.

Section 8.    *Reservation and Availability of Capital Stock.*  (a) The Company covenants and agrees that it will cause to be reserved and kept available out of its authorized and unissued shares of Preferred Stock or any shares of Preferred Stock held in treasury, the number of shares of Preferred Stock sufficient to permit the exercise in full of all outstanding Rights as provided in this Rights Agreement.

(b)      So long as the Preferred Stock issuable upon the exercise of Rights may be listed on any national securities exchange, the Company shall use its reasonable best efforts to cause, from and after such time as the Rights become exercisable, all securities reserved for such issuance to be listed on any such exchange upon official notice of issuance upon such exercise.

(c)      The Company shall take all such action as may be necessary to ensure that all one one-thousandths of a share of Preferred Stock (and following the occurrence of a Section 9(a)(ii) Event, Common Stock and/or other securities) shall, at the time of delivery of the certificates for such securities (subject to payment of the Purchase Price and compliance with all other applicable provisions of this Rights Agreement), be duly and validly authorized and issued, fully paid and nonassessable.

(d)      The Company shall pay when due and payable any and all taxes and other governmental charges which may be payable in respect of the issuance or delivery of the Right Certificates and of any certificates (or Book Entry) for shares of Preferred Stock (or Common Stock and/or other securities as the case may be) upon the exercise or exchange of Rights.  The Company shall not, however, be required to pay any transfer tax or other governmental charge which may be payable in respect of any transfer, issuance or delivery of any Right Certificates to a Person other than, or the issuance or delivery of certificates or depository receipts for shares of Preferred Stock (or Common Stock and/or other securities as the case may be) in respect of a name other than, that of the registered holder of the applicable Right Certificate.  Prior to any such issuance or delivery of any Right Certificates or any certificates (or Book Entry) for Preferred Stock (or Common Stock and/or other securities as the case may be), any such tax or other governmental charge shall have been paid by the holder of such Right Certificate or it shall have been established to the Company's and the Rights Agent's satisfaction that no such tax or other governmental charge is due.

(e)      From and after such time as the Rights become exercisable, if then necessary to permit the issuance of shares of Preferred Stock upon the exercise of Rights, the Company shall use its reasonable best efforts to register and qualify such shares of Preferred Stock under the Securities Act and any applicable state securities or "Blue Sky" laws (to the extent exemptions therefrom are not available), cause such registration statement and qualifications to become effective as soon as possible after such filing and keep such registration and qualifications effective (with a prospectus at all times meeting the requirements of the Securities Act) until the earlier of the date as of which the Rights

17

are no longer exercisable for such securities and the Expiration Date.  The Company may temporarily suspend, for a period of time not to exceed 120 days, the exercisability of the Rights in order to prepare and file a registration statement under the Securities Act and permit it to become effective.  Upon any such suspension, the Company shall issue a public announcement stating that the exercisability of the Rights has been temporarily suspended, as well as a public announcement at such time as the suspension is no longer in effect.  The Company shall notify the Rights Agent whenever it makes a public announcement pursuant to this Section 8(e) and give the Rights Agent a copy of such announcement. Notwithstanding any provision of this Rights Agreement to the contrary, the Rights shall not be exercisable in any jurisdiction unless the requisite qualification in such jurisdiction shall have been obtained and until a registration statement under the Securities Act shall have been declared effective, unless an exemption therefrom is available.

Section 9.    *Adjustment of Purchase Price, Number and Kind of Shares or Number of Rights.*  (a) (i) To preserve the actual or potential economic value of the Rights, if at any time after the date hereof there shall be any change in the shares of Common Stock or the Preferred Stock, whether by reason of stock dividends, stock splits, reverse stock splits, recapitalization, mergers, consolidations, combinations or exchanges of securities, split-ups, split-offs, spin-offs, liquidations, other similar changes in capitalization, any distribution or issuance of cash, assets, evidences of indebtedness or subscription rights, options or warrants to holders of Common Stock or Preferred Stock, as the case may be (other than distribution of the Rights or regular quarterly cash dividends) or otherwise, then, in each such event the Board shall make such appropriate adjustments in the number of shares of Common Stock, Preferred Stock (or the number and kind of other securities) issuable upon exercise of each Right (or, in exchange for any Right pursuant to Section 21), the Purchase Price and Redemption Price in effect at such time and/or the number of Rights outstanding at such time (including the number of Rights or fractional Rights associated with each share of Common Stock) such that following such adjustment such event shall not have had the effect of reducing or limiting the benefits the holders of the Rights would have had absent such event.  If an event occurs which requires an adjustment under both this Section 9(a)(i) and Section 9(a)(ii), the adjustment provided for in this Section 9(a)(i) shall be made prior to, and in addition to, any adjustment required pursuant to Section 9(a)(ii).

(ii)    Subject to Section 21 hereof, if any Person, alone or together with its Affiliates and Associates, becomes, at any time after the date of this Rights Agreement, an Acquiring Person (a "**Section 9(a)(ii) Event**"), then each holder of a Right shall thereafter (except as otherwise provided herein, including Section 6(e)) be entitled to receive, upon exercise thereof at a price equal to the then current Purchase Price multiplied by the number of one one-thousandths of a share of Preferred Stock for which a Right is exercisable immediately prior to the Section 9(a)(ii) Event, in accordance with this Rights Agreement, in lieu of Preferred Stock, such number of duly and validly authorized and issued, fully paid and nonassessable shares of Common Stock of the Company (such shares being referred to herein as the "**Adjustment Shares**") equal to the result obtained by dividing

18

(x)      the product obtained by multiplying the then current Purchase Price by the number of one one-thousandths of a share of Preferred Stock for which a Right was exercisable immediately prior to the occurrence of such event by

(y)      50% of the current market price per share of Common Stock (determined pursuant to Section 9(b)) on the date of the occurrence of such event;

*provided*, *however*, that the Purchase Price (as so adjusted) and the number of Adjustment Shares so receivable upon exercise of a Right shall, following the Section 9(a)(ii) Event, be subject to further adjustment as appropriate in accordance with Section 9(c).  From and after the occurrence of a Section 11 Event, any Rights that have not theretofore been exercised pursuant to this Section 9(a)(ii) shall thereafter be exercisable only in accordance with Section 11 and not pursuant to this Section 9(a)(ii).

(iii)      The Company may at its option substitute for a share of Common Stock issuable upon the exercise of Rights in accordance with the foregoing subparagraph (ii) a number of shares of Preferred Stock or fraction thereof such that the current market price of one share of Preferred Stock multiplied by such number or fraction is equal to the current per share market price of one share of Common Stock.  If the number of shares of Common Stock which are authorized by the Company's certificate of incorporation but not outstanding or reserved for issuance other than upon exercise of the Rights is not sufficient to permit the exercise in full of the Rights in accordance with Section 9(a)(ii), the Company shall, to the extent permitted by law (and to the extent that the Board has not theretofore determined to seek stockholder approval for the authorization of additional shares of Common Stock as provided in the following sentence) with respect to each Right, make adequate provision to substitute for the Adjustment Shares, upon payment of the Purchase Price then in effect, (A) (to the extent available) Common Stock, then (B) (to the extent available) such number of one one-thousandths of a share of Preferred Stock as are then equivalent in value to the value of the Adjustment Shares and then (C) other equity or debt securities of the Company, cash or other assets, a reduction in the Purchase Price or any combination of the foregoing, having an aggregate value (as determined by the Board) equal to the value of the Adjustment Shares; *provided* that (1) the Company may, and (2) if the Company shall not have made adequate provision as required above to deliver value within 30 days following the first occurrence of a Section 9(a)(ii) Event, then the Company shall be obligated to, deliver, upon the surrender for exercise of a Right and without requiring payment of the Purchase Price, (x) (to the extent available) Common Stock, then (y) (to the extent available) one-thousandths of a share of Preferred Stock and then, (z) other equity or debt securities of the Company, cash or other assets or any combination of the foregoing, having an aggregate value (as determined by the Board) equal to the excess of the value of the Adjustment Shares over the then current Purchase Price. If the Board determines that it is likely that sufficient additional shares of Common Stock could be authorized for issuance upon full exercise of the Rights

19

and the Board determines, in its absolute discretion to seek such authorization, the 30 day period referred to in the prior sentence may be extended for a period of up to 90 days after the first occurrence of a Section 9(a)(ii) Event, in order to permit the Company to seek any stockholder approval required for the authorization of such additional shares (such 30 day period as it may be extended, shall hereafter be referred to as the "**Substitution Period**").  To the extent that the Company determines that some action is to be taken pursuant to the preceding two sentences, the Company (A) shall provide, subject to Section 6(e), that such action shall apply uniformly to all outstanding Rights and (B) may suspend the exercisability of the Rights until the expiration of the Substitution Period in order to seek stockholder approval for such authorization of additional shares and/or to decide the appropriate form and value of any consideration to be delivered as referred to in such sentence.  If any such suspension occurs, the Company shall issue a public announcement stating that the exercisability of the Rights has been temporarily suspended, as well as a public announcement at such time as the suspension is no longer in effect.  The Company shall notify the Rights Agent whenever it makes a public announcement pursuant to this Section 9(a)(iii) and give the Rights Agent a copy of such announcement.  For purposes of this Section 9(a)(iii), the value of the Common Stock shall be the current market price per share of Common Stock (as determined pursuant to Section 9(b)) on the date of the first occurrence of a Section 9(a)(ii) Event; any common stock equivalent shall be deemed to have the same value as the Common Stock on such date; and the value of other securities or assets shall be determined as of such date pursuant to Section 9(b)(iv).

(b)       (i) For purposes of computations hereunder other than computations made pursuant to Section 9(a)(iii) or Section 12, the "current market price" per share of Common Stock on any date shall be the average of the daily closing prices per share of such Common Stock at the close of the regular session of trading for the 30 consecutive Trading Days immediately prior to, but not including, such date; for purposes of computations made pursuant to Section 9(a)(iii), the "current market price" per share of Common Stock on any date shall be deemed to be the average of the daily closing prices per share of such Common Stock at the close of the regular session of trading for the 10 consecutive Trading Days immediately following, but not including, such date; and for purposes of computations made pursuant to Section 12, the "current market price" per share of Common Stock for any Trading Day shall be the closing price per share of Common Stock at the close of the regular session of trading for such Trading Day; *provided* that if the current market price per share of the Common Stock is determined during a period that is in whole or in part following the announcement by the issuer of such Common Stock of (i) a dividend or distribution on such Common Stock payable in shares of such Common Stock or securities exercisable for or convertible into shares of such Common Stock (other than the Rights), or (ii) any subdivision, combination or reclassification of such Common Stock, and prior to the ex-dividend date for such dividend or distribution or the record date for such subdivision, combination or reclassification, then, and in each such case, the "current market price" shall be properly adjusted to take into account ex-dividend trading.  The closing price for each day shall be the last sale price, regular way, at the close of the regular session of trading or, if no such

20

sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case as reported in the principal consolidated transaction reporting system at the close of the regular session of trading with respect to securities listed or admitted to trading on the NYSE American ("**NYSE American**") or, if the shares of Common Stock are not listed or admitted to trading on the NYSE American, on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the last quoted price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or such other system then in use or, if on any such date the shares of Common Stock are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the Common Stock selected by the Board (in each case prices which are not identified as having been reported late to such system). If on any such date, no market maker is making a market in the Common Stock or the Common Stock is not publicly held or not so listed or traded, the "current market value" of such shares on such date shall be as determined by the Board which determination shall be described in a statement filed with the Rights Agent and shall be conclusive for all purposes.

(ii)     For the purpose of any computation hereunder, the "current market price" per share of Preferred Stock shall be determined in the same manner as set forth above for the Common Stock in Section 9(b)(i) (other than the last sentence thereof).  If the current market price per share of Preferred Stock cannot be determined in such manner, the "current market price" per share of Preferred Stock shall be conclusively deemed to be an amount equal to the Multiplier Number then in effect multiplied by the current market price per share of Common Stock (as determined pursuant to Section 9(b)(i)).  If neither the Common Stock nor the Preferred Stock is publicly traded, "current market price" shall mean the fair value per share as determined by the Board which determination shall be described in a statement filed with the Rights Agent and shall be conclusive for all purposes.  For all purposes of this Rights Agreement, the "current market price" of one one-thousandth of a share of Preferred Stock shall be equal to the "current market price" of one share of Preferred Stock divided by 1,000.

(iii)     For purposes of any computation hereunder, the "current market price" per Right shall be determined in the same manner as set forth above for the Common Stock in Section 9(b)(i) (including the last sentence thereof).

(iv)     For the purpose of any computation hereunder, the value of any securities or assets other than Common Stock, Preferred Stock or Rights shall be the fair value as determined by the Board, which determination shall be described in a statement filed with the Rights Agent and shall be conclusive for all purposes.

(c)     If at any time, as a result of an adjustment made pursuant to Section 9(a) or 11(a), the holder of any Right is entitled to receive upon exercise of such Right any

21

shares of capital stock other than Preferred Stock, thereafter the number of such other shares so receivable upon exercise of any Right and the Purchase Price thereof shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Preferred Stock contained in Section 9(a), and the provisions of Sections 6, 8, 11 and 12 with respect to the Preferred Stock shall apply on like terms to any such other shares.

(d)     All Rights originally issued by the Company subsequent to any adjustment made hereunder shall evidence the right to purchase, at the Purchase Price then in effect, the adjusted number and kind of securities issuable from time to time hereunder upon exercise of the Rights, all subject to further adjustment as provided herein.

(e)     Irrespective of any adjustment or change in the Purchase Price or the number of one one-thousandths of a share of Preferred Stock or number of kind of other securities issuable upon the exercise of the Rights, the Right Certificates theretofore and thereafter issued may continue to express the terms which were expressed in the initial Right Certificates issued hereunder.

(f)     Before taking any action that would cause an adjustment reducing the Purchase Price below the then par value, if any, of the number of one one-thousandths of a share of Preferred Stock issuable upon exercise of the Rights or other securities issuable upon the exercise of the Rights, the Company shall take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable such number of one one-thousandths of a share of Preferred Stock or other such securities at such adjusted Purchase Price.

(g)     In any case in which this Section 9 shall require that an adjustment in the Purchase Price be made effective as of a record date for a specified event, the Company may elect to defer (with prompt written notice thereof to the Rights Agent) until the occurrence of such event the issuance to the holder of any Right exercised after such record date the number of one one-thousandths of a share of Preferred Stock or other capital stock, if any, issuable upon such exercise over and above the number of one one-thousandths of a share of Preferred Stock or other capital stock, if any, issuable upon such exercise on the basis of the Purchase Price in effect prior to such adjustment; *provided* that the Company shall deliver to such holder a due bill or other appropriate instrument evidencing such holder's right to receive such additional shares upon the occurrence of the event requiring such adjustment.

(h)     Anything in this Section 9 to the contrary notwithstanding, the Company shall be entitled to make such reductions in the Purchase Price, in addition to those adjustments expressly required by this Section 9, as and to the extent that it, in its sole discretion, determines to be advisable so that any consolidation or subdivision of the Preferred Stock or Common Stock, issuance wholly for cash of any Preferred Stock or Common Stock at less than the current market price, issuance wholly for cash of any Preferred Stock or Common Stock or securities which by their terms are convertible into or exercisable for Preferred Stock or Common Stock, stock dividends or issuance of rights, options or warrants referred to in this Section 9 hereafter made by the Company to

22

the holders of its Preferred Stock or Common Stock, shall not be taxable to such stockholders.

(i)       The Company agrees that after the occurrence of the earlier of the Distribution Date or the Stock Acquisition Date, it will not, except as permitted by Sections 20, 21 or 24, take (or permit any Subsidiary to take) any action if at the time such action is taken it is reasonably foreseeable that such action will substantially diminish or otherwise eliminate the benefits intended to be afforded by the Rights.

Section 10.   *Certificate of Adjusted Purchase Price or Number of Shares.* Whenever an adjustment is made as provided in Section 9 or Section 11, the Company shall (a) promptly prepare a certificate setting forth such adjustment and a brief statement of the facts accounting for such adjustment, (b) promptly file with the Rights Agent and with the transfer agent for the Common Stock a copy of such certificate and (c) if such adjustment occurs any time after the Distribution Date, mail a brief summary thereof to each holder of a Right Certificate in the manner set forth in Section 23; *provided* that the failure to prepare, file or mail such certificate or summary shall not affect the validity of the adjustment.  The Rights Agent shall be fully protected in relying on any such certificate and on any adjustment statement therein contained and shall have no duty or liability to calculate or verify or confirm any of the adjustments set forth therein, nor shall it be deemed to have knowledge of any adjustment or basis for adjustment hereunder unless and until it shall have received such certificate.

Section 11.   *Consolidation, Merger or Sale or Transfer of Assets or Earning Power.*  (a) If, following the occurrence of a Section 9(a)(ii) Event, directly or indirectly,

(x)       the Company shall effect a share exchange, consolidate with, merge with or into or otherwise combine with, any Person, and the Company is not the continuing or surviving corporation of such share exchange, consolidation, merger or combination;

(y)       any Person shall effect a share exchange, merge with and into, consolidate with the Company or otherwise combine with, the Company, and the Company is the continuing or surviving corporation of such share exchange, merger or combination and, in connection therewith all or part of the outstanding shares of Common Stock is changed into or exchanged for other stock or securities of the Company or of any other Person, cash or any other property; or

(z)       the Company and/or one or more of its Subsidiaries sells or otherwise transfers, in one transaction or a series of related transactions, to any other Person, assets or earning power aggregating more than 50% of the assets or earning power of the Company and its Subsidiaries, taken as a whole,

(each of the above, a "**Section 11 Event**") then, on the first occurrence of any such event, proper provision shall promptly be made so that

23

(i)     each holder of a Right, except as provided in Section 6(e) hereof, shall thereafter be entitled to receive, upon exercise thereof at the then current Purchase Price multiplied by the number of one one-thousandths of a share of Preferred Stock for which a Right is then exercisable in accordance with the terms of this Rights Agreement and in lieu of shares of Preferred Stock, such number of duly and validly authorized and issued, fully paid and nonassessable shares of freely tradeable Common Stock of the Principal Party (as hereinafter defined), not subject to any rights of call or first refusal, liens, encumbrances or other claims, as shall be equal to the result obtained by dividing

(A)     the product obtained by multiplying the then current Purchase Price by the number of one one-thousandths of a share of Preferred Stock for which a Right was then exercisable by

(B)     50% of the then current market price (determined pursuant to Section 9(b)) per share of the Common Stock of such Principal Party on the date of consummation of such Section 11 Event;

*provided*, *however*, that the Purchase Price (as so adjusted pursuant to the foregoing clause (i)(A)) and the number of shares of Common Stock of such Principal Party so receivable upon exercise of a Right shall be subject to further adjustment as appropriate in accordance with Section 9(c) to reflect any events occurring in respect of the Common Stock of such Principal Party after the occurrence of such Section 11 Event;

(ii)     the Principal Party shall thereafter be liable for, and shall assume, by virtue of such consolidation, merger, combination, sale or transfer, all the obligations and duties of the Company pursuant to this Rights Agreement;

(iii)     the term "**Company**" shall thereafter be deemed to refer to such Principal Party, it being specifically intended that the provisions of Section 9 shall apply only to such Principal Party following the first occurrence of a Section 11 Event; and

(iv)     such Principal Party shall take such steps (including the authorization and reservation of a sufficient number of shares of its Common Stock to permit exercise of all outstanding Rights in accordance with this Section 11(a)) in connection with the consummation of any such transaction as may be necessary to assure that the provisions hereof shall thereafter be applicable, as nearly as reasonably may be, in relation to the shares of its Common Stock thereafter deliverable upon the exercise of the Rights; *provided* that, upon the subsequent occurrence of any consolidation, merger, sale or transfer of assets or other extraordinary transaction in respect of such Principal Party, each holder of a Right shall thereupon be entitled to receive, upon exercise of a Right and payment of the Purchase Price as provided in this Section 11, such cash, shares, rights, warrants and other property which such holder would have been entitled to receive had such holder, at the time of such transaction, owned the Common

24

Stock of the Principal Party receivable upon the exercise of a Right pursuant to this Section 11, and such Principal Party shall take such steps (including, but not limited to, reservation of shares of stock) as may be necessary to permit the subsequent exercise of the Rights in accordance with the terms hereof for such cash, shares, rights, warrants and other property.

(b) "Principal Party" means

(i) in the case of any transaction described in Sections 11(a)(x) or 11(a)(y), (A) the Person that is the issuer of any securities into which shares of Common Stock of the Company are changed, or otherwise exchanged or converted in such share exchange, merger, consolidation or combination or (B) if no securities are so issued, (x) the Person that is the other party to such merger or consolidation if such Person survives said merger, or, if there is more than one such Person, the Person the shares of Common Stock of which have the greatest aggregate market value of shares outstanding or (y) if the Person that is the other party to the merger does not survive the merger, the Person that does survive the merger (including the Company if it survives) or (z) the Person resulting from the consolidation; or

(ii) in the case of any transaction described in Section 11(a)(z), the Person that is receiving the greatest portion of the assets or earning power transferred pursuant to such transaction or transactions or, if each Person that is a party to such transaction or transactions receives the same portion of the assets or earning power so transferred or if the Person receiving the greatest portion of the assets or earning power cannot be determined, whichever of such Persons is the issuer of Common Stock having the greatest aggregate market value of shares outstanding;

*provided* that in any such case, if the Common Stock of such Person is not at such time and has not been continuously over the preceding 12-month period registered under Section 12 of the Exchange Act, then (A) if such Person is a direct or indirect Subsidiary of another Person the Common Stock of which is and has been so registered, "Principal Party" shall refer to such other Person; (B) if such Person is a Subsidiary, directly or indirectly, of more than one Person, the Common Stocks of two or more of which are and have been so registered, "Principal Party" shall refer to whichever of such Persons is the issuer of the Common Stock having the greatest aggregate market value; and (C) if such Person is owned, directly or indirectly, by a joint venture formed by two or more Persons that are not owned, directly or indirectly, by the same Person, the rules set forth in clauses (A) and (B) above shall apply to each of the owners having an interest in the venture as if the Person owned by the joint venture was a Subsidiary of both or all of such joint venturers, and the Principal Party in each such case shall bear the obligations set forth in this Section 11 in the same ratio as its interest in such Person bears to the total of such interests.

(c)     The Company shall not consummate any such share exchange, consolidation, merger, combination, sale or transfer unless (i) the Principal Party has a sufficient number of authorized shares of its Common Stock which are not outstanding or otherwise reserved for issuance (and which shall, when issued upon exercise of the Rights in accordance with this Rights Agreement be duly and validly authorized and issued, fully paid and nonassessable and free of preemptive rights, rights of first refusal or any other restriction or limitations on transfer on ownership thereof) to permit the exercise in full of the Rights in accordance with this Section 11, (ii) prior thereto a registration statement under the Securities Act on an appropriate form with respect to the Rights and the securities issuable upon exercise of the Rights shall be effective under the Securities Act and (iii) prior thereto the Company and such Principal Party shall have executed and delivered to the Rights Agent a valid, binding and enforceable supplemental agreement providing for the terms set forth in Sections 11(a) and 11(b) and providing that the Principal Party shall use its reasonable best efforts to (A) cause a registration statement under the Securities Act on an appropriate form with respect to the Rights and the securities issuable upon exercise of the Rights to remain effective (with a prospectus at all times meeting the requirements of the Securities Act) until the Expiration Date, (B) qualify or register the Rights and the securities issuable upon exercise of the Rights under the blue sky or securities laws of such jurisdictions as may be necessary or appropriate, (C) deliver to holders of the Rights historical financial statements for the Principal Party which comply in all respects with the requirements for registration on Form 10 under the Exchange Act, (D) list (or continue the listing of) the Rights and the securities issuable upon exercise of the Rights on a national securities exchange in the United States, and (E) obtain waivers of any rights of first refusal or preemptive rights in respect of the Common Stock or other securities of the Principal Party subject to purchase upon exercise of the outstanding Rights.

(d)     In case the Principal Party which is to be a party to a transaction referred to in this Section 11 has a provision in any of its authorized securities or in its certificate of incorporation or bylaws or other instrument governing its affairs, which provision would have the effect of (i) causing such Principal Party to issue, in connection with, or as a consequence of, the consummation of a transaction referred to in this Section 11, shares of Common Stock of such Principal Party at less than the then current market value per share (determined pursuant to Section 9(b) hereof) or securities exercisable for, or convertible into, Common Stock of such Principal Party at less than such then current market value (other than to holders of Rights pursuant to this Section 11) or (ii) providing for any special tax or similar payment in connection with the issuance to any holder of a Right of Common Stock of such Principal Party pursuant to the provisions of this Section 11, then, in such event, the Company shall not consummate any such transaction unless prior thereto the Company and such Principal Party shall have executed and delivered to the Rights Agent a supplemental agreement providing that the provision in question shall have been canceled, waived or amended, or that the authorized securities shall be redeemed, so that the applicable provision will have no effect in connection with, or as a consequence of, the consummation of the proposed transaction.

(e)     The Company covenants and agrees that it shall not, at any time after any Person becomes an Acquiring Person, enter into any transaction described in Section

26

11(a)(x), (y) or (z) hereof if (i) at the time of or immediately after such share exchange, consolidation, merger, sale, transfer or other transaction there are any rights, warrants or other instruments or securities outstanding or agreements in effect which would substantially diminish or otherwise eliminate the benefits intended to be afforded by the Rights, (ii) prior to, simultaneously with or immediately after such share exchange, consolidation, merger, sale, transfer or other transaction, the stockholders of the Person who constitutes, or would constitute, the Principal Party for purposes of Section 11 hereof shall have received a distribution of Rights previously owned by such Person or any of its Affiliates or Associates or (iii) the form or nature of organization of the Principal Party would preclude or limit the exercisability of the Rights.

(f)     The provisions of this Section 11 shall similarly apply to successive share exchanges, consolidations, mergers, sales, transfers or other transactions.

(g)     Notwithstanding anything contained herein to the contrary, in the event of any merger or other acquisition transaction involving the Company pursuant to a merger or other acquisition agreement between the Company and any Person (or one or more of such Person's Affiliates or Associates) which agreement has been approved by the Board prior to any Person becoming an Acquiring Person, this Rights Agreement and the rights of holders of Rights hereunder shall be terminated in accordance with Section 6.

Section 12.   *Fractional Rights and Fractional Shares.*   (a) The Company is not required to issue fractions of Rights or to distribute Right Certificates which evidence fractional Rights.  In lieu of any such fractional Rights, the Company shall pay to the registered holders of the Right Certificates with regard to which such fractional Rights would otherwise be issuable an amount in cash equal to the same fraction of the current market price of a whole Right.  For purposes of this Section 12(a), the current market price of a whole Right shall be the closing price of a Right at the close of the regular session of trading for the Trading Day immediately prior to the date on which such fractional Right would otherwise have been issuable.  The closing price of a Right for any day shall be determined in the manner set forth in Section 9(b)(iii).

(b)     The Company is not required to issue fractions of shares of Preferred Stock (other than fractions which are integral multiples of one one–thousandth of a share of Preferred Stock) upon exercise of the Rights or upon exchange of the Rights pursuant to Section 21, and the Company is not required to distribute certificates which evidence fractional shares of Preferred Stock (other than fractions which are integral multiples of one one-thousandth of a share of Preferred Stock).  Fractions of shares of Preferred Stock that are integral multiples of one one-thousandth of a share of Preferred Stock may, at the election of the Company, be evidenced by depositary receipts, pursuant to an appropriate agreement between the Company and a depositary selected by it; *provided* that such agreement shall provide that the holder of such depositary receipt shall have all the rights, privileges and preferences to which they are entitled as beneficial owners of the shares of Preferred Stock represented by such receipt.  In lieu of any such fractional shares of Preferred Stock that are not integral multiples of one one-thousandth of a share of Preferred Stock, the Company shall pay to the registered holders of Right Certificates at the time such Rights are exercised as herein provided or exchanged pursuant to Section

27

21(a) an amount in cash equal to the same fraction of the current market price of one one-thousandth of a share of Preferred Stock.  For purposes of this Section 12(b), the current market price of one one-thousandth of a share of Preferred Stock shall be as determined pursuant to Section 9(b)(ii) for the Trading Day immediately prior to the date of such exercise or exchange.

(c)     Following the occurrence of any Section 9(a)(ii) Event or Section 11 Event or upon any exchange pursuant to Section 21, the Company shall not be required to issue fractions of shares of Common Stock upon exercise of the Rights or to distribute certificates which evidence fractional shares of Common Stock.  In lieu of fractional shares of Common Stock, the Company shall pay to the registered holders of Right Certificates at the time such Rights are exercised or exchanged as herein provided an amount in cash equal to the same fraction of the current market price of a share of Common Stock.  For purposes of this Section 12(c), the current market price of a share of Common Stock shall be the closing price of a share of Common Stock (as determined pursuant to Section 9(b)) for the Trading Day immediately prior to the date of such exercise or exchange.

(d)     Each holder of a Right, by its acceptance of the Right, expressly waives its right to receive any fractional Rights or any fractional shares upon exercise of a Right except as permitted by this Section 12.

(e)     Whenever a payment for fractional Rights or fractional shares is to be made by the Rights Agent, the Company shall (i) promptly prepare and deliver to the Rights Agent a certificate setting forth in reasonable detail the facts related to such payments and the prices and/or formulas utilized in calculating such payments, and (ii) provide sufficient monies to the Rights Agent in the form of fully collected funds to make such payments.  The Rights Agent shall be fully protected in relying upon such a certificate and shall have no duty with respect to, and shall not be deemed to have knowledge of, any payment for cash for fractional Rights or fractional shares under any Section of this Rights Agreement relating to the payment of cash for fractional Rights or fractional shares unless and until the Rights Agent shall have received such a certificate and sufficient monies.

Section 13.   *Rights of Action.*  All rights of action in respect of this Rights Agreement, except the rights of action given to the Rights Agent under this Rights Agreement, are vested in the respective registered holders of the Right Certificates (and, prior to the Distribution Date, the registered holders of Common Stock); and any such holder, without the consent of any other such holder or the Rights Agent, may, on its own behalf and for its own benefit, enforce, and may institute and maintain any suit, action or proceeding against the Company to enforce, or otherwise act in respect of, its right to exercise the Rights evidenced by such Right Certificate (or, prior to the Distribution Date, such Common Stock) in the manner provided in this Rights Agreement.  Without limiting the foregoing or any remedies available to the holders of Rights, it is specifically acknowledged that the holders of Rights would not have an adequate remedy at law for any breach of this Rights Agreement and will be entitled to specific performance of the

obligations under, and injunctive relief against actual or threatened violations of the obligations of, any Person subject to this Rights Agreement.

Section 14.   *Agreement of Right Holders.*  Each holder of a Right, by its acceptance of the Right, consents and agrees with the Company and the Rights Agent and with every other holder of a Right that:

(a)    prior to a Distribution Date, the Rights will be evidenced by and transferable only in connection with the transfer of Common Stock;

(b)    after a Distribution Date, the Rights will be evidenced by Right Certificates and transferable only on the registry books of the Rights Agent pursuant to Section 5;

(c)    subject to Sections 5 and 6, the Company and the Rights Agent may deem and treat the Person in whose name a Right Certificate (or, prior to the Distribution Date, the associated Common Stock) is registered as the absolute owner thereof and of the Rights evidenced thereby (notwithstanding any notations of ownership or writing on the Right Certificate or the associated certificate for Common Stock or Book Entry made by anyone other than the Company or the Rights Agent) for all purposes whatsoever, and neither the Company nor the Rights Agent, subject to the last sentence of Section 6(e), shall be affected by any notice to the contrary; and

(d)    notwithstanding anything in this Rights Agreement to the contrary, neither the Company nor the Rights Agent shall have any liability to any holder of a Right or other Person as a result of its inability to perform any of its obligations under this Rights Agreement by reason of any preliminary or permanent injunction or other order, judgment, decree or ruling issued by a court of competent jurisdiction or by a governmental, regulatory or administrative agency or commission, or any statute, rule, regulation or executive order promulgated or enacted by any governmental authority prohibiting or otherwise restraining performance of such obligation; *provided* that the Company must use its reasonable best efforts to have any such injunction, order, judgment, decree or ruling lifted or otherwise overturned as soon as possible.

Section 15.   *Right Certificate Holder Not Deemed a Stockholder.*  No holder, as such, of any Right Certificate shall be entitled to vote, receive dividends or be deemed for any purpose the holder of the shares of capital stock which may at any time be issuable on the exercise of the Rights represented thereby, nor shall anything contained herein or in any Right Certificate be construed to confer upon the holder of any Right Certificate, as such, any of the rights of a stockholder of the Company (including any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, to give or withhold consent to any corporate action, to receive notice of meetings or other actions affecting stockholders (except as provided in Section 22), or to receive dividends or subscription rights, or otherwise) until the Right or Rights evidenced by such Right Certificate shall have been exercised or exchanged in accordance with the provisions hereof.

29

Section 16.  *Appointment of Rights Agent.*  (a) The Company hereby appoints the Rights Agent to act as agent for the Company in accordance with the terms and conditions hereof, and the Rights Agent hereby accepts such appointment.  The Company may from time to time appoint such co-rights agents as it may deem necessary or desirable, upon at least ten (10) days' prior written notice (the term "Rights Agent" being used herein to refer, collectively, to the Rights Agent together with any such co-Rights Agents).  In the event the Company appoints one or more co-Rights Agents, the respective duties of the Rights Agent and any co-Rights Agents shall be as the Company shall determine and the Company shall provide written notice thereof to the Rights Agent.  The Rights Agent shall have no duty to supervise, and in no event shall be liable for, the acts or omissions of any such co-Rights Agent.

(b)      The Company shall pay to the Rights Agent reasonable compensation for all services rendered by it hereunder and, from time to time, on demand of the Rights Agent, its reasonable expenses and counsel fees and disbursements and other disbursements incurred in the execution, preparation, delivery, amendment or administration of this Rights Agreement and the exercise and performance of its duties hereunder.  The Company also shall indemnify the Rights Agent for, and to hold it harmless against, any loss, liability, expense, damage, judgment, fine, penalty, claim, demand, settlement or cost (including, without limitation, the reasonable fees and expenses of legal counsel) incurred without gross negligence, bad faith or willful misconduct on the part of the Rights Agent (which gross negligence, bad faith or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction), for any action taken, suffered or omitted to be taken by the Rights Agent in connection with the acceptance and administration of this Rights Agreement or the exercise or performance of its duties hereunder, including the costs and expenses of defending against any claim of liability. The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company. The provisions of this Section 16 and Section 18 below shall survive the termination of this Rights Agreement, the exercise or expiration of the Rights and the resignation, replacement or removal of the Rights Agent.

Section 17.  *Merger or Consolidation or Change of Name of Rights Agent.*  (a) Any entity into or with which the Rights Agent or any successor Rights Agent may be merged, consolidated or combined, any entity resulting from any merger, consolidation or combination to which the Rights Agent or any successor Rights Agent shall be a party, or any entity succeeding to the corporate trust or stock transfer business of the Rights Agent or any successor Rights Agent, shall be the successor to the Rights Agent under this Rights Agreement without the execution or filing of any paper or any further act on the part of any party hereto; *provided* that such entity would be eligible for appointment as a successor Rights Agent under the provisions of Section 19.  If at the time such successor Rights Agent succeeds to the agency created by this Rights Agreement any of the Right Certificates have been countersigned but not delivered, any such successor Rights Agent may adopt the countersignature of a predecessor Rights Agent and deliver such Right Certificates so countersigned; and if at that time any of the Right Certificates have not been countersigned, any successor Rights Agent may countersign such Right Certificates either in the name of the predecessor Rights Agent or in the name of the successor Rights

30

Agent; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Rights Agreement.

(b)      If at any time the name of the Rights Agent shall be changed and at such time any of the Right Certificates have been countersigned but not delivered, the Rights Agent may adopt the countersignature under its prior name and deliver Right Certificates so countersigned; and if at that time any of the Right Certificates have not been countersigned, the Rights Agent may countersign such Right Certificates either in its prior name or its changed name; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Rights Agreement.

Section 18.   *Duties of the Rights Agent.*  The Rights Agent undertakes to perform only the duties and obligations expressly imposed by this Rights Agreement upon the following terms and conditions, by all of which the Company and the holders of Right Certificates, by their acceptance thereof, shall be bound:

(a)      The Rights Agent may consult with legal counsel (who may be legal counsel for the Company), and the advice or opinion of such counsel shall be full and complete authorization and protection to the Rights Agent as to any action taken or omitted to be taken by it and in accordance with such opinion and the Rights Agent shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it in accordance with such advice or opinion.

(b)      Whenever in the performance of its duties under this Rights Agreement the Rights Agent deems it necessary or desirable that any fact or matter (including the identity of any "Acquiring Person" and the determination of "current market price") be proved or established by the Company prior to taking, suffering or omitting to take any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by the Chairman of the Board, the Chief Executive Officer, the Chief Financial Officer, the President or any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer (each an "**Authorized Officer**") of the Company and delivered to the Rights Agent; and such certificate shall be full authorization and protection to the Rights Agent and the Rights Agent shall not incur any liability for or in respect of any action taken, suffered or omitted to be taken by it under the provisions of this Rights Agreement in reliance upon such certificate.

(c)      The Rights Agent shall be liable hereunder only for its own gross negligence, bad faith or willful misconduct (which gross negligence, bad faith or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction).  Anything to the contrary notwithstanding, in no event shall the Rights Agent be liable for any special, punitive, indirect, consequential or incidental loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Rights Agent has been advised of the likelihood of such loss or damage. Any liability of the Rights Agent under this Rights Agreement will be limited to the amount of annual fees paid by the Company to the Rights Agent during the twelve (12) months

31

immediately preceding the event for which recovery from the Rights Agent is being sought.

(d)     The Rights Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Rights Agreement or in the Right Certificates (except its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the Company only.

(e)     The Rights Agent shall not have any liability for or be responsible (i) in respect of the validity of this Rights Agreement or the execution and delivery hereof (except the due execution hereof by the Rights Agent) or in respect of the validity or execution of any Right Certificate (except its countersignature thereof), (ii) for any breach by the Company of any covenant or condition contained in this Rights Agreement or in any Right Certificate, (iii) for any change in the exercisability of the Rights (including the Rights becoming null and void pursuant to Section 6(e)) or (iv) any change or adjustment in the terms of the Rights (including the manner, method or amount thereof) provided herein or the ascertaining of the existence of facts that would require any such change or adjustment (except with respect to the exercise of Rights evidenced by Right Certificates after receipt of the certificate described in Section 10 hereof, upon which the Rights Agent may rely).  The Rights Agent shall not by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Preferred Stock or other securities to be issued pursuant to this Rights Agreement or any Right Certificate or as to whether any shares of Preferred Stock or other securities will, when issued, be duly and validly authorized and issued, fully paid and nonassessable.

(f)     The Company agrees that it will perform, execute, acknowledge and deliver, or cause to be performed, executed, acknowledged and delivered, all such acts, instruments and assurances as may reasonably be required by the Rights Agent for the carrying out or performing by the Rights Agent of the provisions of this Rights Agreement.

(g)     The Rights Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from an Authorized Officer and to apply to such officers for advice or instructions in connection with its duties, and such instructions shall be full authorization and protection to the Rights Agent and the Rights Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with instructions of any such officer or for any delay in acting while waiting for those instructions.  The Rights Agent shall be fully authorized and protected in relying upon the most recent instructions received from any such officers.

(h)     The Rights Agent and any stockholder, affiliate, director, officer or employee of the Rights Agent may buy, sell or deal in any of the Rights or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not the Rights Agent under this Rights

32

Agreement.  Nothing herein shall preclude the Rights Agent or any stockholder, affiliate, director, officer or employee from acting in any other capacity for the Company or for any other Person.

(i)     The Rights Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself (through its directors, officers or employees) or by or through its attorneys or agents, and the Rights Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys or agents or for any loss to the Company, any holders of Rights or any other Person resulting from any such act, default, neglect or misconduct absent gross negligence, bad faith or willful misconduct  in the selection and continued employment thereof (which gross negligence, bad faith or willful misconduct must be determined by a final, non-appealable judgment of a court of competent jurisdiction).

(j)     No provision of this Rights Agreement shall require the Rights Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it.

(k)     If, with respect to any Right Certificate surrendered to the Rights Agent for exercise or transfer, the certificate attached to the form of assignment or form of election to purchase, as the case may be, has either not been completed or indicates an affirmative response to clause 1 or 2 thereof, the Rights Agent shall not take any further action with respect to such requested exercise or transfer without first consulting with the Company.

(l)     The Rights Agent shall be fully protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it in connection with its acceptance and administration of this Rights Agreement or the exercise or performance of its duties hereunder, in each case in reliance upon any Right Certificate or certificate for Common Stock or for other securities of the Company, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, notice, instruction, direction, consent, certificate, statement or other paper or document reasonably believed by it to be genuine and to be signed, executed and, where necessary, verified or acknowledged, by the proper Person or Persons or otherwise upon the advice of counsel set forth in this Section 18.  The Rights Agent shall not be deemed to have knowledge of any event of which it was supposed to receive notice thereof hereunder, and the Rights Agent shall be fully protected and shall incur no liability for failing to take any action in connection therewith, unless and until it has received such notice.

Section 19.  *Change of Rights Agent.*  The Rights Agent or any successor Rights Agent may resign and be discharged from its duties under this Rights Agreement upon at least 30 days' notice to the Company and to each transfer agent of the Common Stock and Preferred Stock (only if the transfer agent is not also the Rights Agent) by recognized national overnight delivery service.  In the event the transfer agency relationship in effect between the Company and the Rights Agent terminates, the Rights Agent will be deemed to have resigned on the 10th Business Day after such termination and be discharged from

33

its duties as Rights Agent under this Agreement as of the effective date of such termination, and the Company shall be responsible for sending any required notice.  The Company may remove (with or without cause) the Rights Agent or any successor Rights Agent upon at least 30 days' notice to the Rights Agent or successor Rights Agent, as the case may be, and to each transfer agent of the Common Stock and Preferred Stock by recognized national overnight delivery service, registered or certified mail, and, after the Distribution Date, to the holders of the Right Certificates.  If the Rights Agent resigns or is removed or otherwise becomes incapable of acting, the Company shall appoint a successor to the Rights Agent.  If the Company fails to make such appointment within a period of 30 days after giving notice of such removal or after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated Rights Agent or by the holder of a Right Certificate (who shall, with such notice, submit its Right Certificate for inspection by the Company), then the registered holder of any Right Certificate may apply to any court of competent jurisdiction for the appointment of a new Rights Agent.  Any successor Rights Agent, whether appointed by the Company or by such a court, shall be (a) an entity organized, in good standing and doing business under the laws of the United States or of any state of the United States, in good standing, which is, authorized under such laws to exercise stock transfer or stockholder services powers, or corporate trust powers and is subject to supervision or examination by federal or state authority and which has, together with its Affiliates, at the time of its appointment as Rights Agent a combined capital and surplus of at least $50,000,000 or (b) an Affiliate of an entity described in Section 19(a).  After appointment, the successor Rights Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Rights Agent without further act or deed; but the predecessor Rights Agent shall deliver and transfer to the successor Rights Agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose.  Not later than the effective date of any such appointment, the Company shall file notice thereof with the predecessor Rights Agent and each transfer agent of the Common Stock and the Preferred Stock, and, if such appointment occurs after the Distribution Date, mail a notice thereof to the registered holders of the Right Certificates in accordance with Section 23.  Failure to give or mail any notice provided for in this Section 19, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Rights Agent or the appointment of the successor Rights Agent, as the case may be.

Section 20.  *Redemption.*  (a) At any time prior to the occurrence of a Section 9(a)(ii) Event, the Board may, at its option, redeem all but not less than all of the then outstanding Rights at a redemption price of $0.001 per Right, as such amount may be appropriately adjusted pursuant to Section 9(a)(i) (such redemption price being hereinafter referred to as the "**Redemption Price**").  The redemption of the Rights may be made effective at such time, on such basis and with such conditions as the Board in its sole discretion may establish.  The Redemption Price shall be payable, at the option of the Company, in cash, shares of Common Stock (based on the current market value of the Common Stock at the time of redemption), or such other form of consideration as the Board shall determine.

34

(b)      Immediately upon the action of the Board electing to redeem the Rights (or at such later time as the Board may establish for the effectiveness of such redemption) and without any further action and without any notice, the right to exercise the Rights will terminate and thereafter the only right of the holders of Rights shall be to receive the Redemption Price for each Right so held.  The Company shall promptly thereafter give notice of such redemption to the Rights Agent and the holders of the Rights in accordance with Section 23 hereof; *provided* that the failure to give, or any defect in, such notice shall not affect the validity of such redemption.  Any notice which is provided in the manner herein specified shall be deemed given, whether or not the holder receives the notice.  Each such notice of redemption will state the method by which the payment of the Redemption Price will be made.  Neither the Company nor any of its Affiliates or Associates may redeem, acquire or purchase for value any Rights at any time in any manner other than as specifically set forth in this Section 20 or in Section 21 hereof and other than in connection with the purchase of Common Stock prior to the Distribution Date.

(c)      In the event the Company receives a Qualifying Offer and the Board has not redeemed the outstanding Rights or exempted such Qualifying Offer from the terms of this Rights Agreement or called a meeting of stockholders for the purpose of voting on whether or not to exempt such Qualifying Offer from the terms of this Rights Agreement, in each case, by the close of business on the date that is ninety (90) days following the commencement of such Qualifying Offer within the meaning of Rule 14d-2(a) under the Exchange Act (the "**Board Evaluation Period**"), the holders of record (or their duly authorized proxy) of 25% or more of the Common Stock of the Company then outstanding (excluding Common Stock that are Beneficially Owned by the Person making the Qualifying Offer) (the "**Requisite Percentage**") may submit to the Board, not later than ninety (90) days following the Board Evaluation Period a written demand complying with the terms of this Section 20(c) (the "**Meeting Demand**") directing the Board to submit to a vote of stockholders at a meeting of the stockholders of the Company (a "**Qualifying Offer Meeting**") a resolution exempting such Qualifying Offer from the provisions of this Rights Agreement (the "**Qualifying Offer Resolution**"). Any Meeting Demand must be (A) delivered to the Secretary at the principal executive offices of the Company; and (B) signed by the demanding stockholders (the "**Demanding Stockholders**") or a duly authorized agent of the Demanding Stockholders.

(i)      After receipt of a Meeting Demand in proper form and in accordance with this Section 20(c) from Demanding Stockholders holding the Requisite Percentage, the Board shall take such actions necessary or desirable to cause the Qualifying Offer Resolution to be so submitted to a vote of stockholders at a Qualifying Offer Meeting to be convened within ninety (90) days following the Board's receipt of the Meeting Demand (the "**Meeting Period**") by including a proposal relating to adoption of the Qualifying Offer Resolution in the proxy materials of the Company for the Qualifying Offer Meeting; provided, however, that if the Company at any time during the Meeting Period and prior to a vote on the Qualifying Offer Resolution enters into a Definitive Acquisition Agreement, the Meeting Period may be extended (and any Qualifying Offer Meeting called in connection therewith may be cancelled) if the Qualifying Offer Resolution is

35

separately submitted to a vote at the same meeting as the Definitive Acquisition Agreement. Subject to the requirements of applicable law, the Board may take a position in favor of, or opposed to, the adoption of the Qualifying Offer Resolution, or no position with respect to the Qualifying Offer Resolution, as it determines to be appropriate in the exercise of its fiduciary duties.

(ii)     In the event that (A) the Qualifying Offer continues to be a Qualifying Offer and (B) at the Qualifying Offer Meeting at which a quorum is present, either (x) in the case of a Qualifying Offer in which the consideration is all cash, a majority of the Common Stock outstanding as of the record date for the Qualifying Offer Meeting selected by the Board (excluding Common Stock Beneficially Owned by the Person making the Qualifying Offer and such Person's Affiliates and Associates) or (y) in the case of a Qualifying Offer in which the consideration is other than all cash, $66^2/_3\%$ of the Common Stock outstanding as of the record date for the Qualifying Offer Meeting selected by the Board (excluding Common Stock Beneficially Owned by the Person making the Qualifying Offer and such Person's Affiliates and Associates) shall vote in favor of the Qualifying Offer Resolution (such vote in favour of the Qualifying Offer Resolution set forth in clause (x) or (y), the "**Qualifying Offer Approval**"), then the Qualifying Offer shall be exempt from the application of this Rights Agreement in all respects to such Qualifying Offer as long as it remains a Qualifying Offer, such exemption to be effective on the close of business on the date on which the results of the vote on the Qualifying Offer Resolution at the Qualifying Offer Meeting are certified as official by the appointed inspectors of election for the Qualifying Offer Meeting (the "**Exemption Date**"). Notwithstanding anything herein to the contrary, no action or vote by stockholders not in compliance with the provisions of this Section 20(c) shall serve to exempt any offer from the terms of this Rights Agreement. In the event of a Qualifying Offer Approval, immediately upon the close of business on the Exemption Date, and without any further action and without any notice, the right to exercise the Rights with respect to the Qualifying Offer will terminate and, notwithstanding anything in this Rights Agreement to the contrary, the consummation of the Qualifying Offer shall not cause the offeror (or its Affiliates or Associates) to become an Acquiring Person; and the Rights shall immediately expire and have no further force and effect upon such consummation.

Section 21.   *Exchange.*  (a) At any time on or after the occurrence of a Section 9(a)(ii) Event, the Board may, at its option exchange all or any part of the then outstanding and exercisable Rights (which shall not include Rights that have become null and void pursuant to Section 6(e)) for shares of Common Stock at an exchange ratio of one share of Common Stock per Right, appropriately adjusted to reflect any adjustments in the number of Rights pursuant to Section 9(a)(i) (such exchange ratio being hereinafter referred to as the "**Exchange Ratio**").  The exchange of the Rights by the Board may be made effective at such time, on such basis and with such conditions as the Board in its sole discretion may establish.  Notwithstanding the foregoing (i) the Board shall not be empowered to effect such exchange at any time after any Person (other than an Exempt Person) together with all Affiliates and Associates of such Person, becomes the

36

Beneficial Owner of 50% or more of the shares of Common Stock then outstanding and (ii) from and after the occurrence of a Section 11 Event, any Rights that theretofore have not been exchanged pursuant to this Section 21(a) shall thereafter be exercisable only in accordance with Section 11 and may not be exchanged pursuant to this Section 21(a).  If the Board elects to exchange any Rights pursuant to this Section 21(a) prior to the issuance of Right Certificates, the Company may conduct the exchange without issuing Right Certificates and, for purposes of this Rights Agreement, the holders of the Rights shall be deemed to have simultaneously received and surrendered for exchange, Right Certificates on the date of such exchange.

(b)     Any action of the Board ordering the exchange of any Rights pursuant to Section 21(a) shall be irrevocable, and immediately upon the taking of such action and without any further action and without any notice, the right to exercise such Rights will terminate and thereafter (subject only to clause (ii) in the penultimate sentence of Section 21(a)) the only right of a holder of such Rights shall be to receive that number of shares of Common Stock equal to the number of such Rights held by such holder multiplied by the Exchange Ratio.  The Company shall promptly thereafter give public notice of such exchange and the Company shall promptly mail a notice of any such exchange to the Rights Agent and to all of the holders of such Rights in accordance with Section 23; *provided* that the failure to give, or any defect in, any such notice shall not affect the validity of such exchange.  Any notice which is provided in the manner herein specified shall be deemed given, whether or not the holder receives the notice.  Each such notice of exchange will state the method by which the exchange of Rights for shares of Common Stock will be effected and, in the event of any partial exchange, the number of Rights which will be exchanged.  Any partial exchange shall be effected pro rata based on the number of Rights (other than Rights which have become null and void pursuant to Section 6(e)) held by each holder of Rights.

(c)     In any exchange pursuant to this Section 21, the Company, at its option, may substitute Preferred Stock for Common Stock exchangeable for Rights, at the initial rate of one one-thousandth of a share of Preferred Stock for each share of Common Stock, as appropriately adjusted to reflect adjustments in the voting rights of the Preferred Stock pursuant to the terms thereof, so that the fraction of a share of Preferred Stock delivered in lieu of each share of Common Stock shall have the same current market price and voting rights as one share of Common Stock.

(d)     In the event that there shall not be sufficient shares of Common Stock or Preferred Stock issued but not outstanding or authorized but unissued to permit any exchange of Rights, as contemplated in accordance with this Section 21, the Company shall either at the election of the Board (i) take all such action as may be necessary to authorize additional shares of Common Stock or Preferred Stock for issuance upon exchange of the Rights (provided that if such approval is not obtained the Company will take the action specified in clause (ii) of this sentence), or (ii) take such action as shall be necessary to ensure and provide, as and when and to the maximum extent permitted by applicable law and without exposing directors to personal liability in connection therewith (as determined by the Board) and any agreements or instruments in effect on the Stock Acquisition Date (and remaining in effect) to which it is a party, that each

37

Right shall thereafter constitute the right to receive debt or equity securities or other assets (or a combination thereof) having a fair value equal to the product of the current market price of a share of Common Stock (as determined pursuant to Section 9(b) on the date of the Section 9(a)(ii) Event multiplied by the Exchange Ratio in effect on the date of the Section 9(a)(ii) Event, where the fair value of such debt or equity securities or other assets (or a combination thereof) shall be as determined by the Board.

(e)     Upon or prior to effecting an exchange pursuant to this Section 21, or as promptly as reasonably practicable thereafter, the Board may direct the Company to enter into a trust agreement in such form and with such terms as the Board shall then approve (the "**Trust Agreement**").  If the Board so directs, the Company shall enter into the Trust Agreement and shall issue to the trust created by such agreement (the "**Trust**") all or part (as determined by the Board) of the fractional shares of Preferred Stock, or shares of Common Stock or other securities, if any, issuable pursuant to the exchange provided in this Section 21, and all Persons entitled to receive shares or other securities pursuant to the exchange shall be entitled to receive such shares or other securities (and any dividends or distributions made thereon after the date on which such shares or other securities are deposited in the Trust) only from the Trust and solely upon compliance with the relevant terms and provisions of the Trust Agreement.  Prior to effecting an exchange and registering shares of Common Stock (or other such securities) in any Person's name, including any nominee or transferee of a Person, the Company may require (or cause the trustee of the Trust to require), as a condition thereof, that any holder of Rights provide evidence, including, without limitation, the identity of the Beneficial Owners and their Affiliates and Associates (or former Beneficial Owners and their Affiliates and Associates) as the Company or the Rights Agent shall reasonably request in order to determine if such Rights are null and void. If any Person shall fail to comply with such request, the Company shall be entitled conclusively to deem the Rights formerly held by such Person to be null and void pursuant to Section 6(e) and not transferable or exercisable or exchangeable in connection herewith. Any shares of Common Stock or other securities issued at the direction of the Board in connection herewith shall be validly issued, fully paid and nonassessable shares of Common Stock or other securities (as the case may be), and the Company shall be deemed to have received as consideration for such issuance a benefit having a value that is at least equal to the aggregate par value of the shares so issued.

Section 22.   *Notice of Proposed Actions.*   (a) If the Company proposes, at any time after the earlier of the Distribution Date or the Stock Acquisition Date, (i) to pay any dividend payable in stock of any class or to make any other distribution (other than a regular quarterly cash dividend out of earnings or retained earnings of the Company) to the holders of Preferred Stock, (ii) to offer to the holders of its Preferred Stock rights or warrants to subscribe for or to purchase any additional shares of Preferred Stock or shares of stock of any class or any other securities, rights or options, (iii) to effect any reclassification of its Preferred Stock (other than a reclassification involving only the subdivision or combination of outstanding shares of Preferred Stock), (iv) to effect any share exchange, consolidation, merger or combination with any other Person, or to effect (or permit any of its subsidiaries to effect) any sale or other transfer, in one transaction or a series of related transactions, of assets or earning power aggregating more than 50% of

38

the assets or earning power of the Company and its Subsidiaries, taken as a whole, or (v) to effect the liquidation, dissolution or winding-up of the Company, then, in each such case, the Company shall give to the Rights Agent and each holder of a Right Certificate, to the extent feasible, a notice of such proposed action specifying the record date for the purposes of any such dividend, distribution or offering of rights or warrants, or the date on which any such share exchange, reclassification, consolidation, merger, combination, sale, transfer, liquidation, dissolution or winding-up is to take place and the date of participation therein by the holders of Preferred Stock and/or Common Stock, if any such date is to be fixed and such notice shall be so given in the case of any action covered by Section 22(a)(i) or Section 22(a)(ii) above at least 10 days prior to the record date for determining holders of the Preferred Stock and/or Common Stock entitled to participate in such dividend, distribution or offering, and in the case of any such other action, at least 10 days prior to the date of the taking of such proposed action or the date of participation therein by the holders of Preferred Stock and/or Common Stock, whichever shall be earlier.  The failure to give a notice required by this Section or any defect therein shall not affect the legality or validity of the action taken by the Company or the vote upon any such action.

(b)     If a Section 9(a)(ii) Event or Section 11 Event occurs, then, in any such case, (i) the Company shall as soon as practicable thereafter give to the Rights Agent and each holder of a Right (or if occurring prior to the Distribution Date, the holders of the Common Stock), in accordance with Section 23, a written notice of the occurrence of such event, which shall specify the event and the consequences of the event to holders of Rights under Sections 9(a)(ii) or 11, as the case may be, and (ii) all references in Section 22(a) to Preferred Stock shall be deemed thereafter to refer to Common Stock and/or other capital stock, as the case may be.

Section 23.   *Renewal.*  (a) In the event the Board has not renewed this Rights Agreement or called a meeting of stockholders for the purpose of voting on whether or not to renew this Rights Agreement, in each case, by the close of business on the date that is 90 days prior to the Final Expiration Date, the holders of record (or their duly authorized proxy) of 25% or more of the Common Stock of the Company then outstanding (the "**Renewal Percentage**") may submit to the Board, not later than 90 days prior to the Final Expiration Date a written demand complying with the terms of this Section 23 (the "**Renewal Meeting Demand**") directing the Board to submit to a vote of stockholders at a meeting of the stockholders of the Company (a "**Renewal Meeting**") a resolution renewing this Rights Agreement (the "**Renewal Resolution**"). Any Renewal Meeting Demand must be (A) delivered to the Secretary at the principal executive offices of the Company; and (B) signed by the demanding stockholders (the "**Renewal Stockholders**") or a duly authorized agent of the Renewal Stockholders.

(b)     After receipt of a Renewal Meeting Demand in proper form and in accordance with this Section 23 from Renewal Stockholders holding the Renewal Percentage, the Board shall take such actions necessary or desirable to cause the Renewal Resolution to be so submitted to a vote of stockholders at a Renewal Meeting to be convened within 90 days following the Board's receipt of the Renewal Meeting Demand (the "**Renewal Meeting Period**") by including a proposal relating to adoption of the

Renewal Resolution in the proxy materials of the Company for the Renewal Meeting. Subject to the requirements of applicable law, the Board may take a position in favor of, or opposed to, the adoption of the Renewal Resolution, or no position with respect to the Renewal Resolution, as it determines to be appropriate in the exercise of its fiduciary duties.

(c)     In the event that, at the Renewal Meeting at which a quorum is present, a majority of the Common Stock outstanding as of the record date for the Renewal Meeting selected by the Board shall vote in favor of the Renewal Resolution, then this Rights Agreement shall, without any further action and without any notice, be renewed for a period of one (1) year. Notwithstanding anything herein to the contrary, no action or vote by stockholders not in compliance with the provisions of this Section 23(c) shall serve to renew this Rights Agreement.

Section 24.   *Notices.*   Except as set forth below, all notices, requests, demands and other communications to any party hereunder and to the holder of any Right shall be in writing unless otherwise expressly specified herein.  Notices or demands authorized by this Rights Agreement to be given or made to or on the Company or (subject to Section 19) the Rights Agent shall be sufficiently given or made if sent in writing by recognized national overnight delivery service, first class, registered or certified mail (postage prepaid) to the addresses set forth below (or such other address as such party specifies in writing to the other party):

if to the Company, to:

FTS International, Inc.
[Address]
[Address]
Attention: [•]
Email: [•]

if to the Rights Agent, to:

[•]
[Address]
[Address]
Attention: [•]
Email: [•]

Except as otherwise expressly set forth in this Rights Agreement, notices or demands authorized by this Rights Agreement to be given or made by the Company or the Rights Agent to the holder of any Right is sufficiently given or made if sent in writing by recognized national overnight delivery service or first-class mail (postage prepaid) to each record holder of such Right at the address of such holder shown on the records of the Company or the transfer agent or registrar for the Common Stock.  Notwithstanding anything in this Rights Agreement to the contrary except as set forth in Section 3(a) with respect to the obligation by the Company to send a summary of the Rights to each holder

40

of Common Stock, prior to the Distribution Date a public filing by the Company with the Securities and Exchange Commission shall constitute sufficient notice to the holders of securities of the Company, including the Rights, for purposes of this Rights Agreement and no other notice need be given to such holders.

Section 25.  *Supplements and Amendments.*  At any time prior to the occurrence of a Section 9(a)(ii) Event, the Company may in its sole and absolution discretion, and the Rights Agent shall if the Company so directs, supplement or amend any provision of this Rights Agreement in accordance with this Section 25 in any respect without the approval of the holders of the Rights or Right Certificates.  At any time after the occurrence of a Section 9(a)(ii) Event, the Company may, and the Rights Agent shall if the Company so directs, supplement or amend this Rights Agreement without the approval of any holders of Rights in order to (i) cure any ambiguity, (ii) correct or supplement any provision contained herein which may be defective or inconsistent with any other provision herein or (iii) amend or supplement the provisions hereunder in any manner the Company may deem necessary or desirable and which shall not adversely affect the interests of the holders of Rights as such (other than an Acquiring Person or an Affiliate or Associate of an Acquiring Person).  Upon the delivery of a certificate from an Authorized Officer of the Company stating that the proposed supplement or amendment is in compliance with the terms of this Rights Agreement, the Rights Agent shall execute such supplement or amendment.  Notwithstanding anything to the contrary contained in this Rights Agreement, the Rights Agent may, but shall not be obligated to, enter into any supplement or amendment that affects the Rights Agent's own rights, duties, obligations or immunities under this Rights Agreement.

Section 26.  *Successors.*  All the covenants and provisions of this Rights Agreement by or for the benefit of the Company or the Rights Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 27.  *Determinations and Actions by the Board, etc.*  The Board shall have the exclusive power and authority to administer this Rights Agreement and to exercise all rights and powers specifically granted to the Board or to the Company, or as may be necessary or advisable in the administration of this Rights Agreement, including the right and power to (i) interpret the provisions of this Rights Agreement and (ii) make all determinations deemed necessary or advisable for the administration of this Rights Agreement (including a determination to redeem or exchange or not to redeem or exchange the Rights or to amend this Rights Agreement).  All such actions, calculations, interpretations and determinations (including, for purposes of clause (y) below, all omissions with respect to the foregoing) which are done or made by the Board shall (x) be final, conclusive and binding on the Company, the Rights Agent, the holders of the Rights and all other parties and (y) not subject the Board or any member hereof to any liability to the holders of the Rights.  The Rights Agent shall be entitled to assume that the Board acted in good faith and shall be fully protected and incur no liability in reliance thereon.

Section 28.  *Benefits of This Rights Agreement.*  Nothing in this Rights Agreement shall be construed to give to any Person other than the Company, the Rights

41

Agent and the registered holders of the Right Certificates (and, prior to a Distribution Date, the Common Stock) any legal or equitable right, remedy or claim under this Rights Agreement.  This Rights Agreement shall be for the sole and exclusive benefit of the Company, the Rights Agent and the registered holders of the Right Certificates (and, prior to a Distribution Date, the Common Stock).

Section 29.  *Severability.*  If any term, provision, covenant or restriction of this Rights Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Rights Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Section 30.  *Governing Law.*  This Rights Agreement, each Right and each Right Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts to be made and performed entirely within such State.

Section 31.  *Counterparts; Effectiveness.*  This Rights Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute one and the same instrument.  This Rights Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by all of the other parties hereto.  Until and unless each party has received a counterpart hereof signed by the other party hereto, this Rights Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). A facsimile or .pdf signature delivered electronically shall constitute an original signature for all purposes.

Section 32.  *Force Majeure.*  Notwithstanding anything to the contrary contained herein, the Rights Agent shall not be liable for any delays or failures in performance resulting from acts beyond its reasonable control, including, without limitation, acts of God, pandemics, terrorist acts, shortage of supply, breakdowns or malfunctions, interruptions or malfunctions of computer facilities, or loss of data due to power failures or mechanical difficulties, information storage or retrieval systems, labor difficulties, war or civil unrest.

IN WITNESS WHEREOF, the parties hereto have caused this Rights Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FTS INTERNATIONAL, INC.

By: _____
      Name:
      Title:

[RIGHTS AGENT]

By: _____
      Name:
      Title:

[*Signature Page to Rights Agreement*]

EXHIBIT A

## FORM OF
## CERTIFICATE OF DESIGNATIONS
## OF
## SERIES A PARTICIPATING CUMULATIVE PREFERRED STOCK
## OF
## FTS INTERNATIONAL, INC.

FTS International, Inc., a corporation organized and existing under the laws of the State of Delaware (the "**Corporation**"), in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware thereof, does hereby certify:

The board of directors of the Corporation (the "**Board of Directors**") or a duly authorized committee of the Board of Directors, in accordance with the certificate of incorporation and bylaws of the Corporation and applicable law, adopted the following resolution on [•], 2020 creating a series of preferred stock of the Corporation from its blank check preferred stock authority designated as "**Series A Participating Cumulative Preferred Stock**".

RESOLVED, that pursuant to the provisions of the certificate of incorporation and the bylaws of the Corporation and applicable law, a series of preferred stock, created from its blank check preferred stock authority, par value $0.01 per share, of the Corporation be and hereby is created, and that the designation and number of shares of such series, and the voting and other powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions thereof, of the shares of such series, are as follows:

Section 1.    *Designation and Number of Shares*.  The shares of such series shall be designated as "Series A Participating Cumulative Preferred Stock" (the "**Series A Preferred Stock**"), and the number of shares constituting such series shall be [•].  Such number of shares of the Series A Preferred Stock may be increased or decreased by resolution of the Board of Directors; *provided* that no decrease shall reduce the number of shares of Series A Preferred Stock to a number less than the number of shares then outstanding plus the number of shares issuable upon exercise or conversion of outstanding rights, options or other securities issued by the Corporation.

Section 2.    *Dividends and Distributions*.  (a) Subject to the rights of the holders of any shares of any class or series of stock of the Corporation ranking prior and superior to the shares of Series A Preferred Stock with respect to dividends, the holders of shares of Series A Preferred Stock, in preference to the holders of Common Stock, par value $0.01 per share (the "**Common Stock**") and any other shares of any class or series of stock of the Corporation ranking junior to the Series A Preferred Stock in respect thereof, shall be entitled to receive, when, as and if declared by the Board of Directors out of funds legally available for the purpose, quarterly dividends payable on the first day of [February, May, August and November] of each year (each such date being referred to herein as a "**Quarterly Dividend Payment Date**"), commencing on the first Quarterly

A-1

Dividend Payment Date after the first issuance of any share or fraction of a share of Series A Preferred Stock, in an amount per share (rounded to the nearest cent) equal to the greater of (i) $0.01 and (ii) the Multiplier Number (as hereinafter defined) then in effect times the aggregate per share amount of all cash dividends or other distributions and the then Multiplier Number then in effect times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions (other than (A) a dividend payable in shares of Common Stock, or (B) a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise)), declared on the Common Stock since the immediately preceding Quarterly Dividend Payment Date, or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series A Preferred Stock.  As used herein, the "**Multiplier Number**" shall be 1,000; *provided* that if, at any time after [•] (the "**Rights Declaration Date**"), the Corporation shall (i) declare or pay any dividend on the Common Stock payable in shares of Common Stock or make any distribution on the Common Stock in shares of Common Stock, (ii) subdivide (by a stock split or otherwise) the outstanding shares of Common Stock into a larger number of shares of Common Stock or (iii) combine (by a reverse stock split or otherwise) the outstanding shares of Common Stock into a smaller number of shares of Common Stock, then in each such event the Multiplier Number shall be adjusted to a number determined by multiplying the Multiplier Number in effect immediately prior to such event by a fraction, the numerator of which is the number of shares of Common Stock that are outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that are outstanding immediately prior to such event (and rounding the result to the nearest whole number); and *provided further* that, if at any time after the Rights Declaration Date, the Corporation shall issue any shares of its capital stock in a merger, reclassification, or change of the outstanding shares of Common Stock, then in each such event the Multiplier Number shall be appropriately adjusted to reflect such merger, reclassification or change so that each share of Preferred Stock continues to be the economic equivalent of a Multiplier Number of shares of Common Stock prior to such merger, reclassification or change.

(b)     The Corporation shall declare a dividend or distribution on the Series A Preferred Stock as provided in Section 2(a) at the same time it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); *provided* that if no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date (or, with respect to the first Quarterly Dividend Payment Date, the period between the first issuance of any share or fraction of a share of Series A Preferred Stock and such first Quarterly Dividend Payment Date), a dividend of $0.01 per share on the Series A Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

(c)     Dividends shall begin to accrue and be cumulative on outstanding shares of Series A Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issuance of such shares of Series A Preferred Stock, unless the date of issuance of such shares is on or before the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue and be cumulative from the

A-2

date of issue of such shares, or unless the date of issue is a date after the record date for the determination of holders of shares of Series A Preferred Stock entitled to receive a quarterly dividend and on or before such Quarterly Dividend Payment Date, in which case dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date.  Accrued but unpaid dividends shall not bear interest.  Dividends paid on shares of Series A Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated *pro rata* on a share-by-share basis among all such shares at the time outstanding.  The Board of Directors may fix a record date for the determination of holders of shares of Series A Preferred Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall not be more than 60 days prior to the date fixed for the payment thereof.

(d)     So long as any shares of Series A Preferred Stock are outstanding, no dividends or other distributions shall be declared, paid or distributed, or set aside for payment or distribution on the Common Stock unless, in each case, the dividend required by this Section 2 to be declared on the Series A Preferred Stock shall have been declared and set aside.

(e)     The holders of shares of Series A Preferred Stock shall not be entitled to receive any dividends or other distributions except as herein provided.

Section 3.     *Voting Rights*.  In addition to any other voting rights required by law, the holders of shares of Series A Preferred Stock shall have the following voting rights:

(a)     Each share of Series A Preferred Stock shall entitle the holder thereof to a number of votes equal to the Multiplier Number then in effect on all matters submitted to a vote of stockholders of the Corporation.

(b)     Except as otherwise provided herein or by law, the holders of shares of Series A Preferred Stock and the holders of shares of Common Stock shall vote together as a single class on all matters submitted to a vote of stockholders of the Corporation.

(c)     (i) If at any time dividends on any Series A Preferred Stock shall be in arrears in an amount equal to six quarterly dividends thereon, the number of directors constituting the Board of Directors shall be increased by two.  The occurrence of such contingency shall mark the beginning of a period (herein called a "**default period**") which shall extend until such time when all accrued and unpaid dividends for all previous quarterly dividend periods and for the current quarterly dividend period on all shares of Series A Preferred Stock then outstanding shall have been declared and paid or set apart for payment.  During each default period, all holders of Series A Preferred Stock and any other series of Preferred Stock then entitled as a class to elect directors, voting together as a single class, irrespective of series, shall have the right to elect two directors.

(ii)     During any default period, such voting right of the holders of Series A Preferred Stock may be exercised initially at a special meeting called pursuant to Section 3(c)(iii) hereof or at any annual meeting of stockholders, and

A-3

thereafter at annual meetings of stockholders.  The absence of a quorum of holders of Common Stock shall not affect the exercise by holders of Preferred Stock of such voting right.  At any meeting at which holders of Preferred Stock shall initially exercise such voting right, they shall have the right, voting as a class, to elect directors to fill such vacancies, if any, in the Board of Directors as may then exist up to two directors or, if such right is exercised at an annual meeting, to elect two directors.

(iii)     Unless the holders of Preferred Stock shall have previously exercised their right to elect directors during an existing default period, the Board of Directors may order, or any stockholder or stockholders owning in the aggregate not less than 25% of the total number of shares of Preferred Stock outstanding, irrespective of series, may request, the calling of a special meeting of holders of Preferred Stock, which meeting shall thereupon be called by the Chief Executive Officer, a Vice President or the Secretary of the Corporation.  Notice of such meeting and of any annual meeting at which holders of Preferred Stock are entitled to vote pursuant to this Section 3(c)(iii) shall be given to each holder of record of Preferred Stock by mailing such notice to him at the address of such holder shown on the registry books of the Corporation or transfer agent or registrar for the Preferred Stock.  Such meeting shall be called for a time not earlier than 20 days and not later than 60 days after such order or request or in default of the calling of such meeting within 60 days after such order or request, such meeting may be called on similar notice by any stockholder or stockholders owning in the aggregate not less than 25% of the total number of shares of Preferred Stock outstanding, irrespective of series.  Notwithstanding the provisions of this Section 3(c)(iii), no such special meeting shall be called during the period within 60 days immediately preceding the date fixed for the next annual meeting of stockholders.

(iv)     In any default period, the holders of Common Stock, Series A Preferred Stock and other classes of stock of the Corporation if applicable, shall continue to be entitled to elect the whole number of directors until the holders of Preferred Stock shall have exercised their right to elect two directors voting as a class, after the exercise of which right (x) the directors so elected by the holders of Preferred Stock shall continue in office until the next annual meeting of stockholders for the election of directors or until their successors shall have been elected by such holders or until the expiration of the default period, and (y) any vacancy in the Board of Directors may (except as provided in Section 3(c)(ii) hereof) be filled by vote of a majority of the remaining directors theretofore elected by the holders of the class of stock which elected the Director whose office shall have become vacant.  References in this Section 3(c) to directors elected by the holders of a particular class of stock shall include directors elected by such directors to fill vacancies as provided in clause (y) of the foregoing sentence.  Until the default in payments of all dividends which permitted the election of said directors shall cease to exist, any director who shall have been so elected pursuant to the provisions of this Section 3(c) may be removed at any time, without cause, only by the affirmative vote of the holders of the shares of

A-4

Series A Preferred Stock at the time entitled to cast a majority of the votes entitled to be cast for the election of any such director at a special meeting of such holders called for that purpose.

(v)     Immediately upon the expiration of a default period, (x) the right of the holders of Preferred Stock as a class to elect directors shall cease (subject to revesting in the event of each subsequent default period), (y) the term of any directors elected by the holders of Preferred Stock as a class shall terminate, and (z) the number of directors constituting the Board shall be reduced by two.

(d)     Except as otherwise expressly provided herein and by applicable law, holders of Series A Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

Section 4.     *Certain Restrictions*.  (a) Whenever quarterly dividends or other dividends or distributions payable on the Series A Preferred Stock as provided in Section 2 are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or not declared, on outstanding shares of Series A Preferred Stock shall have been paid in full, the Corporation shall not:

(i)     declare or pay dividends on, or make any other distributions on, any shares of Common Stock or other stock ranking junior (either as to dividends or upon liquidation, dissolution or winding-up) to the Series A Preferred Stock;

(ii)     declare or pay dividends on, or make any other distributions on, any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding-up) with the Series A Preferred Stock, except dividends paid ratably on the Series A Preferred Stock and all such other parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

(iii)     redeem, purchase or otherwise acquire for value any shares of Common Stock or other stock ranking junior (either as to dividends or upon liquidation, dissolution or winding-up) to the Series A Preferred Stock; *provided* that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such junior stock in exchange for shares of stock of the Corporation ranking junior (as to dividends and upon dissolution, liquidation or winding-up) to the Series A Preferred Stock; or

(iv)     redeem, purchase or otherwise acquire for value any shares of Series A Preferred Stock, or any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding-up) with the Series A Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board) to all holders of Series A Preferred Stock and all such other parity stock upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights

A-5

and preferences of the respective series and classes, shall determine will result in fair and equitable treatment among the respective series or classes.

(b)     The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for value any shares of stock of the Corporation unless the Corporation could, under Section 4(a), purchase or otherwise acquire such shares at such time and in such manner.

Section 5.     *Reacquired Shares*.  Any shares of Series A Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and canceled promptly after the acquisition thereof.  All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock without designation as to series and may be reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors subject to the conditions and any restrictions on issuance set forth herein or in the certificate of incorporation of the Corporation or as otherwise required by Delaware law.

Section 6.     *Liquidation, Dissolution or Winding-up*.  Upon any liquidation, dissolution or winding-up of the Corporation, no distribution shall be made (a) to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding-up) to the Series A Preferred Stock unless, prior thereto, the holders of shares of Series A Preferred Stock shall have received an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment plus an amount equal to the greater of (i) $1.00 per share or (ii) an aggregate amount per share equal to the Multiplier Number then in effect times the aggregate amount to be distributed per share to holders of Common Stock, or (b) to the holders of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding-up) with the Series A Preferred Stock, except distributions made ratably on the Series A Preferred Stock and all such other parity stock in proportion to the total amounts to which the holders of all such shares are entitled upon such liquidation, dissolution or winding-up.  In the event, however, that there are not sufficient assets available to permit such payment in full to the holders of the Series A Preferred Stock and to the holders of all other classes and series of stock of the Corporation, if any, that rank on a parity with the Series A Preferred Stock in respect thereof, then the assets available for such distribution shall be distributed ratably to the holders of the Series A Preferred Stock and the holders of such parity shares in proportion to their respective liquidation preferences.

Section 7.     *Consolidation, Merger, etc*.  If the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash or any other property, then in any such case the shares of Series A Preferred Stock shall at the same time be similarly exchanged for or changed into an amount per share equal to (x) the Multiplier Number then in effect *times* (y) the aggregate amount of stock, securities, cash or any other property, as the case may be, into which or for which each share of Common Stock is changed or exchanged.  In the event that both this Section 7 and Section 2 appear to apply to a transaction, this Section 7 will control.

A-6

Section 8.    *No Redemption*.  The Series A Preferred Stock shall not be subject to redemption by the Corporation or at the option of any holder of Series A Preferred Stock; *provided however* that subject to Section 4(a)(iv), the Corporation may purchase or otherwise acquire outstanding shares of Series A Preferred Stock in the open market or by offer to any holder or holders of Series A Preferred Stock.  The shares of Series A Preferred Stock shall not be subject to, or entitled to the operation of a retirement or sinking fund.

Section 9.    *Rank*.  The Series A Preferred Stock shall rank as to the payment of dividends and the distribution of assets upon liquidation, dissolution and winding-up junior to all other series of the Preferred Stock of the Corporation unless the Board of Directors shall specifically determine otherwise in fixing the powers, preferences and relative, participating, option and other special rights of the shares of such other series and the qualifications, limitations and restrictions thereof.

Section 10.   *Fractional Shares*.  Series A Preferred Stock may be issued in fractions of a share which shall entitle the holder, in proportion to such holder's fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series A Preferred Stock.

Section 11.   *Amendment*.  At any time when any shares of Series A Preferred Stock are outstanding, the certificate of incorporation of the Corporation shall not be amended in any manner (whether by merger, consolidation or otherwise) which would alter or change the powers preferences and relative, participating, optional and other special rights of the Series A Preferred Stock so as to effect holders of the Series A Preferred Stock adversely, without the affirmative vote of the holders of at least two-thirds of the outstanding shares of Series A Preferred Stock, voting separately as a class.

IN WITNESS WHEREOF, the undersigned has executed this Certificate this 28th day of July, 2020.

FTS INTERNATIONAL, INC.

By: _____

Name:

Title:

**EXHIBIT B**

**UNDER CERTAIN CIRCUMSTANCES, AS SET FORTH IN THE RIGHTS AGREEMENT, RIGHTS ISSUED TO OR BENEFICIALLY OWNED BY, ANY PERSON WHO IS, WAS OR BECOMES AN ACQUIRING PERSON OR AN AFFILIATE OR ASSOCIATE THEREOF (AS SUCH CAPITALIZED TERMS ARE DEFINED IN THE RIGHTS AGREEMENT), WHETHER CURRENTLY HELD BY OR ON BEHALF OF SUCH PERSON OR BY ANY SUBSEQUENT HOLDER, SHALL BE NULL AND VOID AND WILL NO LONGER BE TRANSFERABLE.**

## SUMMARY OF TERMS OF STOCKHOLDER RIGHTS AGREEMENT

### Introduction

On [•], 2020, the Board of Directors of FTS International, Inc. (the "**Company**") declared a dividend of one preferred stock purchase right (a "**Right**") for each outstanding share of common stock, par value $0.01 per share (the "**Common Stock**"), of the Company. The dividend is payable on [•], 2020 (the "**Record Date**") to holders of record as of the close of business on that date. The description and terms of the Rights are set forth in a Rights Agreement (the "**Rights Agreement**") between the Company and [•] as Rights Agent (the "**Rights Agent**").

The Board of Directors has adopted the Rights Agreement to reduce the likelihood that a potential acquirer would gain (or seek to influence or change) control of the Company by acquisitions from other stockholders, open market accumulation or other tactics without paying an appropriate premium for the Company's shares. In general terms and subject to certain exceptions, it works by imposing a significant penalty upon any person or group that acquires 20% or more of the outstanding Common Stock of the Company without the approval of the Board of Directors. The Rights Agreement should not interfere with any merger or other business combination approved by the Board of Directors.

### The Rights

The Board of Directors authorized the issuance of a Right with respect to each outstanding share of Common Stock on the Record Date. The Rights will initially trade with, and will be inseparable from, the Common Stock, and the registered holders of the Common Stock will be deemed to be the registered holders of the Rights. Issuances of new shares of Common Stock after the Record Date but before the Distribution Date, as defined under the subheading "Exercisability" below, will be accompanied by new Rights.

Prior to the Distribution Date, the Rights will be evidenced by the certificates for (or by the book entry account that evidences record ownership of) the Common Stock. After the Distribution Date, the Rights Agent will mail separate certificates ("**Rights Certificates**") evidencing the Rights to each record holder of the Common Stock as of

the close of business on the Distribution Date, and thereafter the Rights will be transferable separately from the Common Stock.

### Exercisability

The Rights will not be exercisable until after the Distribution Date. After the Distribution Date, each Right will be exercisable to purchase, for $[•] (the "**Purchase Price**"), one one-thousandth of a share of Series A Participating Cumulative Preferred Stock, par value $0.01 per share (the "**Preferred Stock**"). This portion of a share of Preferred Stock will give the stockholder approximately the same dividend, voting or liquidation rights as would one share of Common Stock. Prior to exercise, Rights holders in their capacity as such have no rights as a stockholder of the Company, including the right to vote and to receive dividends.

The "**Distribution Date**" generally means the earlier of:

- the close of business on the 10th business day after the date of the first public announcement that a person or any of its affiliates and associates has become an "Acquiring Person," as defined below, and

- the close of business on the 10th business day (or such later day as may be designated by the Board of Directors before any person has become an Acquiring Person) after the date of the commencement of a tender or exchange offer by any person which would, if consummated, result in such person becoming an Acquiring Person.

An "**Acquiring Person**" generally means any person who or which, together with all affiliates and associates of such person obtains beneficial ownership of 20% or more of shares of Common Stock, with certain exceptions.

### Beneficial Ownership

Certain synthetic interests in securities created by derivative positions – whether or not such interests are considered to be ownership of underlying shares of Common Stock or are reportable for purposes of Regulation 13D of the Securities Exchange Act of 1934, as amended – are treated as beneficial ownership of the number of shares of Common Stock equivalent to the economic exposure created by the derivative positions, to the extent actual shares of Common Stock are directly or indirectly held by counterparties to the derivatives contracts. Swap dealers unassociated with any control intent or intent to evade the purposes of the Rights Agreement are excepted from such imputed beneficial ownership.

### Preferred Stock

The value of one one-thousandth interest in a share of Preferred Stock should approximate the value of one share of Common Stock, subject to adjustment. Each one one-thousandth of a share of Preferred Stock, if issued:

B-2

- will not be redeemable,

- will entitle holders to quarterly dividend payments of $0.01 per share, or an amount equal to the dividend paid on one share of Common Stock, whichever is greater,

- will entitle holders upon liquidation either to receive $1.00 per share, or an amount equal to the payment made on one share of Common Stock, whichever is greater,

- will have the same voting power as one share of Common Stock,

- if shares of the Common Stock are exchanged via merger, consolidation, or a similar transaction, will entitle holders to a per share payment equal to the payment made on one share of Common Stock.

### Consequences of a Person or Group Becoming an Acquiring Person

*Flip in.*  Subject to the Company's exchange rights, described below, at any time after any person has become an Acquiring Person, each holder of a Right (other than an Acquiring Person, its affiliates and associates) will be entitled on exercise to purchase for each Right held, at the Purchase Price, a number of shares of Common Stock having a market value of twice the Purchase Price.

*Exchange.*  At any time on or after any person has become an Acquiring Person (but before any person becomes the beneficial owner of 50% or more of the outstanding shares of Common Stock or the occurrence of any of the events described in the next paragraph), the Board of Directors may exchange all or part of the Rights (other than Rights beneficially owned by an Acquiring Person, its affiliates and associates) for shares of Common Stock at an exchange ratio of one share of Common Stock per Right.

*Flip over.*  If, after any person has become an Acquiring Person, (1) the Company is involved in a merger or other business combination in which the Company is not the surviving corporation or its Common Stock is exchanged for other securities or assets or (2) the Company and/or one or more of its subsidiaries sell or otherwise transfer assets or earning power aggregating more than 50% of the assets or earning power of the Company and its subsidiaries, taken as a whole, then each Right (other than Rights beneficially owned by an Acquiring Person, its affiliates and associates) will entitle the holder on exercise to purchase for each Right held, for the Purchase Price, a number of shares of common stock of the other party to such business combination or sale (or in certain circumstances, an affiliate) having a market value of twice the Purchase Price.

### Expiration

The Rights will expire on _____, 2021 (the "**Final Expiration Date**"), unless earlier exercised, exchanged, amended or redeemed.

B-3

In the event the Board of Directors has not renewed the Rights Agreement or called a meeting of stockholders for the purpose of voting on whether or not to renew the Rights Agreement, in each case, by the close of business on the date that is 90 days prior to the Final Expiration Date, the holders of record of 25% or more of the Common Stock of the Company then outstanding may submit to the Board of Directors, not later than 90 days prior to the Final Expiration Date a written demand (the "**Renewal Meeting Demand**") directing the Board of Directors to submit to a vote of stockholders at a meeting of the stockholders of the Company (a "**Renewal Meeting**") a resolution renewing the Rights Agreement (the "**Renewal Resolution**").

After receipt of a Renewal Meeting Demand, the Board of Directors shall cause the Renewal Resolution to be submitted to a vote of stockholders at a Renewal Meeting to be convened within 90 days following the Board of Directors' receipt of the Renewal Meeting Demand.

In the event that at the Renewal Meeting a majority of the Common Stock outstanding as of the record date for the Renewal Meeting selected by the Board of Directors shall vote in favor of the Renewal Resolution, then this Rights Agreement shall be renewed, without any further action and without any notice, for a period of one year.

### Redemption

The Board of Directors may redeem all of the Rights at a price of $0.001 per Right at any time before any person has become an Acquiring Person.  If the Board of Directors redeems any Rights, it must redeem all of the Rights.  Once the Rights are redeemed, the only right of the holders of Rights will be to receive the redemption price per Right.  The redemption price will be subject to adjustment.

### Qualifying Offers

In the event (a) the Company receives a Qualifying Offer (as defined below) and (b) the Board of Directors has not redeemed the outstanding Rights or exempted such Qualifying Offer from the terms of the Rights Agreement or called a meeting of stockholders for the purpose of voting on whether or not to exempt such Qualifying Offer from the Rights Agreement, in each case, by the close of business on the date that is 90 days following the commencement of such Qualifying Offer (the "**Board Evaluation Period**"), the holders of record of 25% or more of the Common Stock then outstanding (excluding the Common Stock beneficially owned by the person making the Qualifying Offer) may submit to the Board of Directors a written demand directing the Board of Directors to submit to a vote of stockholders at a meeting of the stockholders of the Company (a "**Qualifying Offer Meeting**") a resolution exempting such Qualifying Offer from the provisions of the Rights Agreement (the "**Qualifying Offer Resolution**"). The Board of Directors may take a position in favor of or opposed to the adoption of the Qualifying Offer Resolution, or no position with respect to the Qualifying Offer Resolution, as it determines to be appropriate in the exercise of its fiduciary duties.

B-4

In the event that at the Qualifying Offer Meeting either (x) in the case of a Qualifying Offer in which the consideration is all cash, a majority of the Common Stock outstanding as of the record date for the Qualifying Offer Meeting selected by the Board of Directors or (y) in the case of a Qualifying Offer in which the consideration is other than all cash, $66^2/_3$% of the Common Stock outstanding as of the record date for the Qualifying Offer Meeting selected by the Board of Directors vote in favor of the Qualifying Offer Resolution, then the Qualifying Offer will be exempt from the application of the Rights Agreement in all respects to such Qualifying Offer as long as it remains a Qualifying Offer.

"**Qualifying Offer**" will mean an offer determined by the Board of Directors in good faith to have the following characteristics, among others:

a)  an offer that has commenced within the meaning of Rule 14d-2(a) under the Securities Exchange Act of 1934, as amended (the "Exchange Act");

b)  a fully financed, all-cash tender offer, or an exchange offer offering shares of common stock of the offeror, or a combination thereof, in each such case for any and all of the outstanding shares of Common Stock at the same per-share consideration;

c)  (A) an offer that is conditioned on a minimum of 85% of the shares of Common Stock outstanding on a fully-diluted basis being tendered and not withdrawn as of the offer's expiration date, which condition will not be waivable or (B) an offer (1) that is conditioned on a minimum of at least a majority of (I) the shares of Common Stock of the Company outstanding on a fully diluted basis, and (II) the outstanding shares of Common Stock of the Company not held by the offeror (or such offeror's affiliates and associates) being tendered and not withdrawn as of the offer's expiration date, which condition shall not be waivable, and (2) pursuant to which the Company has received an irrevocable, legally binding written commitment of the offeror to consummate, as promptly as practicable upon successful completion of the offer, a second step transaction whereby all Common Stock not tendered into the offer will be acquired at the same consideration per share actually paid pursuant to the offer, subject to stockholders' statutory appraisal rights, if any (the "**Minimum Tender Condition**");

d)  an offer that is subject only to the Minimum Tender Condition and other customary terms and conditions, which conditions will not include any financing, funding or similar conditions or any requirements with respect to the offeror or its representatives being permitted any due diligence on the Company;

e)  an offer pursuant to which the Company has received an irrevocable written commitment by the offeror that the offer, if it is otherwise to expire prior thereto, will be extended for at least 15 business days after any increase in the consideration offered or after any bona fide alternative offer is commenced;

f)  an offer pursuant to which the Company has received an irrevocable, legally binding written commitment of the offeror that the offer will remain open until at least the later of (a) the date the Board of Directors redeems the outstanding Rights or exempts such offer from the terms of the Rights Agreement; (b) if no Meeting demand has been received from the holders of record of 25% or more of the then outstanding Common Stock with respect to such offer (excluding the Common Stock that are held by the person making the Qualifying Offer), 10 business days after the end of the Board Evaluation Period; and (c) if a Qualifying Offer Meeting is requested, 10 business days

B-5

after the date of such Qualifying Offer Meeting or, if no Qualifying Offer Meeting is held within the required period, 10 business days following the last day of such required period;

g) an offer pursuant to which the Company has received an irrevocable, legally binding written commitment of the offeror that no amendments will be made to the offer to reduce the consideration being offered or to otherwise change the terms of the offer in a way that is adverse to a tendering stockholder; and

h) if the offer includes common stock of the offeror, (a) the offeror is a publicly-owned United States corporation and its common stock is freely tradable and is listed or admitted to trading on a national securities exchange; (b) no stockholder approval of the offeror is required to issue such Common Stock, or, if required, such approval has already been obtained; (c) no person (including its affiliates and associates) holds more than 20% of the voting shares of the offeror at the time of commencement of the offer or at any time during the term of the offer; (d) no other class of voting shares of the offeror is outstanding; and (e) the offeror meets the registrant eligibility requirements for use of Form S-3 for registering securities under the Securities Act of 1933.

### Amendment

At any time before any person has become an Acquiring Person, the Rights Agreement may be amended in any respect.  After such time, the Rights Agreement may be amended (i) to cure any ambiguity, (ii) to correct any defective or inconsistent provision or (iii) in any respect that does not adversely affect Rights holders (other than any Acquiring Person, its affiliates and associates).

### Antidilution

The Rights Agreement includes antidilution provisions designed to prevent efforts to diminish the effectiveness of the Rights.

**A copy of the Rights Agreement has been filed with the Securities and Exchange Commission as an Exhibit to a Registration Statement on Form 8-A.  A copy of the Rights Agreement is available free of charge from the Company.  The foregoing description of the Rights Agreement is qualified in its entirety by reference to the full text of the Rights Agreement, as amended from time to time, the complete terms of which are incorporated herein by reference.**

**EXHIBIT C**

**[FORM OF RIGHT CERTIFICATE]**

No. R -                                                              [Number of] Rights

**NOT EXERCISABLE AFTER _____, 2021 OR EARLIER IF THE RIGHTS EVIDENCED HEREBY ARE REDEEMED OR EXCHANGED BY THE COMPANY AS SET FORTH IN THE RIGHTS AGREEMENT.  THE RIGHTS ARE SUBJECT TO REDEMPTION AT $0.001 PER RIGHT AND TO EXCHANGE ON THE TERMS SET FORTH IN THE RIGHTS AGREEMENT, UNDER CERTAIN CIRCUMSTANCES, AS SET FORTH IN THE RIGHTS AGREEMENT, RIGHTS ISSUED TO OR BENEFICIALLY OWNED BY, ANY PERSON WHO IS, WAS OR BECOMES AN ACQUIRING PERSON OR AN AFFILIATE OR ASSOCIATE THEREOF (AS SUCH CAPITALIZED TERMS ARE DEFINED IN THE RIGHTS AGREEMENT), WHETHER CURRENTLY HELD BY OR ON BEHALF OF SUCH PERSON OR BY ANY SUBSEQUENT HOLDER, SHALL BE NULL AND VOID OR WILL NO LONGER BE TRANSFERABLE.**

RIGHT CERTIFICATE

FTS INTERNATIONAL, INC.

        This Right Certificate certifies that _____, or registered assigns, is the registered holder of the number of Rights set forth above, each of which entitles the holder (upon the terms and subject to the conditions set forth in the Rights Agreement dated as of [•], 2020 (the "**Rights Agreement**") between FTS International, Inc., a Delaware corporation (the "**Company**"), and [•] (the "**Rights Agent**")) to purchase from the Company, at any time after the Distribution Date and prior to the Expiration Date, one one-thousandth of a fully paid, nonassessable share of Series A Participating Cumulative Preferred Stock (the "**Preferred Stock**") of the Company at a purchase price of $[•] (the "**Purchase Price**"), payable in lawful money of the United States of America, upon surrender of this Right Certificate, with the form of election to purchase properly completed and duly executed.

        Terms used herein and not otherwise defined herein shall have the meanings given to them in the Rights Agreement.

        The number of Rights evidenced by this Right Certificate (and the number and kind of shares issuable upon exercise of each Right) and the Purchase Price set forth above are as of [●], 20[●], and may have been or in the future be adjusted or modified as a result of the occurrence of certain events, as more fully provided in the Rights Agreement.

        At any time, if the Rights evidenced by this Right Certificate are beneficially owned by (a) an Acquiring Person or an Associate or Affiliate of such Acquiring Person,

C-1

(b) a Post-Transferee, (c) a Pre-Transferee or (d) a transferee of a Post-Transferee or Pre-Transferee, such Rights shall become null and void and non-transferable without any further action, and no holder hereof shall have any rights whatsoever with respect to such Rights.

This Right Certificate is subject to all of the terms, provisions and conditions of the Rights Agreement, which terms, provisions and conditions are hereby incorporated herein by reference and made a part hereof and to which Rights Agreement reference is hereby made for a full description of the rights, limitations of rights, obligations, duties and immunities hereunder of the Rights Agent, the Company and the holders of the Right Certificates.  Copies of the Rights Agreement are on file with the Rights Agent and are also available from the Company upon written request.

Any Right Certificate or Right Certificates may, upon the terms and subject to the conditions set forth below in the Rights Agreement, be transferred or exchanged for another Right Certificate or Right Certificates of like tenor and date evidencing Rights entitling the holder to purchase a like aggregate number of one one-thousandths of a share of Preferred Stock as the Rights evidenced by the Right Certificate or Right Certificates surrendered shall have entitled such holder to purchase.  If this Right Certificate shall be exercised in part, the holder shall be entitled to receive upon surrender hereof another Right Certificate or Right Certificates for the number of whole Rights not exercised.  Any registered holder desiring to transfer or exchange any Right Certificate or Right Certificates shall surrender such Right Certificate or Right Certificates (with, in the case of a transfer, the form of assignment and certificate on the reverse side thereof duly executed) to the Rights Agent at the principal office or offices of the Rights Agent designated for such purpose.

Subject to the provisions of the Rights Agreement, the Board of Directors of the Company may, at its option,

(a)     at any time prior to the earlier of (i) occurrence of a Section 9(a)(ii) Event and (ii) the Final Expiration Date, redeem all but not less than all of the then outstanding Rights at a redemption price of $0.001 per Right as may be adjusted pursuant to the Rights Agreement; or

(b)     at any time after the occurrence of a Section 9(a)(ii) Event exchange all or part of the then outstanding Rights (which shall not include Rights that have become null and void pursuant to Section 6(e)) for shares of Common Stock or fractional shares of Preferred Stock at an exchange ratio of one one-thousandth of a share of Preferred Stock per Right, as may be appropriately adjusted pursuant to the Rights Agreement.  Immediately upon the action of the Board of Directors of the Company authorizing any such exchange, and without any further action or any notice, the Rights (other than Rights which are not subject to such exchange) will terminate and the Rights will only enable holders to receive the shares issuable upon such exchange.

The Company shall not be required to issue or authorize fractions of shares of Preferred Stock (other than fractions which are integral multiples of one one-thousandth of a share of Preferred Stock) upon the exercise of the Rights, but, in lieu thereof, a cash payment will be made, as provided in the Rights Agreement.

No holder of this Right Certificate shall be entitled to vote, receive dividends or be deemed for any purpose the holder of the shares of capital stock which may at any time be issuable on the exercise hereof, nor shall anything contained in the Rights Agreement or herein be construed to confer upon the holder hereof, as such, any of the rights of a stockholder of the Company (including any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give to or withhold consent from any corporate action, to receive notice of meetings or other actions affecting stockholders (except as provided in the Rights Agreement), to receive dividends or subscription rights, or otherwise) until the Right or Rights evidenced by this Right Certificate shall have been exercised as provided in the Rights Agreement.

This Right Certificate shall not be valid or obligatory for any purpose until it shall have been countersigned by the Rights Agent.

C-3

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed under its corporate seal by its authorized officers.

Dated as of [●], 20[●]

FTS INTERNATIONAL, INC.

By: _____
       Name:
       Title:

Attest:

By: _____
    Name:
    Title:   [Secretary]

Countersigned:

[RIGHTS AGENT],
as Rights Agent

By: _____
    Name:
    Title:

Form of Reverse Side of Right Certificate

**FORM OF ASSIGNMENT**

(To be executed by the registered holder if such holder
desires to transfer the Rights evidenced by this Right Certificate.)

FOR VALUE RECEIVED_____

hereby sells, assigns and transfers unto_____

_____
(Please print name and address of transferee)

_____

the Rights evidenced by this Right Certificate, together with all right, title and interest therein, and does hereby irrevocably constitute and appoint _____ Attorney, to transfer the Rights evidenced by this Right Certificate on the books of the within-named Company, with full power of substitution.

Dated: _____, 20\_\_

_____
Signature

Signature Guaranteed:

Signatures must be guaranteed by participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

## CERTIFICATE

The undersigned hereby certifies that the Rights evidenced by this Rights Certificate (1) are not Beneficially Owned by an Acquiring Person or any Affiliate or Associate of an Acquiring Person or (2) after due inquiry and to the best knowledge of the undersigned, were not acquired from any Person who is, was or became an Acquiring Person or any Affiliate or Associate of an Acquiring Person or from a Post-Transferee or Pre-Transferee.

Dated: _____, 20__

_____

Signature

Signature Guaranteed:

Signatures must be guaranteed by participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

_____

## NOTICE

The signatures to the foregoing Assignment and Certificate must correspond to the name as written upon the face of this Right Certificate in every particular, without alteration or enlargement or any change whatsoever.

_____

## FORM OF ELECTION TO PURCHASE

(To be executed by the registered holder if such holder desires to exercise Rights represented by the Right Certificate.)

To:     FTS International, Inc.

The undersigned hereby irrevocably elects to exercise _____ Rights represented by this Right Certificate to purchase shares of Preferred Stock issuable upon the exercise of the Rights (or such other securities of the Company or of any other Person which may be issuable upon the exercise of the Rights) and requests that certificates for such shares be issued in the name of and delivered to (or entries for such shares be made in the book-entry account system of the transfer agent in the name of and written confirmation to):

Please insert social security or other identifying number_____

_____
(Please print name and address)

_____

If such number of Rights shall not be all the Rights evidenced by this Right Certificate, a new Right Certificate for the balance of such Rights shall be registered in the name of and delivered to:

Please insert social security or other identifying number_____

_____
(Please print name and address)

_____

Dated: _____, 20\_\_

_____
Signature

Signature Guaranteed:

Signatures must be guaranteed by participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

## CERTIFICATE

The undersigned hereby certifies that the Rights evidenced by this Rights Certificate (1) are not Beneficially Owned by an Acquiring Person or any Affiliate or Associate of an Acquiring Person or (2) after due inquiry and to the best knowledge of the undersigned, were not acquired from any Person who is, was or became an Acquiring Person or any Affiliate or Associate of an Acquiring Person or from a Post-Transferee or Pre-Transferee.

Dated: _____, 20___

_____
Signature

Signature Guaranteed:

Signatures must be guaranteed by participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

## NOTICE

The signature to the foregoing Election to Purchase and Certificate must correspond to the name as written upon the face of this Right Certificate in every particular, without alteration or enlargement or any change whatsoever.

**Exhibit B**

**Registration Rights Agreement**

*DRAFT*

# REGISTRATION RIGHTS AGREEMENT

**by and among**

**FTS INTERNATIONAL, INC.**

**and**

**THE HOLDERS PARTY HERETO**

**Dated as of [•], 2020**

## TABLE OF CONTENTS

PAGE

1.   Definitions..................................................................................................1

2.   Demand Registration. ................................................................................5

3.   Shelf Registration......................................................................................7

4.   Piggyback Registration. ..........................................................................10

5.   Suspensions; Withdrawals ......................................................................11

6.   Company Undertakings. ..........................................................................13

7.   Holder Undertakings ...............................................................................19

8.   Registration Expenses.............................................................................20

9.   Lock-Up Agreements...............................................................................21

10.   Public Reports.........................................................................................21

11.   Indemnification; Contribution. ...............................................................22

12.   Transfer of Registration Rights...............................................................25

13.   Amendment, Modification and Waivers; Further Assurances..................26

14.   Miscellaneous. ........................................................................................26

Annex A        Form of Joinder Agreement

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "**Agreement**") is made as of [•], 2020 by and among FTS International, Inc., a Delaware corporation (the "**Company**"), and the Consenting Noteholders and Consenting Term Loan Lenders (each as defined in the Plan) party hereto pursuant to the Plan of Reorganization (the "**Plan**") of the Company and certain of its subsidiaries and affiliates under Chapter 11 of Title 11 of the United States Code approved by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan.

### RECITALS:

WHEREAS, the Company proposes to issue the New Common Stock (as defined in Section 1) pursuant to, and upon the terms set forth in, the Plan to the Consenting Noteholders and Consenting Term Loan Lenders party hereto; and

WHEREAS, this Agreement was contemplated by the Plan and approved by the Bankruptcy Court, and the Company is thus required to provide to the Consenting Noteholders and Consenting Term Loan Lenders certain arrangements with respect to registration of the Registrable Securities (as defined in Section 1) under the Securities Act.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Company and each of the Holders (as defined in Section 1) hereby agree as follows:

1.  **Definitions.**

    (a)   As used herein, the following terms have the following meanings:

"**Affiliate**" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person; *provided* that funds or accounts managed, advised or sub-advised by any Holder shall also be considered Affiliates of such Holder.

"**Automatic Shelf Registration Statement**" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

"**beneficially owned**", "**beneficial ownership**" and similar phrases have the same meanings as such terms have under Rule 13d-3 and 13d-5 (or any successor rule then in effect) promulgated under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The calculation of beneficial ownership for a Holder shall also include funds or accounts managed, advised or sub-advised by any Holder.

"**Block Sale**" means the sale of shares of New Common Stock or other Capital Stock to one or more purchasers that are financial institutions in an offering registered under the Securities Act (a) without a prior public marketing process by means of (i) a bought deal or (ii) a block trade or (b) pursuant to an "overnight" underwritten offering.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by applicable law or executive order to close.

"**Capital Stock**" means with respect to a corporation, any and all shares, interests or equivalents in capital stock of such corporation (whether voting or nonvoting and whether common or preferred) and any and all warrants, rights (including conversion and exchange rights) and options to purchase any such shares, interests or equivalents (including convertible debt).

"**Commission**" means the United States Securities and Exchange Commission or any successor governmental agency.

"**control**" (including the terms "controlling," "controlled by" and "under common control with") means, unless otherwise noted, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract, or otherwise.

"**Counsel to the Holders**" means the law firm or other legal counsel to the Holders, as such counsel selected (i) in the case of a Demand Registration, Shelf Registration or Shelf Takedown, by the Holders of a majority of the Registrable Securities initially requesting such Demand Registration, Shelf Registration or Shelf Takedown; and (ii) in the case of a Piggyback Registration, the Holders of a majority of the Registrable Securities included in such Piggyback Registration.

"**EDGAR**" means the Electronic Data Gathering, Analysis and Retrieval System of the Commission.

"**Effective Date**" has the meaning assigned to such term in the Plan.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**FINRA**" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"**Free Writing Prospectus**" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"**Holder**" means (i) any Consenting Noteholder or Consenting Term Loan Lender that beneficially owns Registrable Securities and is a party to this Agreement (and any transferee or assignee of such Registrable Securities in accordance with Section 12 hereof) or (ii) any other party to any Joinder, in each case, that, together with its Affiliates, beneficially owns Registrable Securities.

"**Issuer Free Writing Prospectus**" means an issuer free writing prospectus as defined in Rule 433 under the Securities Act.

"**Joinder**" a joinder agreement in the form of Annex A executed and delivered to the Company pursuant to Section 12 hereof.

"**Material Adverse Effect**" means any material adverse effect on the business, properties, assets, operations, results of operations, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole.

"**National Securities Exchange**" means any exchange registered as a U.S. national securities exchange in accordance with the provisions of Section 19 of the Exchange Act (or any successor provisions then in effect).

"**New Common Stock**" means the shares of common stock, par value $0.01 per share, of the Company issued on or after the Effective Date pursuant to the Plan.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"**Public Offering**" means any sale or distribution to the public of Capital Stock of the Company pursuant to an offering registered under the Securities Act, whether by the Company, by Holders and/or by any other holders of the Company's Capital Stock, including a Block Sale.

"**Prospectus**" means the prospectus used in connection with a Registration Statement.

"**Registrable Securities**" means at any time New Common Stock or other Capital Stock of the Company (including New Common Stock issuable upon conversion of the Warrants) held or beneficially owned by any Holder, including (i) any New Common Stock issued pursuant to the Plan or upon the conversion, exercise or exchange, as applicable, of any other securities and/or interests issued pursuant to the Plan; (ii) any shares of New Common Stock acquired in the open market or otherwise purchased or acquired by the Holder after the Effective Date and (iii) any shares of New Common Stock issued by way of dividend, distribution, split or combination of securities or any recapitalization, merger, consolidation or other reorganization; *provided*, *however*, that as to any Registrable Securities, such securities shall irrevocably cease to constitute Registrable Securities upon the earliest to occur of: (A) the date on which such securities have been disposed of pursuant to an effective registration statement under the Securities Act or Rule 144; (B) the date on which such securities are freely disposable pursuant to Rule 144 without regard to volume or manner of sale restrictions; (C) the date on which such securities have been transferred to any Person, other than a Holder or a Person pursuant to Section 12 hereof; and (D) the date on which such securities cease to be outstanding.

"**Registration Statement**" means any registration statement filed hereunder or in connection with a Piggyback Registration.

3

"**Required Holders**" means Holders who collectively have beneficial ownership of at least [7.5%] of the New Common Stock originally issued under the Plan.

"**Rule 144**" means Rule 144 promulgated under the Securities Act (or any successor rule then in effect).

"**Rule 144A**" means Rule 144A promulgated under the Securities Act (or any successor rule then in effect).

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Shelf Registration**" means a registration of securities pursuant to a Registration Statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"**Shelf Takedown**" means an Underwritten Shelf Takedown or another Public Offering pursuant to a Shelf Registration.

"**Warrants**" means the warrants to purchase New Common Stock being issued to certain Persons pursuant to the Plan.

"**Well-Known Seasoned Issuer**" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act (or any successor rule then in effect) and which (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 or Form F-3 under the Securities Act.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Block Sale | 3(d) |
| Block Sale Notice | 3(d) |
| Bought Deal | 4(a) |
| Company | Recitals |
| Company Demand Registration Notice | 2(b) |
| Company Shelf Registration Notice | 3(a) |
| Company Shelf Takedown Notice | 3(c) |
| Demand Registration Notice | 2(b) |
| Demand Shelf Takedown Notice | 3(c) |
| Determination Date | 3(h) |
| Due Diligence Information | 6(a)(x) |
| End of Suspension Notice | 5(b) |
| Follow-On Registration Notice | 3(i) |
| Follow-On Shelf | 3(i) |
| Form S-1 Shelf | 3(a) |

| **Term** | **Section** |
| --- | --- |
| Form S-3 Shelf | 3(a) |
| Lock-Up Agreement | 9(a) |
| Long-Form Registration | 2(a) |
| Losses | 11(a) |
| Opt-In Election | 7(e) |
| Opt-Out Election | 7(e) |
| Permitted Free Writing Prospectus | 7(a) |
| Piggyback Registration | 4(a) |
| Plan | Recitals |
| Registration Expenses | 8(a) |
| Required Effective Period | 6(a)(iii) |
| road show | 11(a) |
| Shelf Registration Statement | 3(a) |
| Short-Form Registration | 2(a) |
| Suspension Event | 5(b) |
| Suspension Notice | 5(b) |
| Underwritten Shelf Takedown | 3(c) |
| Withdrawal Request | 5(d) |

**2.** **Demand Registration.**

(a)  Requests for Registration. The Required Holders may request registration under the Securities Act of all or any portion of the Registrable Securities held by such Required Holder(s) (A) on Form S-1 (or any successor form then in effect) (a "**Long-Form Registration**") or (B) on Form S-3 or any similar short-form registration (a "**Short-Form Registration**"), if available (any registration under this Section 2(a), a "**Demand Registration**"); *provided* that the Company will not be required to take any action pursuant to this Section 2(a) of this Agreement if (w) within the 180 calendar day period preceding the date of a Demand Registration Notice: (i) the Company effected a Demand Registration or a Piggyback Registration, (ii) such Required Holders received notice of such Demand Registration or Piggyback Registration and (iii) such Required Holders were able to register and sell pursuant to such Demand Registration or Piggyback Registration at least 60% of the Registrable Securities requested to be included therein either at the time of the effectiveness thereof or within 90 calendar days thereafter, (x) such Demand Registration is not expected to yield aggregate gross proceeds of at least $20 million, (y) the Registrable Securities requested to be registered are already covered by an existing and effective Registration Statement (including a Shelf Registration contemplated by Section 3(a)) and such Registration Statement may be utilized for the offer and sale of the Registrable Securities requested to be registered, and (z) the number of Demand Registration requests made pursuant to this Section 2(a) in the aggregate shall exceed [four] in any 12-month period. Upon receipt of any Demand Registration Notice (as defined below) the Company shall use commercially reasonable efforts to cause such Demand Registration to be declared effective as promptly as reasonably practicable after receipt of such request under the applicable rules and regulations of the Commission (and in no event earlier than [45] days following the Effective Date or, if "fresh start" accounting is required, no earlier than [60] days following the Effective Date).

(b)     <u>Demand Registration Notices</u>. All requests for Demand Registrations shall be made by giving written notice to the Company (the "**Demand Registration Notice**"). Each Demand Registration Notice shall specify (i) whether such Demand Registration shall be an underwritten Public Offering and (ii) the approximate number of Registrable Securities proposed to be sold in the Demand Registration. The Company shall promptly give written notice (a "**Company Demand Registration Notice**") of the filing of a Registration Statement pursuant to this Section 2 to all of the Holders within five (5) Business Days before such filing, and, subject to the provisions of Section 2(d) below, shall include in such Demand Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within three Business Days after the date of the Company Demand Registration Notice.

(c)     <u>Short-Form Registrations</u>. Demand Registrations shall be Short-Form Registrations whenever the Company is permitted to use any applicable short form registration statement under the rules and regulations of the Securities Act, unless the underwriters, in their reasonable discretion, determine that the use of a Long-Form Registration is necessary in order for the successful offering of such Registrable Securities. Promptly after the Company has become eligible to use Form S-3 under the Securities Act, the Company shall use commercially reasonable efforts to make Short-Form Registrations on Form S-3 (or any successor form) available for the resale of Registrable Securities on a continuous or delayed basis.

(d)     <u>Priority on Demand Registrations</u>. The Company shall not include in any Demand Registration any securities which are not Registrable Securities without the prior written consent of the Holders of a majority of the Registrable Securities requested to be included in the Demand Registration, *provided* that the Company may include in such Demand Registration shares of its Capital Stock for sale for its own account, subject to the priority provisions described below. If the Demand Registration is an underwritten Public Offering and the managing underwriters for such Demand Registration advise the Company and applicable Holders in writing that in their opinion the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such Demand Registration exceeds the number of Registrable Securities and other securities, if any, which can be sold without adversely affecting the marketability, proposed offering price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in the Demand Registration, timing or method of distribution of the offering, the Company shall include in such Demand Registration the number of Registrable Securities which can be sold without such adverse effect in the following order of priority: (i) first, the Registrable Securities requested to be included in such Demand Registration, allocated *pro rata* among the respective Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder; (ii) second, securities offered by the Company; and (iii) third, other securities requested to be included in such Demand Registration to the extent permitted hereunder.

(e)     <u>Selection of Underwriters</u>. The Holders of a majority of the Registrable Securities initially requesting a Demand Registration which is an underwritten Public Offering shall have the right to select the managing underwriters (which shall consist of one or more reputable nationally recognized investment banks) to administer the Public Offering with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed.

(f)     Effective Demand Registration. A registration shall not constitute a Demand Registration:

(i)     unless it has been declared effective by the Commission and remains continuously effective for the Required Effective Period (as defined below);

(ii)     if after such Demand Registration has become effective and prior to all of the Registrable Securities registered in such Demand Registration being sold, such registration or the related offer, sale or distribution of Registrable Securities thereunder is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental agency or court for any reason not attributable to the Holders requesting the Demand Registration and such interference is not eliminated within forty-five (45) days thereafter; or

(iii)     if the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure on the part of the Holders.

**3.     Shelf Registration.**

(a)     Shelf Registration. The Required Holders may request that the Company file a Registration Statement for a Shelf Registration on Form S-1 covering the resale of the Registrable Securities on a delayed or continuous basis (a "**Form S-1 Shelf**") or, if available, on Form S-3 (a "**Form S-3 Shelf**" and, together with a Form S-1 Shelf (and any Follow-On Shelf), a "**Shelf Registration Statement**") and specify the approximate number of Registrable Securities to be included in such Shelf Registration Statement. The Company shall give written notice (a "**Company Shelf Registration Notice**") of the filing of the Shelf Registration Statement within 10 Business Days prior to such filing to all Holders of Registrable Securities and shall include in such Shelf Registration Statement all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five Business Days of the date of the Company Shelf Registration Notice. The Company shall use commercially reasonable efforts to cause such Shelf Registration Statement to be declared effective as promptly as reasonably practicable after the Effective Date under the applicable rules and regulations of the Commission (and in no event later than [45] days following the Effective Date or, if "fresh start" accounting is required, no later than [60]days following the Effective Date). The Shelf Registration Statement shall be effective for a period ending on the earlier of (i) the date on which all Registrable Securities included in such registration have been sold; (ii) the date on which all such securities cease to be Registrable Securities or (iii) the maximum length permitted by the Commission. The Company shall maintain the Shelf Registration Statement in accordance with the terms hereof.

(b)     Conversion to Form S-3. The Company shall use commercially reasonable efforts to convert any Form S-1 Shelf to a Form S-3 Shelf as soon as reasonably practicable after the Company is eligible to use Form S-3.

(c)     Requests for Underwritten Shelf Takedowns. At any time and from time to time after the Shelf Registration Statement has been declared effective by the Commission, the

Required Holders may request to sell all or any portion of their Registrable Securities in an underwritten Public Offering that is registered pursuant to the Shelf Registration Statement (each, an "**Underwritten Shelf Takedown**"), *provided* that the net proceeds to be received by Holders in connection with such Public Offering will be reasonably expected to exceed $[25] million. All requests for Underwritten Shelf Takedowns shall be made by giving written notice to the Company (a "**Demand Shelf Takedown Notice**"). Each Demand Shelf Takedown Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Underwritten Shelf Takedown and whether the Registrable Securities are proposed to be sold through a Holder Block Sale (as defined below). Except in connection with a Holder Block Sale, within five Business Days after receipt of any Demand Shelf Takedown Notice, the Company shall give written notice of such requested Underwritten Shelf Takedown to all other Holders which have Registrable Securities included on such Shelf Registration (a "**Company Shelf Takedown Notice**") and, subject to the provisions of Section 3(e) below, shall include in such Underwritten Shelf Takedown all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five Business Days after sending the Company Shelf Takedown Notice.

(d)    Block Sale. Notwithstanding anything in Section 3(c), any of the Holders shall be permitted to demand or participate in a Block Sale, subject to the provisions of this Section 3(d). All requests for a Block Sale by a Holder (a "**Holder Block Sale**") shall be made by giving written notice to the Company (a "**Block Sale Notice**"). Each Block Sale Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Holder Block Sale and the proposed date of such proposed Holder Block Sale, *provided* that such date must be at least five Business Days after receipt of the Block Sale Notice. Notwithstanding the foregoing, the Company will not be required to take any action pursuant to this Section 3(d) if (A) such Block Sale is not expected to yield aggregate gross proceeds of at least $20 million or (B) within the 60 calendar day period preceding the date of a Block Sale Notice, a Holder Block Sale or an Underwritten Shelf Takedown was priced. Unless expressly stated otherwise in this Agreement, a Holder Block Sale that involves an underwritten Public Offering shall be treated as an Underwritten Shelf Takedown for all purposes of this Agreement.

(e)    Priority on Underwritten Shelf Takedowns. The Company shall not include in any Underwritten Shelf Takedown that is not a Piggyback Registration any securities which are not Registrable Securities without the prior written consent of the Holders of a majority of the Registrable Securities requested to be included in such Underwritten Shelf Takedown, *provided* that the Company may include in such Demand Registration shares of its Capital Stock for sale for its own account, subject to the priority provision described below. If the managing underwriters for such Underwritten Shelf Takedown advise the Company and the Holders of Registrable Securities included in the Shelf Takedown in writing that in their opinion the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such Underwritten Shelf Takedown exceeds the number of Registrable Securities and other securities, if any, which can be sold without adversely affecting the marketability, proposed offering price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in such Underwritten Shelf Takedown, timing or method of distribution of the offering, the Company shall include in such Underwritten Shelf Takedown the number of Registrable Securities which can be so sold in the following order of priority: (i) first, the Registrable Securities requested to be included in such Underwritten Shelf Takedown allocated

8

*pro rata* among the respective Holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such Holder; (ii) second, securities offered by the Company; and (iii) third, other securities requested to be included in such Underwritten Shelf Takedown to the extent permitted hereunder.

(f)     Restrictions on Underwritten Shelf Takedowns. The Company shall not be obligated to effect more than [four] Underwritten Shelf Takedowns during any period of 12 consecutive months and shall not be obligated to effect an Underwritten Shelf Takedown within 60 days after the pricing of a previous Underwritten Shelf Takedown; *provided*, *however*, that demands pursuant to Section 3(d) shall not be taken into account for the purpose of calculating the amount of Underwritten Shelf Takedowns during any period of 12 consecutive months.

(g)     Selection of Underwriters. The Holders of a majority of the Registrable Securities initially requesting an Underwritten Shelf Takedown shall have the right to select the managing underwriters to administer the Public Offering (which shall consist of one or more reputable nationally recognized investment banks) to administer the Public Offering with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed.

(h)     Automatic Shelf Registration. Further, upon the Company becoming a Well-Known Seasoned Issuer, (i) the Company shall give written notice to all of the Holders as promptly as reasonably practicable, and such notice shall describe, in reasonable detail, the basis on which the Company has become a Well-Known Seasoned Issuer, and (ii) the Company shall, as promptly as practicable, register, under an Automatic Shelf Registration Statement, the sale of all of the Registrable Securities in accordance with the terms of this Agreement. The Company shall use commercially reasonable efforts to file such Automatic Shelf Registration Statement as promptly as practicable, but in no event later than 30 days after it becomes a Well-Known Seasoned Issuer, and to cause such Automatic Shelf Registration Statement to remain effective thereafter until there are no longer any Registrable Securities. The Company shall give written notice of filing such Automatic Shelf Registration Statement to all of the Holders as promptly as practicable thereafter. At any time after the filing of an Automatic Shelf Registration Statement by the Company, if the Company is no longer a Well-Known Seasoned Issuer (the "**Determination Date**"), the Company shall (A) as promptly as practicable, but in no event more than 20 calendar days after such Determination Date, give written notice thereof to all of the Holders and (B) within 30 calendar days after such Determination Date, file a Registration Statement on an appropriate form (or a post-effective amendment converting the Automatic Shelf Registration Statement to an appropriate form) covering all of the Registrable Securities, and use commercially reasonable efforts to have such Registration Statement declared effective as promptly as reasonably practicable after the date the Automatic Shelf Registration Statement is no longer useable by the Holders to sell their Registrable Securities.

(i)     Additional Selling Stockholders and Additional Registrable Securities.

(i)     If the Company is not a Well-Known Seasoned Issuer, within 45 days after a written request by the Required Holders to register for resale any additional Registrable Securities owned by such Required Holder, the Company shall file a Registration Statement substantially similar to the Shelf Registration Statement then effective, if any (each, a

9

"**Follow-On Shelf**") (unless the Follow-On Shelf would be required pursuant to the rules and regulations of the Securities Act to include any audited or unaudited consolidated or pro forma financial statements that are not then currently available, in which case, as soon as reasonably practicable after such financial statements are available), to register for resale such Registrable Securities. Within 5 Business Days of the date of such written request at least 10 Business Days prior to filing the Follow-On Shelf, the Company shall give written notice of the filing of the Follow-On Shelf to all Holders of Registrable Securities (the "**Follow-On Registration Notice**") and shall include in such Follow-On Shelf all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five Business Days after sending the Follow-On Registration Notice. Notwithstanding the foregoing, the Company shall not be required to file a Follow-On Shelf if the Company is not then eligible for use of Form S-3 for secondary offerings and the Company has filed (excluding Block Sale Notice) a Follow-On Shelf in the prior 180 days. The Company shall use all commercially reasonable efforts to cause such Follow-On Shelf to be declared effective as promptly as reasonably practicable. Any Registrable Securities requested to be registered pursuant to this Section 3(i)(i) that have not been registered on a Shelf Registration Statement or pursuant to Section 4 below at the time the Follow-On Shelf is filed shall be registered pursuant to such Follow-On Shelf.

(ii)     If the Company is a Well-Known Seasoned Issuer, within ten Business Days after a written request by one or more Holders of Registrable Securities to register for resale any additional Registrable Securities owned by such Holders, the Company shall make all necessary filings to include such Registrable Securities in the Automatic Shelf Registration Statement filed pursuant to Section 3(h).

(iii)     If a Form S-3 Shelf or Automatic Shelf Registration Statement is effective, within five Business Days after written request therefor by a Holder, the Company shall file a prospectus supplement or current report on Form 8-K to add such Holder as a selling stockholder and/or to include any Registrable Securities owned by such Holder on such Form S-3 Shelf or Automatic Shelf Registration Statement to the extent permitted under the rules and regulations promulgated by the Commission.

4.     **Piggyback Registration.**

(a)     <u>Right to Piggyback</u>. Whenever the Company proposes to file a Registration Statement under the Securities Act or conduct a Shelf Takedown with respect to a Public Offering of any class of the Company's Capital Stock (other than a Demand Registration or registrations on Form S-8 or Form S-4, a "**Piggyback Registration**"), the Company shall give prompt written notice to all Holders of Registrable Securities (except, for the avoidance of doubt, to Holders that opted out from such notice pursuant to Section 7(e) hereof) of its intention to effect such Piggyback Registration and (i) in the case of a Piggyback Registration that is a Shelf Takedown, such notice shall be given not less than (A) in the case of a "bought deal," "registered direct offering" or "overnight transaction" (a "**Bought Deal**"), two Business Days, or (B) otherwise five Business Days, in each case under this <u>clause (i)</u>,  prior to the expected date of commencement of marketing efforts for such Shelf Takedown and (ii) in the case of any other Piggyback Registration, such notice shall be given not less than five Business Days after the public filing of such Registration Statement. The Company shall, subject to the provisions of Section 4(b) below, include in such Piggyback Registration, as applicable, all Registrable

10

Securities with respect to which the Company has received written requests for inclusion therein within (x) in the case of a Bought Deal, two Business Days, (y) in the case of any other Shelf Takedown, three Business Days or (z) in the case of a Shelf Takedown or otherwise five Business Days, in each case after the date of the Company's notice; *provided* that the Company may not commence marketing efforts for such Public Offering until after such periods and the inclusion of all such securities requested subject to Section 4(b). Each Holder of Registrable Securities agrees that the fact that such a notice has been delivered shall constitute confidential information if at such time the Company's counsel deems such information to be material non-public information and such Holder agrees not to disclose that such notice has been delivered or effect any sale or distribution of New Common Stock until the earlier of (i) the date the registration statement prepared in connection with such Piggyback Registration has been publicly filed with the SEC and (ii) 15 days after the date of such notice; *provided*, *however*, that the Company shall not be able to restrict trading in the Registrable Securities more than two times in any 12-month period.

(b)    Priority on Piggyback Registrations. For any Piggyback Registration that includes an underwritten Public Offering and the managing underwriters advise the Company in writing that in their reasonable opinion the number of securities requested to be included in such Piggyback Registration exceeds the number of Registrable Securities and other securities, if any, which can be sold without adversely affecting the marketability, proposed offering price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in such Piggyback Registration, timing or method of distribution of the offering, the Company shall include in such Demand Registration the number of Registrable Securities which can be sold without such adverse effect in the following order of priority: (i) *first*, if the Piggyback Registration includes a primary offering of Company securities for the Company's own account, the securities offered by the Company thereby; (ii) *second*, the Registrable Securities requested to be included in such Piggyback Registration by the Holders allocated *pro rata* among the Holders on the basis of the number of Registrable Securities owned by each Holder; and (iii) *third*, other securities requested to be included in such Piggyback Registration, if any.

(c)    Selection of Underwriters. For any Piggyback Registration that includes an underwritten Public Offering, the Company will have the sole right to select the underwriters for the Public Offering, each of which shall be a nationally recognized investment bank, reasonably acceptable to the Holders of a majority of Registrable Securities, if any, to be included in such Public Offering, which approval shall not be unreasonably withheld or delayed.

**5.    Suspensions; Withdrawals**

(a)    Suspensions. The Company may postpone, for up to 60 days from the date of the Demand Registration Notice, the filing or the effectiveness of a Registration Statement for a Demand Registration or suspend the use of a Prospectus that is part of a Shelf Registration for up to 60 days from the date of the Suspension Notice (as defined below) and therefore suspend sales of Registrable Securities included therein by providing written notice to the Holders if the Company shall have furnished to the Holders a certificate signed by the Chief Executive Officer (or other authorized officer) of the Company stating that the Company's Board of Directors has determined in its reasonable good faith judgment that the offer or sale of Registrable Securities should be suspended; *provided* that the Company may not invoke a delay pursuant to this Section

11

5(a) more than twice or for more than sixty (60) days in the aggregate, in each case, in any twelve (12) month period. The Company may invoke this Section 5(a) only if the Company's Board of Directors determines in good faith, after consultation with its external advisors or legal counsel, that the offer or sale of Registrable Securities would reasonably be expected to: (i) have a Material Adverse Effect on any proposal or plan by the Company or any of its subsidiaries to engage in any material acquisition of assets or stock (other than in the ordinary course of business) or any material merger, consolidation, tender offer, recapitalization, reorganization or other transaction involving the Company or any of its subsidiaries; or (ii) require premature disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential.

(b)   In the case of an event that causes the Company to suspend the use of a Registration Statement as set forth in Section 5(a) or 6(a)(vi)(A) (a "**Suspension Event**"), the Company shall give a notice to the Holders of Registrable Securities included in such Registration Statement (a "**Suspension Notice**") to suspend sales of the Registrable Securities and such notice shall state that such suspension shall continue only for so long as the Suspension Event or its effect is continuing. The Company shall not include any material non-public information in the Suspension Notice and or otherwise provide such information to a Holder unless specifically requested by a Holder in writing. A Holder shall not effect any sales of the Registrable Securities pursuant to such Registration Statement (or such filings) at any time after it has received a Suspension Notice from the Company and prior to receipt of an End of Suspension Notice. Holders may recommence effecting sales of the Registrable Securities pursuant to the Registration Statement (or such filings) following further written notice to such effect (an "**End of Suspension Notice**") from the Company, which End of Suspension Notice shall be given by the Company to the Holders and Counsel to the Holders, if any, promptly following the conclusion of any Suspension Event.

(c)   Time Extension. Notwithstanding any provision herein to the contrary, if the Company gives a Suspension Notice with respect to any Registration Statement pursuant to this Section 5, the Company agrees that it shall (i) extend the Required Effective Period which such Registration Statement shall be maintained effective pursuant to this Agreement by the number of days during the period from the date of receipt by the Holders of the Suspension Notice to and including the date of receipt by the Holders of the End of Suspension Notice; and (ii) provide copies of any supplemented or amended prospectus necessary to resume sales, with respect to each Suspension Event; *provided* that such period of time shall not be extended beyond the date that there are no longer Registrable Securities covered by such Registration Statement.

(d)   Withdrawal Requests. At any time prior to the effective date of a Registration Statement, the Required Holders may withdraw such demand or request for registration ("**Withdrawal Request**") by providing written notice of such withdrawal to the Company. A Withdrawal Request shall count as one of the permitted Demand Registrations hereunder unless: (i) such withdrawal arose out of the fault of the Company; (ii) in the reasonable judgment of the Required Holders, a Material Adverse Effect has occurred; (iii) a Suspension Notice was delivered to the Holders; or (iv) the managing underwriters advise that the amount of Registrable Securities to be sold in such offering be reduced pursuant to Section 2(d) by more than 25% of the Registrable Securities to be included in such Registration

12

Statement. The Company shall pay all Registration Expenses in connection with any Registration Statement subject to a Withdrawal Request. Any Holder may withdraw its request for inclusion of Registrable Securities in a Registration Statement by giving written notice to the Company of its intention to remove its Registrable Securities from such Registration Statement within two Business Days before the earlier of (i) the expected date of the commencement of marketing efforts for the Public Offering in connection with such Registration Statement or (ii) the effectiveness of the Registration Statement.

6.   **Company Undertakings.**

(a)   Whenever Registrable Securities are registered pursuant to this Agreement, the Company shall use commercially reasonable efforts to effect the registration and the sale of such Registrable Securities as soon as reasonably practicable in accordance with the intended method of disposition thereof, and pursuant thereto the Company shall as promptly as reasonably practicable:

(i)   prepare and file with the Commission a Registration Statement with regard to such Registrable Securities as soon as reasonably practicable but not later than 60 days of its receipt of an applicable notice from the Required Holders (unless the Registration Statement would be required pursuant to the rules and regulations of the Securities Act to include any audited or unaudited consolidated or pro forma financial statements that are not then currently available, in which case, promptly after such financial statements are available) and use commercially reasonable efforts to cause such Registration Statement to become effective as soon thereafter as is reasonably practicable;

(ii)   before filing a Registration Statement or Prospectus or any amendments or supplements thereto, furnish to the Holders whose Registrable Securities are requested to be included in the Registration Statement copies of all such documents, other than exhibits, documents that are incorporated by reference and such documents that are otherwise publicly available on EDGAR, proposed to be filed and such other documents reasonably requested by such Holders and provide Counsel to the Holders with a reasonable opportunity to review and comment on such documents of no less than three (3) Business Days;

(iii)   notify each Holder of the effectiveness of each Registration Statement and prepare and file with the Commission such amendments and supplements to such Registration Statement as may be necessary to keep such Registration Statement effective for a period of not less than (A) 90 days in the case of a Demand Registration that is not a Shelf Registration or (B) in the case of a Shelf Registration, until the date on which all Registrable Securities have been sold pursuant to the Shelf Registration, have otherwise ceased to be Registrable Securities or the maximum length permitted by the Commission (or, in each case, if sooner, until all Registrable Securities have been sold under such Registration Statement), and comply with the provisions of the Securities Act (including by preparing and filing with the Commission any Prospectus or supplement to be used in connection therewith) with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the Holders as set forth in such Registration Statement (each such period as applicable, the "**Required Effective Period**");

13

(iv)    furnish to each seller of Registrable Securities, and the managing underwriters, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any Issuer Free Writing Prospectus)), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(v)    (A) to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests in writing, (B) keep such registration or qualification in effect for so long as such Registration Statement remains in effect, and (C) to do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (*provided* that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction);

(vi)    notify each seller of such Registrable Securities, the managing underwriters and Counsel to the Holders (A) at any time when a Prospectus relating to the applicable Registration Statement is required to be delivered under the Securities Act, (1) upon discovery that, or upon the happening of any event as a result of which, such Registration Statement, or the Prospectus or Issuer Free Writing Prospectus relating to such Registration Statement, or any document incorporated or deemed to be incorporated therein by reference contains an untrue statement of a material fact or omits any material fact necessary to make the statements in the Registration Statement or the Prospectus or Issuer Free Writing Prospectus relating thereto not misleading or otherwise requires the making of any changes in such Registration Statement, Prospectus, Issuer Free Writing Prospectus or document, and, at the request of any such seller, the Company shall promptly prepare a supplement or amendment to such Prospectus or Issuer Free Writing Prospectus, furnish a reasonable number of copies of such supplement or amendment to each seller of such Registrable Securities, Counsel to the Holders and the managing underwriters and file such supplement or amendment with the Commission so that, as thereafter delivered to the purchasers of such Registrable Securities, such Prospectus or Issuer Free Writing Prospectus as so amended or supplemented shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading, (2) as soon as the Company becomes aware of any comments or inquiries by the Commission or any requests by the Commission or any Federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or Issuer Free Writing Prospectus covering Registrable Securities or for additional information relating thereto, (3) as soon as the Company becomes aware of the issuance or threatened issuance by the Commission of any stop order suspending or threatening to suspend the effectiveness of a Registration Statement covering the Registrable Securities or (4) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Security for sale in any jurisdiction, or the

14

initiation or threatening of any proceeding for such purpose; and (B) when each Registration Statement or any amendment thereto has been filed with the Commission and when each Registration Statement or the related Prospectus or Issuer Free Writing Prospectus or any Prospectus supplement or any post-effective amendment thereto has become effective;

(vii)    use commercially reasonable efforts to cause all such Registrable Securities (A) if the New Common Stock is then listed on a National Securities Exchange or included for quotation in a recognized trading market, to continue to be so listed or included, (B) if the Registrable Securities are to be distributed in an underwritten Public Offering and the New Common Stock is not then listed on a National Securities Exchange or included for quotation in a recognized trading market, to, as promptly as practicable (subject to the limitations set forth in the Plan), be listed on a National Securities Exchange and in any event within 60 calendar days (if such listing is then permitted under the rules of such National Securities Exchange) and (C) to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of the Registrable Securities;

(viii)    provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of the applicable Registration Statement;

(ix)    in connection with any underwritten Public Offering (including an Underwritten Shelf Takedown):

(A)    enter into and perform under such customary agreements (including underwriting agreements in customary form, including customary representations and warranties and provisions with respect to indemnification and contribution) and take all such other actions as the Holders of a majority of the Registrable Securities being sold or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including effecting a stock split, a combination of shares, or other recapitalization) and provide reasonable cooperation, including causing appropriate officers to attend and participate in "road shows" and analyst or investor presentations and such other selling or other informational meetings organized by the underwriters, if any (taking into account the needs of the Company's businesses and the responsibilities of such officers with respect thereto and the requirement of the marketing process);

(B)    use commercially reasonable efforts to obtain and cause to be furnished to each such Holder included in such underwritten Public Offering and the managing underwriters a signed counterpart of (i) one or more comfort letters from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by comfort letters and (ii) a legal opinion (and negative assurance letter) of counsel to the Company addressed to the relevant underwriters and/or such Holders of Registrable Securities, in

15

each case in customary form and covering such matters of the type customarily covered by such letters as the managing underwriters and/or Holders of a majority of the Registrable Securities included in such underwritten Public Offering reasonably request;

(x) upon reasonable notice and at reasonable times during normal business hours, make available for inspection by any Holder covered by the applicable Registration Statement, Counsel to the Holders, any underwriter participating in any disposition pursuant to such registration, as applicable, and any other attorney or accountant retained by such Holder or underwriter, all financial and other records and pertinent corporate documents of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by any such Holder, underwriter, attorney or accountant in connection with such Registration Statement or Shelf Takedown, as applicable, and make themselves available at mutually convenient times to discuss the business of the Company and other matters reasonably requested by any such Holders, sellers, underwriter or agent thereof in connection with such Registration Statement as shall be necessary (subject to the Company's compliance with Regulation FD) to enable them to exercise their due diligence responsibility, as applicable (any information provided under this Section 6(a)(x), "**Due Diligence Information**"); *provided* that the Company shall not provide any Due Diligence Information to a Holder unless such Holder explicitly requests such Due Diligence Information in writing.

(xi) permit any Holder which in its reasonable judgment might be deemed to be an Affiliate of the Company, Counsel to the Holders, any underwriter participating in any disposition pursuant to a Registration Statement, and any other attorney, accountant or other agent retained by such Holder or underwriter, to participate (including, but not limited to, reviewing, commenting on and attending all meetings) in the preparation of such Registration Statement and any Prospectus supplements relating to a Shelf Takedown, if applicable;

(xii) in the event of the issuance or threatened issuance of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any New Common Stock included in such Registration Statement for sale in any jurisdiction, the Company shall use commercially reasonable efforts to (A) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of such order and (B) obtain the withdrawal of any order suspending or preventing the use of any related Prospectus or Issuer Free Writing Prospectus or suspending qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction at the earliest practicable date;

(xiii) provide a CUSIP number for the Registrable Securities prior to the effective date of the first Registration Statement including Registrable Securities;

(xiv) promptly notify in writing the participating Holders, the sales or placement agent, if any, therefor and the managing underwriters of the securities being sold: (A) when such Registration Statement or related Prospectus or Free Writing Prospectus or any Prospectus amendment or supplement or post-effective amendment has been filed, and, with respect to any such Registration Statement or any post-effective amendment, when the same has

16

become effective; and (B) of any written comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto;

(xv)     (A) prepare and file with the Commission such amendments and supplements to each Registration Statement as may be necessary to comply with the provisions of the Securities Act, including post effective amendments to each Registration Statement as may be necessary to keep such Registration Statement continuously effective for the applicable time period required hereunder and, if applicable, file any Registration Statements pursuant to Rule 462(b) promulgated under the Securities Act; (B) cause the related Prospectus to be supplemented by any required Prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; (C) comply with the provisions of the Securities Act and the Exchange Act and any applicable securities exchange or other recognized trading market with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented; and (D) provide additional information related to each Registration Statement as requested by, and obtain any required approval necessary from, the Commission or any Federal or state governmental authority;

(xvi)    cooperate with each Holder and each underwriter, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(xvii)   within the deadlines specified by the Securities Act, make all required filing fee payments in respect of any Registration Statement or Prospectus used under this Agreement (and any Public Offering covered thereby);

(xviii)  if requested by any participating Holder or the managing underwriters, promptly include in a Prospectus supplement or amendment such information as the Holder or managing underwriters may reasonably request, including in order to permit the intended method of distribution of such securities, and make all required filings of such Prospectus supplement or such amendment as soon as reasonably practicable after the Company has received such request;

(xix)    in the case of certificated Registrable Securities, cooperate with the participating Holders of Registrable Securities and the managing underwriters to facilitate the timely preparation and delivery of certificates (not bearing any legends) representing Registrable Securities to be sold after receiving written representations from each participating Holder that the Registrable Securities represented by the certificates so delivered by such Holder will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the Holders or managing underwriters may reasonably request at least two Business Days prior to any sale of Registrable Securities; *provided* that nothing in this Agreement shall require the Company to issue securities in certificated form unless such securities are already in certificated form;  and

17

(xx) use commercially reasonable efforts to take all other actions deemed necessary or advisable in the reasonable judgment of the Company to effect the registration and sale of the Registrable Securities contemplated hereby.

(b) The Company shall hold in confidence and not make any disclosure of information concerning a Holder provided to the Company unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement. The Company agrees that it shall, upon learning that disclosure of such information concerning a Holder is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to such Holder and allow such Holder, at the Holder's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

(c) As of the date hereof and except as provided pursuant to the Plan, the Company represents and warrants that it is not a party to, or otherwise subject to, any other agreement granting registration rights to any other Person with respect to any securities of the Company, including securities convertible, exercisable or exchangeable into or for shares of any Capital Stock of the Company.

(d) With a view to making available certain rules and regulations of the Commission that may permit the sale of the Registrable Securities to the public without registration, until such date as no Holder owns any Registrable Securities, the Company agrees to:

(i) use commercially reasonable efforts to continue to file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder;

(ii) make available information necessary to comply with Section 4(a)(7) under the Securities Act and Rule 144, Rule 144A and Regulation S promulgated under the Securities Act, if available, with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Section 4(a)(7), Rule 144, Rule 144A and Regulation S promulgated under the Securities Act, as may be amended from time to time, or any other similar rules or regulations now existing or hereafter adopted by the Commission; and

(iii) upon the reasonable written request of any Holder, the Company will deliver to such Holder a written statement as to whether the Company has complied with such information requirements, and, if not, the specific reasons for non-compliance.

(e) The Company agrees that nothing in this Agreement shall prohibit the Holders, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to

18

the Securities Act. To the extent reasonably requested by a Holder and the total price of the Registrable Securities to be sold or transferred in such sale or transfer is reasonably expected to exceed $20 million, the Company shall assist and cooperate with such Holder to facilitate such sale or transfer by providing Due Diligence Information to potential purchasers consistent with Section 6(a)(x).

### 7.   Holder Undertakings

(a)   Free Writing Prospectuses. Each Holder represents that it has not prepared or had prepared on its behalf or used or referred to, and agrees that it will not prepare or have prepared on its behalf or used or refer to, any Free Writing Prospectus, and has not distributed and will not distribute any written materials in connection with the offer or sale of New Common Stock without the prior written consent of the Company and, in connection with any underwritten Public Offering, the underwriters. Any such Free Writing Prospectus consented to by the Company and the underwriters, as the case may be, is hereinafter referred to as a "**Permitted Free Writing Prospectus**." The Company represents and agrees that it has treated and will treat, as the case may be, each Permitted Free Writing Prospectus as an Issuer Free Writing Prospectus, including in respect of timely filing with the Commission, legending and record keeping.

(b)   Information for Inclusion. Each selling Holder that has requested inclusion of its Registrable Securities in any Registration Statement shall furnish to the Company such information regarding such Holder and its plan and method of distribution of such Registrable Securities as the Company may, from time to time, reasonably request in writing. The Company may refuse to proceed with the registration of such Holder's Registrable Securities if such Holder unreasonably fails to furnish such information within a reasonable time after receiving such request.

(c)   Underwritten Public Offering Participation. No Person may participate in any underwritten Public Offering hereunder unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements in customary form entered into pursuant to this Agreement and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; *provided* that no Holder included in any underwritten Public Offering shall be required to make any representations or warranties to the Company or the underwriters (other than (A) representations and warranties regarding (1) such Holder's ownership of its Registrable Securities to be sold or transferred, (2) such Holder's power and authority to effect such transfer, and (3) such matters pertaining to compliance with securities laws as may be reasonably requested by the Company or the underwriters, and (B) such other representations, warranties and other provisions relating to such Holder's participation in such Public Offering as may be reasonably requested by the underwriters) or to undertake any indemnification obligations to the Company with respect thereto, except as otherwise provided in Section 11(b) hereof, or to the underwriters with respect thereto, except to the extent of the indemnification being given to the underwriters and their controlling Persons in Section 11(b) hereof.

19

(d) <u>Price and Underwriting Discounts</u>. In the case of an underwritten Demand Registration or Underwritten Shelf Takedown requested by Holders pursuant to this Agreement, the price, underwriting discount and other financial terms of the related underwriting agreement for the Registrable Securities shall be determined by the Holders representing a majority of the Registrable Securities included in such underwritten Public Offering.

(e) <u>Notice Opt-In and Opt-Out</u>. Notwithstanding anything to the contrary in this Agreement, until a Holder makes an affirmative written election, the Company shall not be required to and shall not deliver any notice or any information to such Holder that would reasonably be expected to constitute material non-public information, including any applicable notices or other information under this Agreement. Upon receipt of written election to receive such notices or information (an "**Opt-In Election**") the Company shall be required to and shall provide to the Holder all applicable notices or information pursuant to this Agreement from the date of such Opt-In Election. At any time following a Holder making an Opt-In Election, such Holder may also make a written election to no longer receive any such notices or information (an "**Opt-Out Election**"), which election shall cancel any previous Opt-In Election, and, following receipt of such Opt-Out Election, the Company shall not be required to, and shall not, deliver any such notice or information to such Holder from the date of such Opt-Out Election. An Opt-Out Election may state a date on which it expires or, if no such date is specified, shall remain in effect indefinitely. A Holder who previously has given the Company an Opt-In Election or Opt-Out Election may revoke such election at any time, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-In Elections and Opt-Out Elections. For the avoidance of doubt, notification by the Company pursuant to Section 3(a) of this Agreement shall not constitute material non-public information.

**8.     Registration Expenses.**

(a) <u>Expenses</u>. All fees and expenses incurred by the Company in connection with this Agreement ("**Registration Expenses**") will be borne by the Company. These fees and expenses will include without limitation (i) stock exchange, Commission, FINRA and other registration and filing fees, (ii) all fees and expenses incurred in connection with complying with any securities or blue sky laws (including reasonable fees, charges and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including any expenses arising from any special audits or "comfort letters" required in connection with or incident to any registration) and other Persons retained by the Company, and (v) the fees and expenses incurred in connection with the listing of the Registrable Securities on a National Securities Exchange.

(b) <u>Reimbursement of Counsel</u>. The Company will also reimburse or pay, as the case may be, the Holders of Registrable Securities included in such registration for the reasonable fees and out-of-pocket expenses of one Counsel to the Holders relating to or in connection with any action taken pursuant to this Agreement within 30 calendar days of presentation of an invoice approved by such Holders and disbursements of each additional counsel retained by any Holder for the purpose of rendering a legal opinion on behalf of such Holder in connection with any underwritten Public Offering if the managing underwriters of

20

such Public Offering or the Company reasonably request such legal opinion and Counsel to the Holders cannot reasonably provide such legal opinion due to legal jurisdiction or otherwise.

**9.      Lock-Up Agreements.**

(a)      Lock-Up Agreements. (i) If required by the Holders of a majority of the Registrable Securities participating in an underwritten Public Offering and requested by the managing underwriters of such Public Offering, or (ii) if requested by the managing underwriters of a Public Offering for the account of the Company, each of the Holders participating in such Public Offering shall enter into a lock-up agreement with the managing underwriters of such Public Offering to not make any sale or other disposition of any of the Company's Capital Stock owned by such Holder (a "**Lock-Up Agreement**"), such agreement to be in customary form and substance with customary exceptions; *provided* that all executive officers and directors of the Company and, in the case of clause (i) hereof, the Holders requesting such Lock-Up Agreements are bound by and have entered into substantially similar Lock-Up Agreements; *provided further* that the foregoing provisions shall only be applicable to the Holders if all stockholders, officers and directors are treated similarly with respect to any release prior to the termination of the lock-up period such that if any such persons are released, then all Holders shall also be released to the same extent on a *pro rata* basis. The Company may impose stop-transfer instructions with respect to the shares of New Common Stock (or other securities) subject to the restrictions set forth in this Section 9(a) until the end of the applicable period of the Lock-Up Agreement. The provisions of this Section 9(a) shall cease to apply to such Holder once such Holder no longer beneficially owns any Registrable Securities.

(b)      Company Lock-Up. In connection with any underwritten Public Offering, and upon the reasonable request of the managing underwriters, the Company shall: (i) agree to a customary lock-up provision applicable to the Company in an underwriting agreement as reasonably requested by the managing underwriters; and (ii) cause each of its executive officers and directors to enter into Lock-Up Agreements for a period of no longer than 75 days, in each case, in customary form and substance, and with exceptions that are customary, for an underwritten Public Offering.

**10.      Public Reports.**

(a)      [Public Reporting. For so long as the Company is subject to the requirements to publicly file information or reports with the Commission pursuant to Section 13 or 15(d) of the Exchange Act, the Company shall use best efforts to timely file all information and reports with the Commission and comply with all such requirements. Subject to Section 10(b), if the Company is not subject to the requirements of Section 13 or 15(d) of the Exchange Act, the Company shall continue to provide such information on the Company's website within the time periods specified in the Commission's rules and regulations applicable to non-accelerated filers (as in effect on the date hereof) with (i) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Company were required to file such forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations", all certified by the principal financial or accounting officer of the Company and, with respect to annual information only, a report thereon by the Company's certified independent accountants, and (ii) all current

21

reports that would be required to be filed with the Commission on Form 8-K if the Company were required to file such reports.]

(b)      Waiver. The Company's obligations under this Section 10 may be waived at any time by prior written consent of the Holders of a majority of the Registrable Securities.

**11.      Indemnification; Contribution.**

(a)      Indemnification by the Company. The Company agrees to indemnify and hold harmless each Holder registered pursuant to this Agreement, such Holder's Affiliates, directors, officers, employees, members, managers, agents and any Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any underwriter that facilitates the sale of the Registrable Securities and any Person who controls such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities and expenses ("**Losses**") to which they or any of them may become subject insofar as such Losses arise out of or are based upon any untrue statement of a material fact contained in any Registration Statement pursuant to which Registrable Securities were registered, Prospectus, preliminary prospectus, any road show, as defined in Rule 433(h)(4) under the Securities Act a ("**road show**"), or Issuer Free Writing Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission to state therein a material fact required to be stated therein or necessary in the case of any Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus, in light of the circumstances under which they were made, to make the statements therein not misleading and the Company agrees to reimburse each such indemnified party for any reasonable legal or other reasonable out-of-pocket expenses incurred by them in connection with investigating or defending any such Losses (whether or not the indemnified party is a party to any proceeding); *provided*, *however*, that the Company will not be liable in any case to the extent that any such Loss arises out of or is based upon any such untrue or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to the Company by or on behalf of any such Holder specifically for inclusion therein, including, without limitation, any notice and questionnaire. This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b)      Indemnification by the Holders. Each Holder severally (and not jointly) agrees to indemnify and hold harmless the Company and each of its Affiliates, directors, employees, members, managers, agents and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any underwriter that facilitates the sale of Registrable Securities and any Person who controls such underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) to the fullest extent permitted by applicable law, from and against any and all Losses to which they or any of them may become subject insofar as such Losses arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement pursuant to which Registrable Securities were registered, Prospectus, preliminary prospectus, road show, Issuer Free Writing Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are

22

based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary in the case of any Prospectus, preliminary prospectus, road show, Issuer Free Writing Prospectus, in light of the circumstances under which they were made, to make the statements therein not misleading, to the extent, but only to the extent, that any such untrue statement or omission is contained in any written information furnished to the Company by or on behalf of such Holder specifically for inclusion therein; *provided*, *however*, that the maximum amount to be indemnified by such Holder pursuant to this Section 10(b) shall be limited to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in the Public Offering to which such Registration Statement, Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus relates; *provided*, *further*, that a Holder shall not be liable in any case to the extent that prior to the filing of any such Registration Statement, Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus or any amendment thereof or supplement thereto, each Holder has furnished in writing to the Company, information expressly for use in, and within a reasonable period of time prior to the effectiveness of such Registration Statement or the use of the Prospectus, preliminary prospectus, road show or Issuer Free Writing Prospectus, or any amendment thereof or supplement thereto which corrected or made not misleading information previously provided to the Company. This indemnity agreement will be in addition to any liability which any such Holder may otherwise have.

(c)     Conduct of Indemnification Proceedings. Promptly after receipt by an indemnified party under this Section 11 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 11(c), notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability under Section 11(a) or Section 11(b) above unless and to the extent such action and such failure results in material prejudice to the indemnifying party and forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in Section 11(a) or Section 11(b) above. The indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, except as provided in the next sentence, after notice from the indemnifying party to such indemnified party of its election to so assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal expenses of other counsel or any other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. Notwithstanding the indemnifying party's rights in the prior sentence, the indemnified party shall have the right to employ its own counsel (and one local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if:

(i)     the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with an actual or potential conflict of interest;

(ii)     the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall

23

have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party;

(iii)    the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or

(iv)    the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.

No indemnifying party shall, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general circumstances or allegations, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all indemnified parties. An indemnifying party shall not be liable under this Section 11(c) to any indemnified party regarding any settlement or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent is consented to by such indemnifying party, which consent shall not be unreasonably withheld. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party (which consent shall not be unreasonably withheld), consent to entry of any judgment or enter into any settlement or compromise unless such settlement or compromise (x) includes as an unconditional term thereof the giving by the claimant or plaintiff therein, to such indemnified party, of a full and final release from all liability in respect to such claim or litigation and (y) does not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of such indemnified party.

(d)    Contribution.

(i)    In the event that the indemnity provided in Section 11(a) or Section 11(b)  above is unavailable to or insufficient to hold harmless an indemnified party for any reason, then each applicable indemnifying party agrees to contribute to the aggregate Losses (including reasonable legal or other reasonable out-of-pocket expenses incurred in connection with investigating or defending same) to which such indemnifying party may be subject in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party on the one hand and by the indemnified party on the other from the Public Offering of the New Common Stock; *provided*, *however*, that the maximum amount of liability in respect of such contribution shall be limited in the case of any Holder to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in connection with such registration. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the indemnifying party on the one hand and the indemnified party on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. The relative fault shall be

24

determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party on the one hand or the indemnified party on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(ii)     The parties agree that it would not be just and equitable if contribution pursuant to this Section 10(d) were determined by *pro rata* allocation (even if the Holders of Registrable Securities or any agents or underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 10(d). The amount paid or payable by an indemnified party as a result of the Losses referred to above in this Section 10(d) shall be deemed to include any reasonable legal or other reasonable out-of-pocket expenses incurred by such indemnified party in connection with investigating or defending any such action or claim.

(iii)     Notwithstanding the provisions of this Section 11(d), no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(iv)     For purposes of this Section 11, each Person who controls any Holder, agent or underwriter (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and each director, officer, employee and agent of any such Holder, agent or underwriter shall have the same rights to contribution as such Holder, agent or underwriter, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and each officer and director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this Section 11(d).

(e)     The provisions of this Section 11 will remain in full force and effect, regardless of any investigation made by or on behalf of any Holder or the Company or any of the officers, directors or controlling Persons referred to in this Section 11, and will survive the transfer of Registrable Securities.

**12.     Transfer of Registration Rights.**

The rights of a Holder hereunder may be transferred, assigned, or otherwise conveyed on a *pro rata* basis in connection with any transfer, assignment, or other conveyance of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied with respect to any transfer, assignment or conveyance of rights hereunder: (a) such transfer or assignment of Registrable Securities is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement by executing and delivering to the Company a Joinder; and (c) the Company is given written notice by such Holder within 15 Business Days of such transfer or assignment, stating the name and address of the transferee or assignee, identifying the Registrable Securities with respect to which such rights are being transferred or assigned and the total number of Registrable Securities and other Capital Stock of the Company beneficially owned by such

25

transferee or assignee. Any rights assigned under this Agreement shall apply only in respect of Registrable Securities that are transferred, assigned or conveyed and not in respect of any other securities that the transferee or assignee may hold.

### 13.  Amendment, Modification and Waivers; Further Assurances.

(a)  Amendment. This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument, (a) signed by (i) the Company, and (ii) the Holders of at least a majority of the Registrable Securities; *provided*, that no provision of this Agreement shall be modified or amended in a manner that is disproportionately and materially adverse to any Holder, without the prior written consent of such Holder, as applicable, or (b) in the case of a waiver, by the party hereto waiving compliance.

(b)  Changes in New Common Stock. If, and as often as, there are any changes in the New Common Stock by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions hereof as may be required so that the rights and privileges granted hereby shall continue with respect to the Registrable Securities as so changed and the Company shall make appropriate provision in connection with any merger, consolidation, reorganization or recapitalization that any successor to the Company (or resulting parent thereof) shall agree, as a condition to the consummation of any such transaction, to expressly assume the Company's obligations hereunder.

(c)  Effect of Waiver. No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof. No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(d)  Further Assurances. Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

### 14.  Miscellaneous.

(a)  Successors and Assigns. All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto (including any trustee in bankruptcy) whether so expressed or not. In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or Holders of Registrable

26

Securities are also for the benefit of, and enforceable by, any subsequent Holder. No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(b)     Remedies; Specific Performance. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically, to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor; *provided* that the liability of the Holders shall be several and not joint. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement and shall not be required to prove irreparable injury to such party or that such party does not have an adequate remedy at law with respect to any breach of this Agreement (each of which elements the parties admit). The parties hereto further agree and acknowledge that each and every obligation applicable to it contained in this Agreement shall be specifically enforceable against it and hereby waives and agrees not to assert any defenses against an action for specific performance of their respective obligations hereunder. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies available under this Agreement or otherwise.

(c)     Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (i) delivered personally to the recipient, (ii) e-mailed or sent by facsimile to the recipient, or (iii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the Company at the address set forth below and to any Holder at the address set forth on the signature page hereto (with copies sent at the address set forth below), or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

The Company's address is:

> FTS International, Inc.
> 777 Main Street, Suite 2900
> Fort Worth, Texas 76102
> Attention: Jennifer L. Keefe
> E-mail: Jennifer.keefe@ftsi.com
>
> with copies to:
>
> Kirkland & Ellis LLP
> 609 Main Street
> Houston, Texas 77002
> Attention: Julian Seiguer, P.C., Bryan D. Flannery
> E-mail: Julian.Seiguer@kirkland.com, bryan.flannery@kirkland.com

27

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(d)     No Inconsistent Agreements. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders of Registrable Securities in this Agreement.

(e)     Adjustments Affecting Registrable Securities. The Company shall not take any action, or permit any change to occur, with respect to its securities which would materially and adversely affect the ability of the Holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement or which would materially and adversely affect the marketability of such Registrable Securities in any such registration (including effecting a stock split or a combination of shares).

(f)     Counterparts. This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format ("**pdf**"), each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement. Delivery of this Agreement by one party to the other may be made by facsimile, electronic mail (including any electronic signature complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) or other transmission method, and the parties hereto agree that any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

(g)     Descriptive Headings; Interpretation; No Strict Construction. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. The words "include," "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation." The use of the words "or," "either" or "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time. All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(h)    Delivery by Facsimile and Electronic Means. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(i)    Arm's Length Agreement. Each of the parties to this Agreement agrees and acknowledges that this Agreement has been negotiated in good faith, at arm's length, and not by any means prohibited by law.

(j)    Sophisticated Parties; Advice of Counsel. Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

(k)    Governing Law. This Agreement and the exhibits, attachments and annexes hereto shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

(l)    Submission to Jurisdiction. Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in the United States District Court for the in the Southern District of New York or any New York state court, in each case, located in the Borough of Manhattan, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(m)    Waiver of Jury Trial. Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement,

29

including contract claims, tort claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 14(m) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(n)     Complete Agreement. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, represent the complete agreement among the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings among the parties.

(o)     Severability. In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(p)     Termination. This Agreement shall terminate and be of no further force or effect when there shall no longer be any Registrable Securities outstanding; *provided*, that the provisions of Sections 6(b), 7(e), 8, 10, 11, 13 and 14 shall survive any such termination; *provided further* that any Holder may elect to terminate its obligations under this Agreement by giving the Company written notice thereof subject to the survival of the foregoing provisions; *provided further* that this Agreement shall automatically terminate with respect to a Holder that no longer holds any Registrable Securities.

(q)     Independent Agreement by the Holders. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder, and no provision of this Agreement is intended to confer any obligations on any Holder vis-à-vis any other Holder. Nothing contained herein, and no action taken by any Holder pursuant hereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Holders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated herein.

[*Signature Pages Follow*]

30

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

**FTS INTERNATIONAL, INC.**

By: _____
    Name:
    Title:

[*Signature Page to Registration Rights Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.


[**HOLDER**]


By: _____

    Name:

    Title:


Address:

_____

_____

_____

Telephone: _____

Fax No.: _____

E-mail: _____


To exercise the Opt-In Election pursuant to Section 7(e), please check the box below and countersign:

[   ] – The undersigned Holder hereby notifies the Company of its exercise of the Opt-In Election.

[**HOLDER**]


By: _____

    Name:

    Title:


[*Signature Page to Registration Rights Agreement*]

**ANNEX A**

**Form of Joinder Agreement**

THIS JOINDER AGREEMENT is made and entered into by the undersigned with reference to the following facts:

Reference is made to the Registration Rights Agreement, dated as of [•], 2020, as amended (the "**Registration Rights Agreement**"), by and among FTS International, Inc., a Delaware corporation (the "**Company**"), the other parties (the "**Holders**") thereto. Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed thereto in the Registration Rights Agreement.

As a condition to the acquisition of rights under the Registration Rights Agreement in accordance with the terms thereof, the undersigned agrees as follows:

1.      The undersigned hereby agrees to be bound by the provisions of the Registration Rights Agreement and undertakes to perform each obligation as if a Holder thereunder and an original signatory thereto in such capacity.

2.      This Joinder Agreement shall bind, and inure to the benefit of, the undersigned hereto and its respective devisees, heirs, personal and legal representatives, executors, administrators, successors and assigns.

3.      This Joinder Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

[*Signature Page Follows*]

B-1

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement.

[**HOLDER**]

By: _____
               Name:
               Title:

Date: _____

Address: _____

         _____

         _____

         _____

Phone Number: _____

Facsimile Number: _____

E-mail for Notice: _____

I.R.S. I.D. Number: _____

Amount of Registrable
Securities Acquired: _____

To exercise the Opt-In Election pursuant to Section 7(e), please check the box below and countersign:

[   ] – The undersigned Holder hereby notifies the Company of its exercise of the Opt-In Election.

[**HOLDER**]

By: _____
               Name:
               Title:

[*Signature Page to Joinder Agreement*]

**Exhibit C**

**Members of the New Board**

[TO COME]

*DRAFT*

**Exhibit D**

**Schedule of Retained Causes of Action**

Article IV.R of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u> of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

**The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including <u>Article VIII</u> of the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including

Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Articles IV and VIII of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action, including the following types of claims:

## I.       Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule D(i)** attached hereto.

## II.      Claims Related to Tax Obligations

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all tax obligations to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule D(ii)** attached hereto.

## III.     Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule D(iii)** attached hereto.

**IV.     Claims Related to Contracts and Leases**

Unless otherwise released by the Plan, the Debtors and Reorganized Debtors, as applicable, expressly reserve Causes of Action based in whole or in part upon any and all contracts and leases, including without limitation all oil and gas leases, and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto), including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors.   The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties:  (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

**V.     Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

**VI.    Claims Related to Deposits/ Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.[1]

**VII.    Claims Related to Liens**

Unless otherwise released by the Plan or the Cash Collateral Order, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

---

[1] For the avoidance of doubt, the Debtors reserve all rights with respect to any deposit provided in accordance with the *Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 103] or otherwise provided as "adequate assurance of payment" (as that term is used by Section 366 of the Bankruptcy Code).

**Schedule D(i)**

**Claims Related to Insurance Policies**

*DRAFT*

| Party | Address | Nature |
|---|---|---|
| ACE American Insurance Company | Chubb<br>Dept. CH 10123,<br>Palatine, IL 60655 | Claims related to insurance policies |
| AIG Specialty Insurance Co | 175 Water Street<br>New York, NY 10038 | Claims related to insurance policies |
| Allied World Insurance Company | 199 Water Street<br>24th Floor<br>New York, NY 10038 | Claims related to insurance policies |
| Arch Insurance Company | Harborside 3<br>210 Hudson Street<br>Suite 300<br>Jersey City, NJ 07311-1107 | Claims related to insurance policies |
| AXIS Insurance Company | 11680 Great Oaks Way<br>Suite 500<br>Alpharetta, GA, 30022 | Claims related to insurance policies |
| Beazley Insurance Company | 45 Rockefeller Plaza<br>16th Floor<br>New York, NY 10111 | Claims related to insurance policies |
| Berkley Insurance Company | 475 Steamboat Road<br>Greenwich, CT 06830 | Claims related to insurance policies |
| Endurance American Insurance Company | 750 Third Avenue<br>New York, NY 10017 | Claims related to insurance policies |
| Everest National Insurance Company | P.O. Box 830<br>477 Martinsville Road<br>Liberty Corner, NJ 07938 | Claims related to insurance policies |

| Party | Address | Nature |
|---|---|---|
| Old Republic | 191 North Wacker Drive Suite 1000 Chicago, IL 60606 | Claims related to insurance policies |
| Old Republic Insurance Company | 191 North Wacker Drive Suite 1000 Chicago, IL, 60606 | Claims related to insurance policies |
| Scottsdale Indemnity Company (Nationwide) | 8877 North Gainey Center Drive Scottsdale, AZ 85258 | Claims related to insurance policies |
| Underwriters at Lloyd's London | 280 Park Avenue East Tower, 25th Floor New York, NY, 10017 | Claims related to insurance policies |

## Schedule D(ii)

**Claims Related to Tax Obligations**

*DRAFT*

| Party | Address | Nature |
|---|---|---|
| United States Department of the Treasury | Internal Revenue Service<br>Ogden, UT 84409-9941 | Claims related to tax refunds |
| Texas State Comptroller | P.O. Box 149357<br>Austin, TX 78714-9357 | Claims related to tax refunds |
| New Mexico Taxation and Revenue Department | P.O. Box 25127<br>Santa Fe, NM 87504-5127 | Claims related to tax refunds |
| Pennsylvania Department of Transportation | P.O. Box 15560<br>Harrisburg, PA 17105-5560 | Claims related to tax refunds |
| Louisiana Department Of Revenue | P.O. Box 4998<br>Baton Rouge, LA 70821-4998 | Claims related to tax refunds |
| Mississippi Department of Revenue | P.O. Box 23075<br>Jackson, MS, 39225-3075 | Claims related to tax refunds |
| Oklahoma Tax Commission | P.O. Box 26850<br>Oklahoma City, OK 73126-0850 | Claims related to tax refunds |
| Parker County Appraisal District | 1108 Santa Fe Drive<br>Weatherford, TX 76086 | Claims related to tax refunds |

**Schedule D(iii)**

**Claims, Defenses, Cross-Claims, and
Counter-Claims Related to Litigation and Possible Litigation**

*DRAFT*

| Case Number | Litigation Party | FTSI Party | Other Defendants |
|---|---|---|---|
| 2:19-CV-04675 (U.S. District Court for the Southern District of Ohio) | Eseroma Cakcaka and Seruwaia Cakacaka | FTS International Services, LLC | Arrows Up, LLC |
| EEOC 564-2017-00579 (EEOC Charge) | Artarlieo A Ford | FTS International Services, LLC | |
| 20-50815-CSS (U.S. Bankruptcy Court for the District of Delaware) | Baker Hughes Oilfield Operations, LLC; GE Oil & Gas Pressure Control, LP; Nabors Drilling Technologies USA, Inc.; Schlumberger Technology Corporation; Smith International, Inc. | FTS International Services, LLC | Alamo Pressure Pumping, LLC; Applied Us Energy, Inc.; Eastham Drilling, Inc. D/B/A Big E Drilling Co.; Briley Trucking, Ltd.; BT Midstream, LLC; Buckeye, Inc.; CSP-Permian, LLC; Durachem Production Services, LLC; Fluid Delivery Solutions, LLC; Hadco Services, Inc.; Halliburton Energy Services, Inc.; Integrity Bio-Chemicals, LLC; JW Powerline, LLC; L.F. Manufacturing, Inc.; McClinton Energy Group, L.L.C.; Meyer Energy Services, LLC; Motley Asset Management, LLC; National Oilwell DHT, L.P.; National Oilwell Varco, L.P.; New Tech Global Ventures, LLC; Nexus II Directional Drilling Specialists Ltd.; Pate Trucking Co., LLC; Petro Amigos Supply Inc.; Prime Time Water Supply LLC; ProPetro Services, Inc.; Enercorp Industrial Solutions, LLC F/K/A Pro Oil and Gas Services, LLC; Qwik Pipe, Inc.; Ranger Energy Services LLC; RDL Transportation Inc.; Reservoir Data Systems LLC; Right Light Services, LLC; Rodan Transport (U.S.A.), Ltd. D/B/A Aveda Transportation and Energy Services; Rusco Operating, LLC; Rwls LLC D/B/A Renegade Services; Select Energy Services, LLC; Sierra Hamilton LLC; Spraberry Production Services, LLC; Summit Casing Equipment, LLC; Tanmar Rentals LLC; Tetra Technologies, Inc. D/B/A Swiftwater Energy Services; Texas Fueling Services, Inc.; Trans-Tex Cementing Services, LLC; Trans-Tex Dyno Services, LLC; Triple Play Transport, LLC; Vaughn Energy Services, Inc.; WB Supply LLC; WS Energy Services, LLC; Wilbanks Trucking Services, LLC |

| Case Number | Litigation Party | FTSI Party | Other Defendants |
|---|---|---|---|
| 2018-199 (123rd District Court, Panola County, TX) | Brandon Morris | FTS International Services, LLC | |
| 4:20-ap-03416 (U.S. Bankruptcy Court for the Southern District of Texas) | Carol Glock, Individually and on behalf of all others similarly situated | FTS International, Inc. | Michael J Doss; Lance Turner; Goh Yong Siang; Boon Simm; Domenic J Dell'Osso, Jr.; Bryan J Lemmerman; Ong Tion Sin; Carol J Johnson; Maju Investments (Mauritius) PTE LTD; CHK Energy Holdings, Inc.; Chesapeake Energy Corporation; Credit Suisse Securities (USAA) LLC; and Morgan Stanley & Co., LLC |
| 4:20-ap-03416 (U.S. Bankruptcy Court for the Southern District of Texas) | CHK Energy Holdings, Inc. | FTS International, Inc. | |
| EEOC 451-2015-01970 (EEOC Charge) | Clifton Wiggins | FTS International Services, LLC | |
| EEOC 31A-2020-00104 (EEOC Charge) | Clinton McClain | FTS International Manufacturing, LLC | |
| 4:20-ap-03413 (U.S. Bankruptcy Court for the Southern District of Texas) | Covia Holdings Corporation | FTS International Services, LLC | |
| EEOC 450-2015-00482 (EEOC Charge) | Crystal Lewis | FTS International Services, LLC | |
| 17-1030 (Court of Common Pleas of Lycoming County, PA) | John Burns | FTS International Services, LLC | |
| 19-04-22876-CVR (143rd Judicial District Court, Reeves County, TX) | Jonathan Castillo | FTS International, Inc. and FTS International Services, LLC | Natural Resources, Inc. and Energy Services Group, Inc. and Timothy Lightfoot |
| 3-6600-19-118 (U.S. Department of Labor - OSHA) | Jordon Miller | FTS International Services, LLC | |
| 12-19-00040-CV (12th Court of Appeals District, Tyler, TX) | Joshua Patterson | FTS International Manufacturing, LLC | Bill Hebert Acker |

| Case Number | Litigation Party | FTSI Party | Other Defendants |
|---|---|---|---|
| C-159892 (26th Judicial District Court, Parish of Bossier, LA) | Latieria Edwards, Individually and on behalf of her minor child, Lacey Hall | FTS International Services, LLC | Matthew Gammell and Ace American Insurance Company |
| 1:19-CV-00202 (U.S. District Court for the Northern District of West Virginia) | Norfolk Southern Railway Company | FTS International Services, LLC | Matriculated Services, LLC; Adrian Holding, LLC |
| T3116 (Texas Commission on Environmental Quality) | Odessa District property | FTS International Services, LLC | |
| EEOC 451-2020-03440 (EEOC Charge) | Robert M Sanchez | FTS International Services, LLC | |

*DRAFT*

## Exhibit E

**Rejected Executory Contracts and Unexpired Leases Schedule**

Neither the exclusion nor the inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease Schedule, nor anything contained in the Plan or this Plan Supplement, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, reserve all rights in connection therewith.

*DRAFT*

| Debtor Party | Non-Debtor Entity | Date of Agreement | Description of Agreement |
|---|---|---|---|
| FTS International, Inc.; FTS International Services, LLC; FTS International Logistics, LLC; FTS International Manufacturing, LLC | Fairmount Minerals, Ltd. | July 23, 2013 | Asset Purchase Agreement |
| FTS International Services, LLC; FTS International Logistics, LLC; FTS International Manufacturing, LLC | FML Sand, LLC; FML Resin, LLC; FML Terminal Logistics, LLC; FML Alabama Resin, Inc. | September 5, 2013 | Assignment and Assumption Agreement |
| FTS International Services, LLC | FML Sand, LLC | September 5, 2013 | Option Agreement |
| FTS International Services, LLC | Technisand, Inc.; Fairmount Minerals, Ltd. | September 5, 2013 | Supply Agreement |
| FTS International Services, LLC (together with affiliates, if any, that from time to time perform services hereunder) | Fairmount Minerals, Ltd. | September 5, 2013 | Transition Services Agreement |
| FTS International Services, LLC | FML Sand, LLC | September 5, 2013 | Monahans TX Lease |
| FTS International Services, LLC | FML Sand, LLC | September 5, 2013 | Williamsport PA Lease |
| FTS International Services, LLC | FML Terminal Logistics LLC | September __, 2013 (intentionally left blank) | Transload Facility Lease – PA |
| FTS International Services, LLC | FML Terminal Logistics LLC | September 5, 2013 | Transload Facility Lease – TX |
| FTS International Services, LLC | FML Terminal Logistics LLC | September __, 2013 (intentionally left blank) | Transload Facility Lease – OK |
| FTS International Services, LLC | Fairmount Minerals, Ltd. | September 5, 2013 | Voca Escrow Agreement |

| FTS International Services, LLC; FTS International Logistics, LLC; FTS International Manufacturing, LLC | Fairmount Minerals, Ltd. | September 5, 2013 | Updated Disclosure Schedules pursuant to Asset Purchase Agreement |
|---|---|---|---|
| FTS International Services, LLC | Fairmount Minerals, Ltd. | August 7, 2013 | First Amendment to the Asset Purchase Agreement |
| FTS International Services, LLC | Fairmount Minerals, Ltd. | September 5, 2013 | Second Amendment to the Asset Purchase Agreement |
| FTS International Services, LLC | FML Sand, LLC; FML Resin, LLC | September 5, 2013 | Registered Trademark Assignment Agreement (US) |
| FTS International Services, LLC | FML Sand, LLC; FML Resin, LLC | September 5, 2015 | Registered Trademark Assignment Agreement (International) |
| FTS International Services, LLC | Fairmount Minerals, Ltd. | September 5, 2013 | Side Letter re Trempealeau County General Warranty Deed |
| FTS International Services, LLC | Covia Holdings Corporation | May 3, 2019 | Amended and Restated Supply Agreement[1] |

---

[1] The Debtors assert that the Amended and Restated Supply Agreement was validly terminated prepetition. The Debtors filed the *Debtors' Motion to Reject Supply Agreement* (the "Rejection Motion") [Docket No. 167]. Pursuant to the Rejection Motion, the Debtors seek to reject the Amended and Restated Supply Agreement, to the extent that the Court determines that the Supply Agreement was not validly terminated prepetition. Accordingly, the Amended and Rested Supply Agreement is listed here only out of an abundance of caution.

*DRAFT*

**Exhibit F**

**New Revolving Exit Facility Indicative Term Sheet**

This **Exhibit F** and the Plan Supplement remain subject to continuing negotiations among the Debtors, the applicable counterparties, and the Consenting Creditors. The respective rights of the Debtors and the Consenting Creditors are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement and any of the documents and designations contained herein at any time before the Effective Date of the Plan or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court, and filing of the forms of the documents set forth in this Plan Supplement (including this **Exhibit F**) shall not be deemed as acceptance of such document by any party to the Restructuring Support Agreement or a waiver of any of the rights of any such party under the Restructuring Support Agreement, the Plan, the Bankruptcy Code or otherwise.

## SUMMARY OF INDICATIVE TERMS OF THE NEW REVOLVING EXIT FACILITY[1]

**Borrowers**
FTS International, Inc., and all other subsidiaries designated as Borrowers, which contribute assets to the borrowing base

**Guarantors**
Existing Guarantors

**Facility Size**
Up to $50,000,000

**Maturity Date**
3 years from the Effective Date

**Collateral**
First lien on certain of the Debtors' assets, including, among other things, accounts receivable, inventory, deposit accounts, and intellectual property

**Financial Covenants**
A "springing" fixed charge coverage ratio, based on an excess availability threshold to be agreed

**Other Terms**
Usual and customary terms and covenants for ABL facilities of this type

---

[1]   These terms are illustrative only and may differ materially based on the ultimate terms agreed to by the Debtors, the Consenting Creditors, and the eventual lender(s) under the New Revolving Exit Facility.

**<u>Exhibit G</u>**

**Warrants**

*DRAFT*

**WARRANT AGREEMENT**

**between**

**FTS INTERNATIONAL, INC.**

**and**

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,**
**as Warrant Agent**

**Dated as of [●], 2020**

**Tranche 1 Warrants to Purchase Common Stock**

**TABLE OF CONTENTS**

**Page**

1.    Definitions....................................................................................................................1

2.    Warrant Certificates .....................................................................................................7
      2.1    Original Issuance of Warrants ...........................................................................7
      2.2    Form of Warrant Certificates.............................................................................7
      2.3    Execution and Delivery of Warrant Certificates...............................................7
      2.4    Global Warrant Certificates ..............................................................................8
      2.5    Withholding and Reporting Requirements .......................................................10

3.    Exercise and Expiration of Warrants .........................................................................11
      3.1    Right to Acquire Common Stock Upon Exercise...............................................11
      3.2    Exercise and Expiration of Warrants .................................................................11
      3.3    Application of Funds upon Exercise of Warrants...............................................13
      3.4    Payment of Taxes...............................................................................................13
      3.5    Cancellation of Warrant Certificates .................................................................13
      3.6    Shares Issuable...................................................................................................13
      3.7    Cashless Exercise...............................................................................................14
      3.8    Cost Basis Information .......................................................................................14

4.    Dissolution, Liquidation or Winding up .....................................................................14

5.    Adjustments .................................................................................................................15
      5.1    Adjustments .......................................................................................................15
      5.2    Fractional Interest ..............................................................................................21
      5.3    No Other Adjustments .......................................................................................21

6.    Loss or Mutilation.......................................................................................................21

7.    Reservation and Authorization of Common Stock ......................................................22

8.    Warrant Transfer Books..............................................................................................23

9.    Warrant Holders..........................................................................................................24
      9.1    No Voting or Dividend Rights............................................................................24
      9.2    Rights of Action.................................................................................................25
      9.3    Treatment of Holders of Warrant Certificates ..................................................25

10.   Concerning the Warrant Agent ...................................................................................25
      10.1   Rights and Duties of the Warrant Agent.............................................................25
      10.2   Limitation of Liability........................................................................................28
      10.3   Indemnification. .................................................................................................28
      10.4   Right to Consult Counsel ...................................................................................29
      10.5   Compensation and Reimbursement ...................................................................29
      10.6   Warrant Agent May Hold Company Securities..................................................29
      10.7   Resignation and Removal; Appointment of Successor........................................29
      10.8   Appointment of Countersigning Agent...............................................................30

11.   Notices .........................................................................................................................32

i

11.1   Notices Generally................................................................................32

11.2   Required Notices to Holders...............................................................33

12.    Inspection.............................................................................................33

13.    Amendments.........................................................................................33

14.    Waivers................................................................................................34

15.    Successor to Company.........................................................................35

16.    Headings...............................................................................................35

17.    Counterparts.........................................................................................35

18.    Severability..........................................................................................35

19.    No Redemption.....................................................................................35

20.    Persons Benefiting...............................................................................35

21.    Applicable Law....................................................................................36

22.    Entire Agreement.................................................................................36

23.    Force Majeure......................................................................................36

24.    Further Assurances...............................................................................36

25.    Confidentiality.....................................................................................36

**EXHIBITS**

Exhibit A          Form of Tranche 1 Warrant Certificate

**WARRANT AGREEMENT**

This Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "***Agreement***"), dated as of [●], 2020, between FTS International, Inc., a Delaware corporation (and any Successor Company (as defined below) that becomes successor to the Company in accordance with Section 15) (the "***Company***") and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "***Warrant Agent***," which term includes any successor thereto permitted under this Agreement). Capitalized terms that are used in this Agreement shall have the meanings set forth in Section 1 hereof.

**WITNESSETH THAT:**

**WHEREAS**, pursuant to the terms and conditions of the *Joint Prepacked Chapter 11 Plan of Reorganization of FTS International, Inc. and Its Debtor Affiliates*, Docket No. 16 of Case No. 20-34622 (DRJ) (the "***Plan***") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), the Company proposes to issue and deliver Warrants (as defined below) to purchase up to an aggregate of [●] shares of its Common Stock (as defined below), subject to adjustment as provided herein, and the Warrant Certificates (as defined below) evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to purchase one (1) share of the Common Stock, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the shares of Common Stock issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) afforded by Section 1145 of the Bankruptcy Code, and of any applicable state securities or "blue sky" laws; and

**WHEREAS**, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW THEREFORE,** in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

1.      **Definitions**.

"***Action***" has the meaning set forth in Section 11.2(c).

"***Adjustment Events***" has the meaning set forth in Section 5.1.

"***Affiliate***" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Agent Members*" has the meaning set forth in Section 2.4(b).

"*Agreement*" has the meaning set forth in the preamble hereto.

"*Applicable Procedures*" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"*Appropriate Officer*" means (i) the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Treasurer or Secretary or any Vice President of the Company or (ii) any other person designated as such by the Board of Directors from time to time.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Black-Scholes Value*" means, with respect to any Sale Cash Only Transaction, the value of a Warrant on the date of consummation of such Sale Cash Only Transaction, as determined by the Company reasonably and in good faith, calculated using a Black-Scholes option pricing model with the following inputs: (a) a risk free rate equal to the annual yield on the U.S. Treasury security with a maturity date closest to the Scheduled Expiration Date as the yield on that security exists as of such date, (b) a term equal to the time in years (rounded to the nearest 1/1000th of a year) from such date until the Scheduled Expiration Date, (c) an assumed volatility of 42.5%, (d) an underlying security price for Common Stock of the value of the consideration received in such Sale Cash Only Transaction in respect of each outstanding share of Common Stock and (e) the aggregate number of shares of Common Stock for which such Warrant is then exercisable.

"*Black-Scholes Value Limit*" for each Warrant means, with respect to any Sale Cash Only Transaction, the quotient obtained by dividing (i) $10,000,000 by (ii) the aggregate number of Warrants outstanding as of the date of this Agreement.

"*Board of Directors*" means either the board of directors of the Company or any duly authorized committee of that board.

"*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"*Cash Consideration*" means, with respect to any Sale Cash Only Transaction or Sale Cash and Securities Transaction, the consideration constituting cash and property other than securities.

"*Commission*" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"*Common Stock*" means, subject to the provisions of Section 5.1(f), the common stock, par value $0.01 per share, of the Company.

"*Company*" means the company identified in the preamble hereto.

2

"*Company Order*" means a written request or order signed in the name of the Company by an Appropriate Officer and delivered to the Warrant Agent.

"*Constituent Person*" has the meaning set forth in the definition of "Qualifying Person."

"*Corporate Agency Office*" has the meaning set forth in Section 8.

"*Countersigning Agent*" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.

"*Current Market Price*" means on any date:

(i)      if the reference is to the per share price of Common Stock on any date herein specified and if on such date the Common Stock is listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States:

(A)      for the purpose of any computation under this Agreement (except under Section 5.2), the average of the Quoted Prices for the 30 consecutive Trading Days ending on such date or, if such date is not a Trading Day, on the next preceding Trading Day; or

(B)      for the purposes of any computation under Section 5.2, the Quoted Price for such date or, if such date is not a Trading Day, for the next preceding Trading Day; or

(ii)      if the reference is to the per share price of Common Stock on any date herein specified and if on such date the Common Stock is not listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States, the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for one (1) share of the Common Stock as determined as of such date by the Treasurer or Chief Financial Officer of the Company in good faith, whose determination shall be final and conclusive and evidenced by a certificate of such officer delivered to the Warrant Agent.

For the avoidance of doubt, no appraisal of any Person or third-party (other than the Treasurer or Chief Financial Officer of the Company as further described in clause (ii) above) shall be permitted or required to determine the Current Market Price.

"*Definitive Warrant Certificate*" means a Warrant Certificate registered in the name of the Holder thereof that does not bear the Global Warrant Legend and that does not have a "Schedule of Decreases in Warrants" attached thereto.

"*Depositary*" means DTC and its successors as depositary hereunder.

"*DTC*" means The Depository Trust Company.

3

"***Exchange Act***" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"***Exercise Date***" has the meaning set forth in Section 3.2(f).

"***Exercise Form***" has the meaning set forth in Section 3.2(c).

"***Exercise Period***" means the period from and including the Original Issue Date to and including the Expiration Date.

"***Exercise Price***" means the exercise price per share of Common Stock, initially set at $[●][1], subject to adjustment as provided in Section 5.1.

"***Expiration Date***" means the earlier to occur of (x) the Scheduled Expiration Date, (y) the date of consummation of a Sale Cash Only Transaction and (z) a Winding Up.

"***Fair Market Value***" means on any date, as to any non-cash property that is receivable upon conversion, change or exchange of shares of Common Stock in any Sale Transaction: the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for such security or other non-cash property, as determined as of such date by the Board of Directors in good faith, whose determination shall be evidenced by a resolution of the Board of Directors filed with the Warrant Agent with written notice of such determination given by the Company to the Holders in accordance with Section 11.2.

"***Funds***" has the meaning set forth in Section 3.3.

"***Global Warrant Certificate***" means a Warrant Certificate deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases in Warrants" attached thereto.

"***Global Warrant Legend***" means the legend set forth in Section 2.4(a).

"***Holder***" means any Person in whose name at the time any Warrant Certificate is registered upon the Warrant Register and, when used with respect to any Warrant Certificate, the Person in whose name such Warrant Certificate is registered in the Warrant Register.

"***Non-Surviving Transaction***" has the meaning set forth in Section 5.1(f).

"***Original Issue Date***" means [●], 2020, the date on which Warrants are originally issued under this Agreement.

"***outstanding***" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement, as adjusted

---

[1] [**NTD**: Exercise Price to be determined. Tranche 1 Warrants to equal 10.0% of incremental New FTS Equity at a strike price of $462.5 million (subject to dilution by the MIP).]

pursuant to Section 5.1, except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired, terminated or become void pursuant to Section 3.2(b) or Section 4 and (iii) Warrants that have otherwise been acquired by the Company; provided, however, that in determining whether the Holders of the requisite amount of the outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Company or any Subsidiary of the Company or any of their respective employees shall be disregarded and deemed not to be outstanding.

"***Person***" means any individual, corporation, limited liability company, partnership, joint venture, trust, association, joint-stock company, business trust or any other entity, unincorporated organization or government or any agency or political subdivision thereof.

"***Plan***" has the meaning set forth in the recitals hereto.

"***Qualifying Person***" means, with respect to any Transaction, a holder of Common Stock that is not (i) an employee of the Company or of any Subsidiary thereof, (ii) a Person with which the Company has consolidated or into which the Company has merged or which has merged into the Company or to which a sale or transfer of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole) was made, as the case may be (any Person described in this clause (ii), a "***Constituent Person***") or (iii) an Affiliate of a Constituent Person.

"***Quoted Price***" means, on any Trading Day, with respect to the Common Stock, the VWAP of the Common Stock on such Trading Day on the principal U.S. national securities exchange on which the Common Stock is listed or admitted to trading or, if the Common Stock is not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Company for that purpose (or, if such volume-weighted average price or the average of the closing bid and asked price is unavailable, the fair market value of one Common Share on such Trading Day reasonably determined by the Company for such purpose).

"***Recipient***" has the meaning set forth in Section 3.2(e).

"****Redomestication Transaction***" means a Non-Surviving Transaction in which all of the property received upon such Non-Surviving Transaction by each holder of shares of Common Stock consists solely of securities, cash in lieu of fractional shares and other de minimis consideration, and the holders of the shares of Common Stock immediately prior to such Non-Surviving Transaction are the only holders of the equity securities of the Successor Company immediately after the consummation of such Non-Surviving Transaction.

"***Required Warrant Holders***" means Holders of Warrant Certificates evidencing a majority of the then-outstanding Warrants.

"***Sale Cash and Securities Transaction***" means a Sale Transaction that is neither (i) a Sale Cash Only Transaction nor (ii) a Sale Securities Only Transaction.

"*Sale Cash Only Transaction*" means a Sale Transaction in which all of the consideration receivable upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole)) of such Sale Transaction consists of cash and/or property other than securities.

"*Sale Securities Only Transaction*" means a Sale Transaction in which all of the property received upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole)) of such Sale Transaction consists solely of securities.

"*Sale Transaction*" means any Transaction that does not constitute a Redomestication Transaction (i.e. either (i) a Sale Cash and Securities Transaction, (ii) a Sale Cash Only Transaction or (iii) a Sale Securities Only Transaction).

"*Scheduled Expiration Date*" means [●], 2023 (the third (3rd) anniversary of the Original Issue Date) or, if not a Business Day, then the next Business Day thereafter.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Subsidiary*" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"*Substituted Property*" has the meaning set forth in Section 5.1(f)(y)(i)(A).

"*Substituted Securities*" has the meaning set forth in Section 5.1(f)(y)(i)(B).

"*Successor Company*" has the meaning set forth in Section 15.

"*Surviving Transaction*" has the meaning set forth in Section 5.1(f).

"*Trading Day*" means a day on which trading in the Common Stock (or other applicable security) generally occurs on the principal exchange or market on which the Common Stock (or other applicable security) is then listed or traded; provided that if the Common Stock (or other applicable security) is not so listed or traded, "Trading Day" means a Business Day..

"*Transaction*" has the meaning set forth in Section 5.1(f).

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"*Warrant Agent*" has the meaning set forth in the preamble hereto.

"*Warrant Certificates*" means those certain warrant certificates evidencing the Warrants, substantially in the form set forth in Exhibit A attached hereto, which, for the avoidance of doubt, are either Global Warrant Certificates or Definitive Warrant Certificates.

"*Warrant Register*" has the meaning set forth in Section 8.

"*Warrants*" means those certain warrants to purchase initially up to an aggregate of [●] shares of Common Stock at the Exercise Price, subject to adjustment pursuant to Section 5, issued hereunder.

"*Winding Up*" has the meaning set forth in Section 4.

**2.     Warrant Certificates**.

2.1     Original Issuance of Warrants.

(a)     On the Original Issue Date, one or more Global Warrant Certificates evidencing the Warrants shall be executed by the Company and delivered to the Warrant Agent for countersignature, and the Warrant Agent shall, upon receipt of a Company Order and at the direction of the Company set forth therein, countersign (by manual or electronic signature) and deliver such Global Warrant Certificates for original issuance to the Depositary, or its custodian, for crediting to the accounts of its participants for the benefit of the holders of beneficial interests in the Warrants on the Original Issue Date pursuant to the Applicable Procedures of the Depositary on the Original Issue Date.

(b)     Except as set forth in Section 2.4, Section 3.2(d), Section 6 and Section 8, the Global Warrant Certificates delivered to the Depositary (or a nominee thereof) on the Original Issue Date shall be the only Warrant Certificates issued or outstanding under this Agreement.

(c)     Each Warrant Certificate shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one (1) share of Common Stock, subject to adjustment as provided in Section 5.

2.2     Form of Warrant Certificates.

The Warrant Certificates evidencing the Warrants shall be in registered form only and substantially in the form set forth in Exhibit A hereto, shall be dated the date on which countersigned by the Warrant Agent, shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact the Warrant Agent's rights, duties or immunities) as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.

7

2.3     Execution and Delivery of Warrant Certificates.

(a)     Warrant Certificates evidencing the Warrants which may be countersigned and delivered under this Agreement are limited to Warrant Certificates evidencing [●] Warrants except for Warrant Certificates countersigned and delivered upon registration of transfer of, or in exchange for, or in lieu of, one or more previously countersigned Warrant Certificates pursuant to Section 2.4, Section 3.2(d), Section 6 and Section 8.

(b)     The Warrant Agent is hereby authorized to countersign (by manual or electronic signature) and deliver Warrant Certificates as required by Section 2.1 or by Section 2.4, Section 3.2(d), Section 6 or Section 8.

(c)     The Warrant Certificates shall be executed in the corporate name and on behalf of the Company by the Chairman of the Board of Directors, the Chief Executive Officer or any one of the Vice Presidents of the Company under corporate seal reproduced thereon (if the Company has a corporate seal) and attested to by the Secretary or one of the Assistant Secretaries of the Company, either manually or by electronic signature printed thereon.  The Warrant Certificates shall be countersigned, either by manual or electronic signature, by the Warrant Agent and shall not be valid for any purpose unless so countersigned.  In case any officer of the Company whose signature shall have been placed upon any of the Warrant Certificates shall cease to be such officer of the Company before countersignature by the Warrant Agent and issue and delivery thereof, such Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by such person as, at the actual date of the execution of such Warrant Certificate, shall be a proper officer of the Company, although at the date of the execution of this Agreement any such person was not such officer.

2.4     Global Warrant Certificates.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in Exhibit A hereto (the "***Global Warrant Legend***").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("***Agent Members***") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Warrants, and as the sole Holder of such Warrant Certificate, for all purposes.  Accordingly, any such Agent Member's beneficial interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the

8

Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any holder of a beneficial interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a beneficial interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in Section 2.4(e).  Interests of beneficial owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures of the Depositary.

(e)     A Global Warrant Certificate registered in the name of the Depositary or its nominee shall be exchanged for Definitive Warrant Certificates only if the Depositary (i) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (ii) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, each Global Warrant Certificate registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation in accordance with Section 3.5, and the Company shall execute, and the Warrant Agent shall countersign and deliver, upon the Company's instruction, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant Certificate, Definitive Warrant Certificates evidencing, in the aggregate, the number of Warrants theretofore represented by such Global Warrant Certificate with respect to such beneficial owner's respective beneficial interest.  Any Definitive Warrant Certificate delivered in exchange for an interest in a Global Warrant Certificate pursuant to this Section 2.4(e) shall not bear the Global Warrant Legend.  Interests in any Global Warrant Certificate may not be exchanged for Definitive Warrant Certificates other than as provided in this Section 2.4(e).

(f)     The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant Certificate is entitled to take under this Agreement or such Global Warrant Certificate.

(g)     Each Global Warrant Certificate will evidence such of the outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of outstanding Warrants from time to time endorsed thereon and that the aggregate number of outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations.  Any endorsement of a Global Warrant Certificate to reflect the amount of any

9

decrease in the aggregate number of outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(h)     The Company initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(i)     Every Warrant Certificate authenticated and delivered in exchange for, or in lieu of, a Global Warrant Certificate or any portion thereof, pursuant to this Section 2.4 or Section 8 or Section 10, shall be authenticated and delivered in the form of, and shall be, a Global Warrant Certificate, and a Global Warrant Certificate may not be exchanged for a Definitive Warrant Certificate, in each case, other than as provided in Section 2.4(e).  Whenever any provision herein refers to issuance by the Company and countersignature and delivery by the Warrant Agent of a new Warrant Certificate in exchange for the portion of a surrendered Warrant Certificate that has not been exercised, in lieu of the surrender of any Global Warrant Certificate and the issuance, countersignature and delivery of a new Global Warrant Certificate in exchange therefor, the Warrant Agent, on the Company's instruction, may endorse such Global Warrant Certificate to reflect a reduction in the number of Warrants evidenced thereby in the amount of Warrants so evidenced that have been so exercised.

(j)     Beneficial interests in any Global Warrant Certificate may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Global Warrant Certificate in accordance with the Applicable Procedures.

(k)     At such time as all Warrants evidenced by a particular Global Warrant Certificate have been exercised or expired, terminated or become void in whole and not in part, such Global Warrant Certificate shall, if not in custody of the Warrant Agent, be surrendered to or retained by the Warrant Agent for cancellation in accordance with Section 3.5.

2.5     Withholding and Reporting Requirements.  The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions or other situations requiring withholding under applicable law, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision to the contrary, the Company will be authorized to (a) take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, (c) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes, (d) require reimbursement from any Holder to the extent any withholding is required in the absence of any distribution or (e) establish any other mechanisms the Company believes are reasonable and appropriate, including requiring Holders to submit appropriate tax and withholding certifications (such as IRS Forms W-9 and the appropriate IRS Forms W-8, as applicable) that are necessary to comply with this Section 2.5.

**3.**     **Exercise and Expiration of Warrants**.

3.1     <u>Right to Acquire Common Stock Upon Exercise</u>.  Each Warrant Certificate duly issued by the Company shall, when countersigned by the Warrant Agent, entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to acquire from the Company, for each Warrant evidenced thereby, one (1) share of Common Stock at the Exercise Price, subject to adjustment as provided in this Agreement.  The Exercise Price, and the number of shares of Common Stock obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by <u>Section 5.1</u>.

3.2     <u>Exercise and Expiration of Warrants</u>.

(a)     <u>Exercise of Warrants</u>.  Subject to and upon compliance with the terms and conditions set forth herein, a Holder of a Warrant Certificate may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the shares of Common Stock obtainable thereunder.

(b)     <u>Expiration of Warrants</u>.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. No further action of any Person (including by, or on behalf of, any Holder, the Company, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this <u>Section 3.2(b)</u>.

(c)     <u>Method of Exercise</u>.  In order for a Holder to exercise all or any of the Warrants represented by a Warrant Certificate, the Holder thereof must (i) (x) in the case of a Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in <u>Exhibit A</u> hereto (an "***Exercise Form***"), setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Definitive Warrant Certificate, at the Corporate Agency Office, (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof as well as any such other information the Warrant Agent may reasonably require, and (II) surrender to the Warrant Agent the Definitive Warrant Certificate evidencing such Warrants; and (ii) pay to the Warrant Agent an amount equal to all taxes required to be paid by the Holder, if any, pursuant to <u>Section 3.4</u> prior to, or concurrently with, exercise of such Warrants by wire transfer in immediately available funds, to the account (No. [●]; ABA No. [●]; Reference: FTS International, Inc.; Attention: [●]) of the Company at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Company and such Holder in accordance with <u>Section 11.1(b)</u>.  For the avoidance of doubt, any exercise of any Warrant shall be "net share settled" pursuant to a cashless exercise as described in <u>Section 3.7</u>.

(d)     <u>Partial Exercise</u>.  If fewer than all the Warrants represented by a Warrant Certificate are exercised, (i) in the case of exercise of Warrants evidenced by a Global Warrant

11

Certificate, the Warrant Agent shall cause the custodian of the Depositary to endorse the "Schedule of Decreases in Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Definitive Warrant Certificate, such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and for the number of Warrants which were not exercised shall be executed by the Company. The Warrant Agent shall countersign the new Definitive Warrant Certificate, registered in such name or names, subject to the provisions of Section 8 regarding registration of transfer and payment of governmental charges in respect thereof, as may be directed in writing by the Holder, and shall deliver the new Definitive Warrant Certificate to the Person or Persons in whose name such new Definitive Warrant Certificate is so registered. The Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Definitive Warrant Certificates duly executed on behalf of the Company for such purpose.

(e)      Issuance of Common Stock. Upon due exercise of Warrants evidenced by any Warrant Certificate in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Company the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit any funds, in accordance with Section 3.3, received as instructed in writing by the Company and advise the Company by telephone at the end of such day of the amount of funds so deposited to its account. The Company shall thereupon, as promptly as practicable, and in any event within two (2) Business Days after the Exercise Date referred to below, (i) determine the number of shares of Common Stock issuable pursuant to exercise of such Warrants pursuant to Section 3.7 and (ii) (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient (as defined below) in accordance with the Applicable Procedures shares of Common Stock in book-entry form to be so held through the facilities of DTC in an amount equal to, or, if the Common Stock may not then be held in book-entry form through the facilities of DTC, duly executed certificates representing, or (y) in the case of exercise of Warrants evidenced by Definitive Warrant Certificates, execute or cause to be executed and deliver or cause to be delivered to the Recipient (as defined below) a certificate or certificates representing, in case of (x) and (y), the aggregate number of shares of Common Stock issuable upon such exercise (based upon the aggregate number of Warrants so exercised), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Company so elects pursuant to Section 5.2. The shares of Common Stock in book-entry form or certificate or certificates representing shares of Common Stock so delivered shall be, to the extent possible, in such denomination or denominations as such Holder shall request in the applicable Exercise Form and shall be registered or otherwise placed in the name of, and delivered to, the Holder or, subject to Section 3.4, such other Person as shall be designated by the Holder in such Exercise Form (the Holder or such other Person being referred to herein as the "*Recipient*").

(f)      Time of Exercise. Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "*Exercise Date*"). At such time, subject to Section **Error! Reference source not found.**, shares of Common Stock in book-entry form or the certificates for the shares of Common Stock issuable upon such exercise as provided in Section 3.2(e) shall be deemed to have been issued and, for all purposes of this Agreement, the Recipient shall, as between such Person and the Company, be deemed to be and entitled to all rights of the holder of record of such Common Stock.

3.3     Application of Funds upon Exercise of Warrants.  All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services (the "**Funds**") shall be held by the Warrant Agent in its name as agent for the Company.  Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Company, any holder or any other party.  The Warrant Agent shall forward funds received for Warrant exercises in a given month by the fifth (5th) Business Day of the following month by wire transfer to an account designated by the Company or as the Warrant Agent otherwise may be directed in writing by the Company.

3.4     Payment of Taxes.  The Company shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants pursuant hereto.  The Company or the Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of shares of Common Stock in book-entry form or any certificates for shares of Common Stock or payment of cash or other property to any Recipient other than, in the case of the Company, the Holder of the Warrant Certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares of Common Stock in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (b) it has been established to the Company's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.

3.5     Cancellation of Warrant Certificates.  Any Definitive Warrant Certificate surrendered for exercise shall, if surrendered to the Company, be delivered to the Warrant Agent.  All Warrant Certificates surrendered or delivered to or received by the Warrant Agent for cancellation pursuant to this Section 3.5 or Section 2.4(e) or Section 2.4(j) shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company.  The Warrant Agent shall destroy any such cancelled Warrant Certificates and deliver its certificate of destruction to the Company, unless the Company shall otherwise direct in writing.

3.6     Shares Issuable.  The number of shares of Common Stock "obtainable upon exercise" of Warrants at any time shall be the number of shares of Common Stock into which such Warrants are then exercisable.  The Company will confirm the number of shares obtainable upon exercise if so requested by the Warrant Agent.  The number of shares of Common Stock "into which each Warrant is exercisable" shall be one (1) share, subject to adjustment as provided in Section 5.1.

3.7     Cashless Exercise.  Notwithstanding any provisions herein to the contrary, upon exercise of any Warrants the Company shall issue to the Holder a number of shares of Common Stock with respect to the Warrants being exercised computed using the following formula:

$$X = (Y (A-B)) \div A$$

Where $X =$     the number of shares of Common Stock to be issued to the Holder in respect of the Warrants being exercised;

$Y =$     the number of shares of Common Stock into which the Warrants being exercised by the Holder are exercisable (on the Exercise Date);

$A =$     the Current Market Price of one (1) share of Common Stock (on the Exercise Date); and

$B =$     the applicable Exercise Price (as adjusted through and including the Exercise Date).

If the foregoing calculation results in a negative number, then no Common Stock shall be issued upon exercise pursuant to this Section 3.

The Company shall calculate and transmit to the Warrant Agent the number of shares of Common Stock to be issued on such exercise, and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

3.8     Cost Basis Information. The Company hereby instructs the Warrant Agent to record cost basis for newly issued shares at the time of exercise in accordance with instructions by the Company.  If the Company does not provide such cost basis information to the Warrant Agent, as outlined above, then the Warrant Agent will treat those shares issued hereunder as uncovered securities or the equivalent, and each holder of such shares will need to obtain such cost basis information from the Company.

**4.     Dissolution, Liquidation or Winding up**.

Unless Section 5.1(f) applies, if, on or prior to the Expiration Date, the Company (or any other Person controlling the Company) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "***Winding Up***") of the affairs of the Company, the Company shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in Section 11.1(b)  at least ten (10) business days prior to the date on which such Winding Up is expected to become effective or, if earlier, the record date for such Winding Up.  Such notice shall also specify the date as of which the holders of record of the shares of Common Stock shall be entitled to exchange their shares for securities, money or other property deliverable upon such Winding Up, on which date (i) each Holder of Warrant Certificates shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of the shares of Common Stock into which the Warrants were exercisable

immediately prior to such Winding Up (net of the then applicable Exercise Price) and (ii) the rights to exercise the Warrants shall terminate.

Unless Section 5.1(f) applies, in case of any such Winding Up of the Company, the Company shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with a Company Order as to the distribution thereof. After receipt of such deposit from the Company and after receipt of surrendered Warrant Certificates evidencing Warrants, and any such other necessary information as the Warrant Agent may reasonably require, the Warrant Agent shall make payment in the appropriate amount to such Person or Persons as it may be directed in writing by the Holder surrendering such Warrant Certificate. The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this Section 4 except such as it shall agree with the Company to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Company or on its behalf with the Warrant Agent pursuant to this Section 4 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with Section 3.3 hereof; provided, that, moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

**5.      Adjustments**.

5.1      Adjustments. In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 5.1 (the "***Adjustment Events***") and the number of shares of Common Stock obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 5.1.

(a)      Subdivisions and Combinations. In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, effect a subdivision (by any stock split or otherwise) of the outstanding shares of Common Stock into a greater number of shares of Common Stock (other than (x) a subdivision upon a Transaction to which Section 5.1(f) applies or (y) a stock split effected by means of a stock dividend or distribution to which Section 5.1(b) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased. Conversely, if the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination, subdivision or otherwise) of the outstanding shares of Common Stock into a smaller number of shares of Common Stock (other than a combination upon a Transaction to which Section 5.1(f) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be proportionately increased. Any adjustment under this Section 5.1(a) shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b)      Common Stock Dividends. In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and

15

unexpired in whole or in part, make or issue to the holders of its Common Stock a dividend or distribution payable in shares of Common Stock (other than a dividend or distribution upon a Transaction to which Section 5.1(f) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date for the determination of the holders of shares of Common Stock entitled to receive such dividend or distribution shall be decreased by multiplying such Exercise Price by a fraction (not to be greater than 1):

> (i) the numerator of which shall be the total number of shares of Common Stock issued and outstanding at the close of business on such date for determination; and

> (ii) the denominator of which shall be the total number of shares of Common Stock issued and outstanding at the close of business on such date for determination plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Any adjustment under this Section 5.1(b) shall become effective immediately after the opening of business on the day after the date the holders of shares of Common Stock receive such dividend or distribution.

> (c) Reclassifications. A reclassification of the Common Stock (other than any such reclassification in connection with a Transaction to which Section 5.1(f) applies) into shares of Common Stock and shares of any other class of stock shall be deemed, if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, a subdivision or combination, as the case may be, of the outstanding shares of Common Stock for the purposes and within the meaning of Section 5.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 5.1(a)).

> (d) Other Provisions Applicable to Adjustments. The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of shares of Common Stock into which each Warrant is exercisable under this Section 5.1:

> (i) Treasury Stock. The dividend or distribution of any issued shares of Common Stock owned or held by or for the account of the Company shall be deemed a dividend or distribution of shares of Common Stock for purposes of Section 5.1(b). The Company shall not make or issue any dividend or distribution on shares of Common Stock held in the treasury of the Company. For the purposes of Section 5.1(b), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company.

> (ii) When Adjustments Are to be Made. The adjustments required by Section 5.1(a), Section 5.1(b) and Section 5.1(c) shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least

16

1%.  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 5.1(a), Section 5.1(b) and Section 5.1(c) and not previously made, would result in such minimum adjustment.

(iii)    Fractional Interests.  In computing adjustments under Section 5.1, fractional interests in Common Stock shall be taken into account to the nearest one-thousandth (1/1000) of a share.

(e)    Adjustment to Shares Obtainable Upon Exercise.  Whenever the Exercise Price is adjusted as provided in this Section 5.1, the number of shares of Common Stock into which a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of shares of Common Stock into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(f)    Changes in Common Stock.  In case at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, the Company shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting: (1) a merger of the Company into, a direct or indirect sale of all of the Company's equity to, or a consolidation of the Company with, any other Person in which the previously outstanding shares of Common Stock shall be (either directly or upon subsequent liquidation) cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing, or a sale or transfer of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole) (a "***Non-Surviving Transaction***"), or (2) any merger of another Person into the Company in which the previously outstanding shares of Common Stock shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Company or other property (including cash) or any combination of the foregoing (a "***Surviving Transaction***"; any Non-Surviving Transaction or Surviving Transaction being herein called a "***Transaction***") then:

(x)    if such Transaction constitutes a Sale Cash Only Transaction, then, at the effective time of the consummation of such Sale Cash Only Transaction, any Warrants not exercised prior to the closing of such Sale Cash Only Transaction shall automatically expire, terminate and become void and the Company shall deliver or cause to be delivered to the Holder of each Warrant Certificate evidencing any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the lesser of (I) the Black-Scholes Value Limit for each such Warrant and (II) the Black-Scholes Value of each such Warrant as of the date of the consummation of the Sale Cash Only Transaction; or

(y)    if such Transaction is a Redomestication Transaction, a Sale Cash and Securities Transaction or a Sale Securities Only Transaction:

(i)    as a condition to the consummation of such Transaction, the Company shall (or, in the case of any Non-Surviving Transaction, the Company shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:

17

(A)      if such Transaction constitutes a Redomestication Transaction, any Warrant that remains outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the securities or other property ("*Substituted Property*") that would have been receivable upon such Transaction by a Qualifying Person holding the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and for an aggregate Exercise Price for such Warrant equal to the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per share of Common Stock immediately prior to such Transaction;

(B)      if such Transaction constitutes a Sale Securities Only Transaction, any Warrant that remains outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the securities ("*Substituted Securities*") that would have been receivable upon the consummation of such Transaction by Qualifying Person  holding the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and for an aggregate Exercise Price for such Warrant equal to the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per share of Common Stock immediately prior to such Transaction; or

(C)      if such Transaction constitutes a Sale Cash and Securities Transaction, any Warrant that remains outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon such Transaction by a Qualifying Person holding the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and for an aggregate Exercise Price for such Warrant equal to the product of (I) the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per share of Common Stock immediately prior to such time as decreased (to an amount not less than the lesser of the par value of the Common Stock as of the date hereof and such par value as of such date of determination) by an amount equal to the Fair Market Value of the Cash Consideration per share of Common Stock receivable in such Sale Cash and Securities Transaction by a Qualifying Person; provided further, however, that if, as the result of rights of election, the kind or amount of

18

securities, cash and other property receivable upon such Sale Cash and Securities Transaction is not the same for each share of Common Stock held by a Qualifying Person, then, for the purposes of this Section 5.1(f)(y)(i)(C), the kind and amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction for each share of Common Stock held by a Qualifying Person shall be deemed to be the pro rata kind and amount per share of Common Stock (determined on the basis of all outstanding shares of Common Stock held by Qualifying Persons) actually received by all Qualifying Persons.

(ii)　　except as otherwise specified in Section 5.1(f)(y)(i), the rights and obligations of the Company (or, in the event of a Non-Surviving Transaction such other Person) and the Holders in respect of Substituted Property or Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Company and Holders in respect of Common Stock hereunder as set forth in Section 3.1 hereof;

(iii)　　with respect to any Transaction, such written instrument under clause (i) above shall provide for adjustments which, for events subsequent to the effective date of such written instrument shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 5. The above provisions of this Section 5.1(f) shall similarly apply to successive Transactions.

(g)　　Compliance with Governmental Requirements.  Before taking any action that would cause an adjustment reducing the Exercise Price below the then par value of any of the shares of Common Stock into which the Warrants are exercisable, the Company will take any corporate action that may be necessary in order that the Company may validly and legally issue fully paid and non-assessable shares of such Common Stock at such adjusted Exercise Price.

(h)　　Optional Tax Adjustment.  The Company may at its option, at any time during the term of the Warrants, increase the number of shares of Common Stock into which each Warrant is exercisable, or decrease the Exercise Price, in addition to those changes required by Section 5.1(a), Section 5.1(b) and Section 5.1(c) as deemed advisable by the Board of Directors of the Company, in order that any event treated for federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients.

(i)　　Warrants Deemed Exercisable.  For purposes solely of this Section 5, the number of shares of Common Stock which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time.

(j)　　Notice of Adjustment.  Upon the occurrence of each adjustment of the Exercise Price or the number of shares of Common Stock into which a Warrant is exercisable pursuant to this Section 5.1, the Company at its expense shall promptly:

(i)　　compute such adjustment in accordance with the terms hereof;

19

(ii)      after such adjustment becomes effective, deliver to all Holders, in accordance with Section 11.1(b) and Section 11.2, a notice setting forth such adjustment and showing in detail the facts upon which such adjustment is based; and

(iii)      deliver to the Warrant Agent a certificate of the Treasurer or Chief Financial Officer of the Company setting forth the Exercise Price and the number of shares of Common Stock into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Stock was determined).  As provided in Section 10, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time at the Corporate Agency Office (as defined below) to any Holder desiring an inspection thereof during reasonable business hours.  The Company hereby agrees that it will provide the Holders and the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 5.1. The Company further agrees that it will provide to the Holders and Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any Section of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

(k)      Statement on Warrant Certificates.  Irrespective of any adjustment in the Exercise Price or amount or kind of shares into which the Warrants are exercisable, Warrant Certificates theretofore or thereafter issued may continue to express the same Exercise Price initially applicable or amount or kind of shares initially issuable upon exercise of the Warrants evidenced thereby pursuant to this Agreement.

5.2      Fractional Interest.  The Company shall not be required upon the exercise of any Warrant to issue any fractional shares of Common Stock, but may, in lieu of issuing any fractional shares of Common Stock make an adjustment therefore in cash on the basis of the Current Market Price per share of Common Stock on the date of such exercise.  If Warrant Certificates evidencing more than one Warrant shall be presented for exercise at the same time by the same Holder, the number of full shares of Common Stock which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of the Warrant Certificates, expressly waive their right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock if such amount of cash is paid in lieu thereof.  The Company shall provide an initial funding of one thousand dollars ($1,000) for the purpose of issuing cash in lieu of fractional shares.  From time to time thereafter, Warrant Agent may request additional funding to cover fractional payments.  The Warrant Agent shall have no obligation to make fractional payments unless the Company shall have provided the necessary funds to pay in full all amounts due and payable with respect thereto.

5.3      No Other Adjustments.  Except in accordance with Section 5.1, the applicable Exercise Price and the number of shares of Common Stock obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing, including, without limitation:

20

(i)      upon the issuance of any other securities by the Company on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of shares of Common Stock upon the exercise of any such securities;

(ii)      upon the issuance of any shares of Common Stock or other securities or any payments pursuant to any management or other equity incentive plan of the Company;

(iii)      upon the issuance of any shares of Common Stock pursuant to the exercise of the Warrants; or

(iv)      upon the issuance of any shares of Common Stock or other securities of the Company in connection with a business acquisition transaction.

**6.      Loss or Mutilation**.

If (a) any mutilated Warrant Certificate is surrendered to the Warrant Agent or (b) both (i) there shall be delivered to the Company and the Warrant Agent (A) a claim by a Holder as to the destruction, loss or wrongful taking of any Warrant Certificate of such Holder and a request thereby for a new replacement Warrant Certificate, and (B) such open penalty surety bond and/or indemnity bond as may be required by them to save each of them and any agent of either of them harmless and (ii) such other reasonable requirements as may be imposed by the Company or Warrant Agent as permitted by Section 8-405 of the Uniform Commercial Code have been satisfied, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a "protected purchaser" within the meaning of Section 8-405 of the Uniform Commercial Code or bona fide purchaser, the Company shall execute and upon its written request the Warrant Agent shall countersign and deliver to the registered Holder of the lost, wrongfully taken, destroyed or mutilated Warrant Certificate, in exchange therefore or in lieu thereof, a new Warrant Certificate of the same tenor and for a like aggregate number of Warrants. At the written request of such registered Holder, the new Warrant Certificate so issued shall be retained by the Warrant Agent as having been surrendered for exercise, in lieu of delivery thereof to such Holder, and shall be deemed for purposes of Section 3.2(c)(y)(II) to have been surrendered for exercise on the date the conditions specified in clauses (A) or (B) of the preceding sentence were first satisfied.  The Warrant Agent may, at its option, issue replacement Warrants for mutilated certificates upon presentation thereof without such indemnity.

Upon the issuance of any new Warrant Certificate under this Section 6, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the fees and expenses of the Warrant Agent and of counsel to the Company) in connection therewith.

Every new Warrant Certificate executed and delivered pursuant to this Section 6 in lieu of any lost, wrongfully taken or destroyed Warrant Certificate shall constitute an additional contractual obligation of the Company, whether or not the allegedly lost, wrongfully taken or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.

21

The provisions of this <u>Section 6</u> are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, wrongfully taken, or destroyed Warrant Certificates.

**7.    Reservation and Authorization of Common Stock**.

The Company covenants that, for the duration of the Exercise Period, the Company will at all times reserve and keep available, from its authorized and unissued shares of Common Stock solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of shares of Common Stock and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all outstanding Warrants for cash.  The Company further covenants that it shall, from time to time, take all steps necessary to increase the authorized number of shares of its Common Stock to such number of shares as shall be sufficient to deliver all shares of Common Stock deliverable upon exercise in full of all outstanding Warrants, if at any time the authorized number of shares of Common Stock remaining unissued would otherwise be insufficient to allow delivery of all the shares of Common Stock then deliverable upon the exercise in full of all outstanding Warrants.  The Company covenants that all shares of Common Stock issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously or as otherwise specified herein).  The Company shall take all such actions as may be necessary to ensure that all such shares of Common Stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).  The Company covenants that all shares of Common Stock will, at all times that Warrants are exercisable, be duly approved for listing subject to official notice of issuance on each securities exchange, if any, on which the Common Stock is then listed.  The Company covenants that the stock certificates, if any, issued to evidence any shares of Common Stock issued upon exercise of Warrants will comply with the Delaware General Corporation Law and any other applicable law.

The Company hereby authorizes and directs its current and future transfer agents for the Common Stock at all times to reserve stock certificates for such number of authorized shares, to the extent as, and if, required.  The Company will supply such transfer agents with duly executed stock certificates for such purposes, to the extent as, and if, required.

The Company hereby represents and warrants to the Holders that the issuance of the Warrants and the issuance of shares of Common Stock upon exercise thereof in accordance with the terms hereof will not constitute a breach of, or a default under, any other material agreements to which the Company is a party on the date hereof.

**8.    Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrant Certificates may be surrendered for registration of transfer or exchange and where Warrant Certificates may be surrendered for exercise of Warrants

22

evidenced thereby, which office is 150 Royall Street, Canton, MA 02021, Attn: Corporate Actions on the Original Issue Date.  The Warrant Agent will give prompt written notice to all Holders of Warrant Certificates of any change in the location of such office.

The Warrants shall be issued in registered form only.  The Company shall cause to be kept at the Corporate Agency Office a warrant register (the "*Warrant Register*") in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrants and of transfers or exchanges of Warrants as herein provided.

Upon surrender for registration of transfer of any Warrant Certificate at the Corporate Agency Office, the Company shall execute, and the Warrant Agent shall countersign and deliver, in the name of the designated transferee or transferees, one or more new Warrant Certificates evidencing a like aggregate number of Warrants.

At the option of the Holder, Warrant Certificates may be exchanged at the Corporate Agency Office upon payment of the charges hereinafter provided for other Warrant Certificates evidencing a like aggregate number of Warrants.  Whenever any Warrant Certificates are so surrendered for exchange, the Company shall execute, and the Warrant Agent shall countersign and deliver, the Warrant Certificates of the same tenor and evidencing the same number of Warrants as evidenced by the Warrant Certificates surrendered by the Holder making the exchange.

All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such registration of transfer or exchange.

Every Warrant Certificate surrendered for registration of transfer or exchange shall (if so required by the Company or the Warrant Agent) be: (i) duly endorsed and containing a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, or (ii) be accompanied by a written instrument of transfer in form satisfactory to the Company and the Warrant Agent, duly executed by the Holder thereof or his attorney duly authorized in writing, also containing a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.  In addition, in connection with any transfer, the Warrant Agent or the Company may request a written opinion of counsel reasonably acceptable to the Company or the Warrant Agent, as applicable, that such transfer is in compliance with the Securities Act and application state securities or "blue sky" laws.  Further, to effect such transfer or exchange, all other necessary information or documentation shall be provided as the Warrant Agent may reasonably request.

No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.  The Warrant Agent shall not have any duty or obligation to take

23

any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

The Warrant Agent shall, upon request and at the expense of the Company from time to time, deliver to the Company such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the shares of Common Stock as the Company may request. The Warrant Agent shall, upon reasonable advance notice, also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

**9.**     **Warrant Holders**.

9.1     No Voting or Dividend Rights.

(a)     No Holder of a Warrant Certificate evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Stock of the Company, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Stock or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Stock.

(b)     The consent of any Holder of a Warrant Certificate shall not be required with respect to any action or proceeding of the Company.

(c)     Except as provided in Section 4, no Holder of a Warrant Certificate, by reason of the ownership or possession of a Warrant or the Warrant Certificate representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)     No Holder of a Warrant Certificate shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrant Certificate held by such Holder.

9.2     Rights of Action. All rights of action against the Company in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrant Certificates, and any Holder of any Warrant Certificate, without the consent of the Warrant Agent or the Holder of any other Warrant Certificate, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

24

9.3     Treatment of Holders of Warrant Certificates.  Every Holder, by virtue of accepting a Warrant Certificate, consents and agrees with the Company, with the Warrant Agent and with every subsequent holder of such Warrant Certificate that, prior to due presentment of such Warrant Certificate for registration of transfer, the Company and the Warrant Agent may treat the Person in whose name the Warrant Certificate is registered as the owner thereof for all purposes and as the Person entitled to exercise the rights granted under the Warrants, and neither the Company, the Warrant Agent nor any agent thereof shall be affected by any notice to the contrary.

10.     **Concerning the Warrant Agent**.  Sections 10.1, 10.2, 10.3, 10.4, 10.5, 10.6 and 10.8 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

10.1     Rights and Duties of the Warrant Agent.

(a)     The Company hereby appoints the Warrant Agent to act as agent of the Company as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Company and agrees to perform that agency upon the express terms and conditions set forth in this Agreement and in the Warrant Certificates or as the Company and the Warrant Agent may hereafter agree in writing, by all of which the Company and the Holders of Warrant Certificates, by their acceptance thereof, shall be bound; provided, however, that the terms and conditions contained in the Warrant Certificates are subject to and governed by this Agreement or any other terms and conditions hereafter agreed to by the Company and the Warrant Agent in writing.

(b)     The Warrant Agent shall not, by countersigning Warrant Certificates or by any other act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants or the Warrant Certificates (except as to its countersignature thereon), (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Company made in such certificates that the Warrant Agent receives; or (v) any of the statements of act or recitals contained in this Agreement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 5 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 5 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to Section 5 hereof or to comply with any of the covenants of the Company contained in Section 5 hereof.

25

(c)    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(d)    The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Company, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(e)    The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

(f)    The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as Warrant Agent hereunder.

(g)    The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)    The Warrant Agent shall not be liable or responsible for any failure of the Company to comply with any of its obligations relating to any registration statement filed with the Commission or this Agreement, including without limitation obligations under applicable regulation or law.

(i)    The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrants authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)    The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(k)     The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing.

(l)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company, the holder of any Warrant Certificate or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(m)     <u>Reliance on Company Statement</u>.  Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement, and will be indemnified and held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

(n)     The Warrant Agent shall have no responsibility to the Company, any Holders of Warrants or any holders of shares of Common Stock for interest or earnings on any moneys held by the Warrant Agent pursuant to this Agreement.

(o)     The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the Warrant Agent, unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Company, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in <u>Section 11.1</u> hereof, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

10.2    <u>Limitation of Liability</u>.

(a)     The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages

under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)     Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant.  The Warrant Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of Section 5 hereof or responsible for the manner, method, or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any shares of Common Stock shall, when issued, be valid and fully paid and non-assessable.

10.3    Indemnification.

(a)     The Company covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, however, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Company.

(b)     Instructions.  From time to time, the Company may provide the Warrant Agent with instructions, by Company Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of the Company for instruction, and may consult with legal counsel for the Warrant Agent or the Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement.  Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken, suffered or omitted to be taken by Warrant Agent in reliance upon any Company instructions or upon the advice or opinion of such counsel.  Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Company.

10.4    Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel.

28

10.5    Compensation and Reimbursement.  The Company agrees to pay the Warrant Agent from time to time compensation for all reasonable fees and expenses relating to its services hereunder as the Company and the Warrant Agent may agree in writing from time to time and to reimburse the Warrant Agent for all of its reasonable expenses and disbursements, including reasonable counsel fees and other disbursements incurred in connection with the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

10.6    Warrant Agent May Hold Company Securities.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.  Nothing herein shall preclude the Warrant Agent or any Countersigning Agent from acting in any other capacity for the Company or for any other legal entity.

10.7    Resignation and Removal; Appointment of Successor.

(a)    The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction)) after giving 30 days' prior written notice to the Company.  The Company may remove the Warrant Agent upon 30 days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Company, cause notice to be given in accordance with Section 11.1(b) to the Company of said notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal, the Company shall appoint in writing a new Warrant Agent.  If the Company shall fail to make such appointment within a period of 30 calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant Certificate may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  Any new Warrant Agent, whether appointed by the Company or by such a court, shall be a Person (other than a natural person) doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Warrant Agent, and having a combined capital and surplus (together with its Affiliates) of not less than $25,000,000. The combined capital and surplus of such new Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Warrant Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority.  After acceptance in writing of such appointment by the new Warrant Agent, it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective

29

date of any such appointment, the Company shall file notice thereof with the resigning or removed Warrant Agent.  Failure to give any notice provided for in this Section 10.7(a), however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)     Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act; provided, however, that such Person would be eligible for appointment as successor to the Warrant Agent under the provisions of Section 10.7(a).  Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate at such Holder's last address as shown on the Warrant Register.

10.8     Appointment of Countersigning Agent.

(a)     The Warrant Agent may, but is not required to, appoint a Countersigning Agent or Agents which shall be authorized to act on behalf of the Warrant Agent to countersign Warrant Certificates issued upon original issue and upon exchange, registration of transfer or pursuant to Section 6, and Warrant Certificates so countersigned shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  Wherever reference is made in this Agreement to the countersignature and delivery of Warrant Certificates by the Warrant Agent or to Warrant Certificates countersigned by the Warrant Agent, such reference shall be deemed to include countersignature and delivery on behalf of the Warrant Agent by a Countersigning Agent and Warrant Certificates countersigned by a Countersigning Agent.  Each Countersigning Agent shall be acceptable to the Company and shall at the time of appointment be a Person (other than a natural person) doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Countersigning Agent, and having a combined capital and surplus (together with its Affiliates) of not less than $25,000,000. The combined capital and surplus of such new Countersigning Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Countersigning Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority.

(b)     Any Person into which a Countersigning Agent may be merged or any Person resulting from any consolidation to which such Countersigning Agent shall be a party, shall be a successor Countersigning Agent without any further act; provided, that, such Person would be eligible for appointment as a new Countersigning Agent under the provisions of Section 10.8(a), without the execution or filing of any paper or any further act on the part of the Warrant Agent or the Countersigning Agent.  Any such successor Countersigning Agent shall promptly cause notice of its succession as Countersigning Agent to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate at such Holder's last address as shown on the Warrant Register.

(c)     A Countersigning Agent may resign at any time by giving 30 days' prior written notice thereof to the Warrant Agent and to the Company.  The Warrant Agent may at any

time terminate the agency of a Countersigning Agent by giving 30 days' prior written notice thereof to such Countersigning Agent and to the Company.

(d)     The Warrant Agent agrees to pay to each Countersigning Agent from time to time reasonable compensation for its services under this Section 10.8 and the Warrant Agent shall be entitled to be reimbursed for such payments, subject to the provisions of Section 10.5.

(e)     Any Countersigning Agent shall have the same rights and immunities as those of the Warrant Agent set forth in this Section 10 and in this Agreement.

**11.     Notices**.

11.1     Notices Generally.

(a)     Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Company or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing, sent via trackable or first-class mail or delivered by hand (including by courier service) as follows:

if to the Company, to:

FTS International, Inc.
777 Main Street, Suite 2900
Fort Worth, Texas 76102
Attention:     Legal Department

if to the Warrant Agent, to:

[American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attention:     Corporate Actions][2]

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 11.1(a).

All such communications shall be effective when sent.

Any Person that telecopies any communication hereunder to any Person shall, on the same date as such telecopy is transmitted, also send, by trackable or first class mail, postage prepaid and addressed to such Person as specified above, an original copy of the communication so transmitted.

---

[2] [**NTD**: AST to confirm notice information.]

(b)      Except as set forth in the last paragraph of this Section 11.1(b), where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

11.2    Required Notices to Holders.  In the event the Company shall:

(a)      take any action that would result in an adjustment to the Exercise Price and/or the number of shares of Common Stock issuable upon exercise of a Warrant pursuant to Section 5.1;

(b)      consummate any Winding Up; or

(c)      consummate any Transaction (each of (a), (b) or (c), an "*Action*");

then, in each such case, the Company shall deliver to the Warrant Agent and, unless the Company has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Company shall deliver (or cause to be delivered ) to each Holder of a Warrant Certificate, in accordance with Section 11.1(b) hereof, a written notice of such Action, including, in the case of an action pursuant to Section 11.2(a), the information required under Section 5.1(j)(ii).  Such notice shall be given promptly after taking such Action.

If at any time the Company shall cancel any of the Actions for which notice has been given under this Section 11.2 prior to the consummation thereof, the Company shall give each Holder prompt notice of such cancellation in accordance with Section 11.1(b), unless the Company has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions.  For the avoidance of doubt, if at any time the Company shall cancel any of the Actions for which notice has been given under this Section 11.2 prior to the consummation thereof, the Company shall give Warrant Agent prompt notice of such cancellation in accordance with Section 11.1(b).

**12.    Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant Certificate. The Warrant Agent may require any such Holder to submit its Warrant Certificate for inspection by the Warrant Agent.

**13.    Amendments**.

(a)    This Agreement may be amended by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

(b)    Notwithstanding the foregoing, the Company and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrant Certificates, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Company in this Agreement further covenants and agreements of the Company thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Company in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrant Certificates hereunder in any material respect.

(c)    The consent of each Holder of any Warrant Certificate evidencing any warrants affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of shares of Common Stock receivable upon exercise of Warrants, in each case other than as provided in Section 5.1; (ii) cause the Expiration Date to be changed to an earlier date; or (iii) modify the provisions contained in Section 5.1 in a manner adverse to the Holders of Warrant Certificates generally with respect to their Warrants.

(d)    The Warrant Agent shall join with the Company in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights, duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided, that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 13.  Upon execution and delivery of any amendment pursuant to this Section 13, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(e)    Promptly after the execution by the Company and the Warrant Agent of any such amendment, unless the Company has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses such adjustment, the Company shall give notice to the Holders of Warrant Certificates, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 11.1(b).  Any failure of the Company to

33

mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

**14.    Waivers**.

The Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Required Warrant Holders, as required pursuant to Section 13.

**15.    Successor to Company**.

So long as Warrants remain outstanding, the Company will not enter into any Transaction unless the acquirer (a "*Successor Company*") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Company to be performed and observed and shall have provided for exercise rights in accordance with Section 5.1(f)(i).  Upon the consummation of such Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if such acquirer had been named as the Company herein.

**16.    Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**17.    Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.  A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

**18.    Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; further, provided, that, if such excluded provision shall affect the rights, immunities, liabilities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon written notice to the Company.

34

**19.     No Redemption**.

The Warrants shall not be subject to redemption by the Company or any other Person; provided, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

**20.     Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Company, the Warrant Agent and the Holders from time to time.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Company, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder, by acceptance of a Warrant Certificate, agrees to all of the terms and provisions of this Agreement applicable thereto.

**21.     Applicable Law**.

THIS AGREEMENT, EACH WARRANT CERTIFICATE ISSUED HEREUNDER, EACH WARRANT EVIDENCED THEREBY AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ANY RULES OR PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

**22.     Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

**23.     Force Majeure.**

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, pandemics, epidemics or civil unrest.

**24.     Further Assurances.**

The Company shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and

35

assurances as may be reasonably required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

**25.      Confidentiality.**

The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions) or to such party's advisors (including its attorneys).  However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

FTS INTERNATIONAL, INC., a Delaware corporation

By: _____

Name:    Jennifer Keefe
Title:    Senior Vice President, General Counsel & Chief Compliance Officer


AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent

By: _____

Name:
Title:

[*Signature Page to Warrant Agreement*]

EXHIBIT A

**[FACE OF TRANCHE 1 WARRANT CERTIFICATE][3]**

**FTS INTERNATIONAL, INC.**

**WARRANT CERTIFICATE**

**EVIDENCING**

**TRANCHE 1 WARRANTS TO PURCHASE COMMON STOCK**

[FACE]

No. [___]                                                          CUSIP No. [●]

[UNLESS THIS GLOBAL TRANCHE 1 WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO FTS INTERNATIONAL, INC. (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL TRANCHE 1 WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.][4]

---

[3] To be removed in the versions of the Definitive Warrant Certificates printed in multiple copies for use by the Warrant Agent in preparing Definitive Warrants Certificates for issuance and delivery from time to time to holders.

[4] Include only on Global Warrant Certificate.

# FTS INTERNATIONAL, INC.

No. [__]                                                    [__,__,___] Warrants
                                                                CUSIP No. [●]

THIS CERTIFIES THAT, for value received, [_____], or registered assigns, is the registered owner of the number of Warrants to purchase Common Stock of FTS International. Inc., a Delaware corporation (the "*Company*", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "*Warrant Agreement*"), dated as of [●], 2020, between the Company and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement)) specified above [or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto][5], and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to purchase from the Company one (1) share of Common Stock of the Company for each Warrant evidenced hereby, at the purchase price of $[●] per share (as adjusted from time to time, the "*Exercise Price*"), payable in full at the time of purchase, the number of shares of Common Stock into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 5 of the Warrant Agreement.

All shares of Common Stock issuable by the Company upon the exercise of Warrants shall, upon such issuance, be duly and validly issued and fully paid and nonassessable.  The Company shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants.  The Company or Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of shares of Common Stock in book-entry form or any certificates for shares of Common Stock or payment of cash or other property to any Recipient other than the Holder of the Warrant Certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares of Common Stock in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Company, (b) it has been established to the Company's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid or (c) the receipt of any other such information as set forth in the Warrant Agreement.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by, in the case of a Global Warrant Certificate, by delivery to the Warrant Agent of the Exercise Form on the

---

[5] Include only on Global Warrant Certificate.

reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with the Applicable Procedures in respect of the exercise of such Warrants or, in the case of a Definitive Warrant Certificate, by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and surrendering this Warrant Certificate to the Warrant Agent at its office maintained for such purpose (the "*Corporate Agency Office*").

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Warrant Certificate has been countersigned by the Warrant Agent by manual or electronic signature of an authorized officer on behalf of the Warrant Agent, this Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed under its corporate seal.

Dated: [_____ __], 20[__]

<br>

FTS INTERNATIONAL, INC.

[SEAL]                                                        By: _____
                                                                                      [Title]

ATTEST:

Countersigned:

American Stock Transfer & Trust                              [                    ]
Company, LLC, as Warrant Agent
                                         OR

By: _____        By: _____
                Authorized Agent                                as Countersigning Agent

                                                             By: _____
                                                                          Authorized Officer

A-3

**Reverse of Tranche 1 Warrant Certificate**

**FTS INTERNATIONAL, INC.**

**TRANCHE 1 WARRANT CERTIFICATE**

**EVIDENCING**

**TRANCHE 1 WARRANTS TO PURCHASE COMMON STOCK**

The warrants evidenced hereby are one of a duly authorized issue of warrants of the Company designated as its Tranche 1 Warrants to Purchase Common Stock (the "*Warrants*"), limited in aggregate number to [●] issued under and in accordance with the Warrant Agreement, dated as of [●], 2020 (the "*Warrant Agreement*"), between the Company and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Warrant Agent, the Holders of Warrant Certificates and the owners of the Warrants evidenced thereby and of the terms upon which the Warrant Certificates are, and are to be, countersigned and delivered.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides that, in addition to certain adjustments to the number of shares of Common Stock into which a Warrant is exercisable and the Exercise Price required to be made in certain circumstances, (x) in the case of any Transaction that is a Redomestication Transaction, a Sale Cash and Securities Transaction or a Sale Securities Only Transaction, the Company shall (or, in the case of any Non-Surviving Transaction, the Company shall cause the other Person involved in such Transaction to) execute and deliver to the Warrant Agent a written instrument providing that (i) the Warrants evidenced hereby, if then outstanding, will be exercisable thereafter, during the period the Warrants evidenced hereby shall be exercisable as specified herein, only into the Substituted Securities (in the case of any Sale Securities Only Transaction or Sale Cash and Securities Transaction) or Substituted Property (in the case of any Transaction (other than a Sale Transaction)), subject to certain limitations if the Warrants have no value, that would have been receivable upon such Transaction by a Qualifying Person holding the number of shares of Common Stock that would have been issued upon exercise of such Warrant if such Warrant had been exercised in full immediately prior to such Transaction (upon certain assumptions specified in the Warrant Agreement); (ii) in the case of any Sale Cash and Securities Transaction, the aggregate Exercise Price for any Warrant will be reduced in respect of the Fair Market Value of the Cash Consideration receivable upon such Transaction by a Qualifying Person; and (iii) the rights and obligations of the Company (or, in the case of any Non-Surviving Transaction, the other Person involved in such Transaction) and the holders in respect of Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Company and Holders in respect of Common Stock, and (y) in the case of any Sale Cash Only Transaction, the Company shall make certain specified payments of cash and the Warrants will expire or become immediately exercisable, in each case as more fully specified in the Warrant Agreement.

A-4

Except as provided in the Warrant Agreement, all outstanding Warrants shall expire and all rights of the Holders of Warrant Certificates evidencing such Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date. The "***Expiration Date***" shall mean the earlier to occur of (x) [●], 2023 (the third (3rd) anniversary of the Original Issue Date) or, if not a Business Day, then the next Business Day thereafter; (y) the date of consummation of any Sale Cash Only Transaction; and (z) a Winding Up.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be issued by the Company in the name or upon the written order of the Holder of this Warrant Certificate upon the cancellation hereof.

The Warrant Certificates are issuable only in registered form in denominations of whole numbers of Warrants. Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Warrant Certificate may be exchanged for Warrant Certificates in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Warrant Certificates issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Warrant Certificate. The Company shall cause to be kept at the office or offices of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates. No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.

Prior to due presentment of this Warrant Certificate for registration of transfer, the Company, the Warrant Agent and any agent of the Company or the Warrant Agent may treat the Person in whose name this Warrant Certificate is registered as the owner hereof for all purposes, and neither the Company, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders of Warrant Certificates under the Warrant Agreement at any time by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Warrant Certificate evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Stock of the Company, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Company; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Company; (iii) except as provided with respect to a Winding Up of the Company, no such Holder, by reason of the ownership or possession of a Warrant or the Warrant Certificate representing the same, shall have any right to receive any cash

A-5

dividends, stock dividends, allotments or rights or other distributions (except as specifically provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Company prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant or Warrant Certificate held by such Holder.

This Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of New York.

All terms used in this Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement. In the event of any conflict between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

<u>Exercise Form for Tranche 1 Warrant Certificate</u>

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions


Re: FTS International, Inc. Warrant Agreement, dated as of [●], 2020

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement, the undersigned registered Holder of this Warrant Certificate hereby irrevocably elects to exercise _____ Warrants evidenced by this Warrant Certificate.

The undersigned requests that the shares of Common Stock issuable upon exercise be in fully registered form in such denominations and registered in such names and delivered, together with any other property receivable upon exercise, in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if this Warrant Certificate is a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if this Warrant Certificate is a Definitive Warrant Certificate, the undersigned requests that a new Definitive Warrant Certificate representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

A-7

Dated: _____         Name: _____

_____                        (Please Print)
         (Insert Social Security or Other
         Identifying Number of Holder)         Address: _____

                                                        _____

                                                        _____
                                                                    Signature
                                               (Signature must conform in all respects to name
                                               of Holder as specified on the face of this Warrant
                                               Certificate and must bear a signature guarantee
                                               by a bank, trust company or member firm of a
                                               U.S. national securities exchange.)

Signature Guaranteed:

        Instructions (i) as to denominations and names of Common Stock issuable upon exercise
and as to delivery of such securities and any other property issuable upon exercise and (ii) if
applicable, as to Definitive Warrant Certificates evidencing unexercised Warrants:

<u>Assignment</u>

    (Form of Assignment To Be Executed If Holder Desires To Transfer Warrant Certificate)

        FOR VALUE RECEIVED _____ hereby sells, assigns
and transfers unto

                                Please insert social security or
                                other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Warrant Certificate and does hereby irrevocably constitute
and appoint _____ Attorney, to transfer said Warrant Certificate on the books of
the within-named Company with full power of substitution in the premises.

Dated: _____         Signature _____

                                               (Signature must conform in all respects to name
                                               of Holder as specified on the face of this Warrant
                                               Certificate and must bear a signature guarantee by
                                               a bank, trust company or member firm of a U.S.
                                               national securities exchange.)

A-8

**[SCHEDULE A**

**SCHEDULE OF DECREASES IN WARRANTS**

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory][6] |
| --- | --- | --- | --- |

---

[6] Include only on Global Warrant Certificate.

A-9

**<u>Exhibit H</u>**

**Management Incentive Plan Documents**

[TO COME]